**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**(CHARLESTON DIVISION)**

| | |
|---|---|
| David Oppenheimer, | ) CASE NO: 2:19-cv-3590-RMG |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Michael C. Scarafile, Patricia R. Scarafile, | ) **Memorandum in Support of Defendants'** |
| Sheila Glover Romanosky, and | ) **Motion for Summary Judgment** |
| O'Shaughnessy Real Estate, Inc., d/b/a | ) |
| Carolina One Real Estate, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Defendants Michael C. Scarafile, Patricia R. Scarafile, Sheila Glover Romanosky, and

O'Shaughnessy Real Estate, Inc., d/b/a Carolina One Real Estate ("CORE") (collectively,

"Carolina One"), by and through undersigned counsel, hereby submit their *Memorandum in*

*Support of Defendants' Motion for Summary Judgment*.

## I.     NATURE OF THE CASE

Plaintiff David Oppenheimer has alleged that Carolina One has copied two of his

copyright-protected photographs and used them in a real estate listing that advertised the sale of

a boat slip. The listing was created in November 2016, and the boat slip sold for $85,000 on June

13, 2017. ECF 13 at 1-2. Plaintiff has brought the following five claims in his Complaint [ECF

No. 1]: (I) Non-Willful Copyright Infringement; (II) Reckless/Willful Copyright Infringement;

(III) Vicarious Copyright Infringement; (IV) Contributory Copyright Infringement; and

(V) Violations of the Digital Millennium Copyright Act. In its Answer [ECF 20], Carolina One

stated several affirmative defenses, including Estoppel, Copyright Misuse, and Unclean Hands.

## II.    FACTUAL BACKGROUND

Plaintiff David Oppenheimer serves as a photographer, specializing in concert, travel, and real estate photography. *See* ECF 1 at ¶¶ 8-9. He publishes his photographs online, on his own Performance Impressions website (https://www.performanceimpressions.com/), on retail websites such as FineArtAmerica® (https://fineartamerica.com/profiles/1-performance-impressions), Pixels.com (https://pixels.com/profiles/1-performance-impressions), and on social media such as Facebook® (https://www.facebook.com/tolerskja/posts/696933490689956), PhotoShelter® (https://get.photoshelter.com/lattice/user/live/U0000gwfdn05kNrA/images/popular), and Flickr® (https://www.flickr.com/photos/livemusicphotography/albums/72157635671279976) (*collectively*, "the Websites"). *See* **Exhibit 7**; **Exhibit 23**; **Exhibit 25**; **Exhibit 26**; **Exhibit 27**; *and* **Exhibit 33**. Plaintiff also ran an Internet marketing company offering search engine optimization services to others for two or three years. *See* **Exhibit 4** at 20:8 – 21:3.

Plaintiff has long been the victim of alleged copyright infringement. In 2012, he stated in a comment responding to an article published online,



**Exhibit 11** at 4 (*Exhibit 24 for Plaintiff's Deposition*); *see also*, **Exhibit 4** at 35:19 – 37:5. Plaintiff has also filed over 130 lawsuits for copyright infringement in the last decade. *See*

**Exhibit 4** at 176:17 – 177:1; *see also*, ECF 41-1 at 17 *and* ECF 48 at 2 & n. 3. The Court noted there are 17 such cases filed by Plaintiff in this District. *See* ECF 81 at 37:10-17; *see also,* ECF 48 at 2 & n. 3. Many of those over 130 suits have been against real estate agents and brokers. *See, e.g.*, **Exhibit 20** at 30:20 – 31:24 (Oppenheimer v. Griffin Hearing Transcript; *Exhibit 50 for Plaintiff's Deposition*); *see also*, **Exhibit 4** at 181:18-22. In addition to suits filed, Plaintiff has made and settled numerous other accusations of copyright infringement without filing suit. *See, e.g.*, Oppenheimer v. Scarafile, 2:21-mc-517-RMG Dkts. 13-1 at 21:5 – 23:12 and 13-2 (Sept. 24, 2021, D.S.C.) (*filed under seal*); **Exhibit 18** (*filed under seal at ECF 84-1*); *and* **Exhibit 19** (*filed under seal at ECF 84-2*). Often, those settlements result in cash payment to Plaintiff. **Exhibit 4** at 181:9-16; *see* Oppenheimer v. Scarafile, 2:21-mc-517-RMG Dkts. 13-1 at 21:5 – 23:12 and 13-2 (Sept. 24, 2021, D.S.C.) (*filed under seal*); **Exhibit 18** (*filed under seal at ECF 84-1*); *and* **Exhibit 19** (*filed under seal at ECF 84-2*).

Plaintiff acquired the two images at issue in the present case during a helicopter flight on August 13, 2013. **Exhibit 5** at 127:1-25 *and* **Exhibit 10** at 3 (*Plaintiff's Response to ROG 1*). The unedited, as-acquired images are entitled "SC-August-2013-2_OPP5960" ("OPP5960") and "SC-August-2013-2_OPP5964" ("OPP5964"), respectively. *See* **Exhibit 6** at 2 (deposit OPP5960) and 6 (deposit OPP5964) *and* **Exhibit 8** at 5 (content titles for "SC-August-2013_2"). The Plaintiff submitted an application to register his copyright in those images in an unpublished collection of photographs on August 31, 2013, and paid a fee for a single application. *See* ECF 66-4; **Exhibit 5** at 29:13 – 31:23; *and* **Exhibit 9** (*Exhibit 78 for Plaintiff's Deposition*). The registration application included among its deposit materials the unedited, as-acquired OPP5960 and OPP5964. **Exhibit 8** at 5. Copyright Certificate of Registration VAu 1-142-190 issued on that application and included a Copyright Office note indicating that the photographs were

"[r]egistered as an unpublished collection, not as a published group" subject to 37 C.F.R. § 202.3(b)(4)(i)(B) (2013). ECF 51-1 (**Exhibit 12** at 6-8); *compare* ECF 1-2 *and* **Exhibit 28**.

Plaintiff edited the as-acquired versions of OPP5960 and OPP5964 using Adobe® Photoshop® software on or about September 30, 2013. **Exhibit 5** at 128:12 – 129:2 *and* **Exhibit 21** at 2-10 (metadata for OPP5960) and 11-19 (metadata for OPP5964). The images at issue are the edited, published versions of OPP5960 and OPP5964 (herein, "edited OPP5960" and "edited OPP5964" respectively) that were created on or about September 30, 2013. **Exhibit 5** at 120:24 – 140:19; **Exhibit 14** at 4 (*Plaintiff's Response to RFA 8*); *and* **Exhibit 22** at 4, 10-13, and 15-16 (*Plaintiff's Second Supplemental Responses to First RFPs*) (wherein produced images are distinguished as between "Deposit Copy" and "Published Version"); *see also*, **Exhibit 27** at 6-7 *and* **Exhibit 33**. Plaintiff embedded several keywords into the "metadata" of edited OPP5960 and edited OPP5964. **Exhibit 4** at 22:21 – 23:12; **Exhibit 5** at 131:9 – 135:5; *and* **Exhibit 21** at 4 (OPP5960 keywords) and 13 (OPP5964 keywords). Plaintiff subsequently uploaded edited OPP5960 and edited OPP5964 to be displayed on his Performance Impressions website and other websites. *See* **Exhibit 4** at 66:17- 76:14 *and* **Exhibit 23** (*Exhibit 72 for Plaintiff's Deposition*).

At the time of the alleged infringement in the present case, in 2016, Plaintiff displayed his edited photographs on the internet often with nothing more than textual notices of copyright. **Exhibit 4** at 38:11 – 56:12, 61:13 – 64:15, 114:9 – 119:20, 127:13 – 130:7, and 143:7 – 150:5); **Exhibit 5** at 177:22 – 179:1; *and* **Exhibit 10** at 5 (*Plaintiff's Supplemental Response to ROG No. 2* (at n. 2)) *and* 18-19 (*Plaintiff's Supplemental Response to ROG No. 18*). Those publications, in particular on Plaintiff's own website, did not use commonly employed infringement prevention measures such as the use of removable watermarks, "right-click" copy protection, or pay-to-

acquire services typically referred to as "paywalls." *See* **Exhibit 4** at 38:11 – 56:12 and 61:13 – 64:15; **Exhibit 5** at 177:22 – 179:1; *and* **Exhibit 10** at 18-19 (*Plaintiff's Supplemental Response to ROG No. 18*). Copyright notices appeared on some of the online-displayed versions of his two photographs at issue, as a "watermark" on the image itself. **Exhibit 4** at 44:1-10. Metadata accompanied some but not all published versions of the two images at issue. **Exhibit 4** at 80:23 – 89:12 and 114:9 – 119:20; **Exhibit 15** at 10 (*Plaintiff's Response to RFA 86*); *and* **Exhibit 17** at 9-10 (*Plaintiff's Response to RFAs 120 and 121*). "Share buttons," inviting the re-posting of his images to social media, accompanied Plaintiff's images displayed on his own website since 2014. **Exhibit 4** at 63:6 – 14; 90:1 – 92:3; 98:10 – 18; 103:14 – 114:3 and 127:12 – 137:5; **Exhibit 5** at 47:6 – 50:15, 52:7 - 14, 69:3 – 80:23, 88:13 – 101:3, and 154:2 – 164:4; **Exhibit 14** at 10-13 (*Plaintiff's Supp Response to RFA Nos. 20 and 22- 25*); **Exhibit 24; Exhibit 25** at 2, 4, and 7; *and* **Exhibit 26** at 2-3, 7, 11-12, 15, and 18-19. Share buttons for Twitter, Facebook, and Pinterest, respectively, look like this:

  

**Exhibit 27** (*Exhibit 131 for Plaintiff's Deposition*) at 3 (images at issue appear at 6-7); *see also* **Exhibit 26** at 3; **Exhibit 5** at 161:22 – 162:2. Other instances of a share button appearing with the images at issue resemble a curved arrow:



**Exhibit 26** at 15. The star is a "favorite" button, and the down arrow over a line is a "download" button. **Exhibit 4** at 116:21 – 117:4 and 117:17 – 118:7. Exhibit Plaintiff's website did not include "terms of service" until 2020. **Exhibit 4** at 57:18 - 58:13.

Real estate agent Sheila Romanosky created a real estate listing for a boat slip at Toler's Cove Marina on November 2, 2016. ECF 28 at 1-2. To the best of her knowledge and recollection, she performed a Google® search at that time and found the two images now referred to as edited OPP5960 and edited OPP5964. **Exhibit 1** at ¶ 45. She does not recall any "pop-up" window or warning of any other kind indicating she could not use the images. *See id.* at ¶ 45.d. Nor does she recall encountering any protocol to purchase or license the images. *See id.* at ¶ 45.d and e. Instead, she recalls it was easy to find, copy, and download the images. *See id.* at ¶45.a and g. She believes a Realtor® Code of Ethics provision prohibiting using another's content "without either attribution or without permission" influenced her decision and allowed her to use the two images at issue in her listing, because she could provide attribution. *See id.* at ¶¶ 10 and 45.h.

Both images accompanied the boat slip listing Ms. Romanosky uploaded to the Charleston multiple listing service ("MLS.") *See id* at ¶ 45. One image accompanied the advertisement she forwarded to the Post & Courier newspaper. *See id* at ¶¶ 7 and 34; *see also* ECF 51-4. The boat slip was sold on June 13, 2017, for $85,000. ECF 13 at 1-2; ECF 19 at 5; *and* ECF 83 at 7 (at n. 5); *see* **Exhibit 1** at ¶ 60). That sale yielded a gross commission to CORE of $2,550, with a net commission to Ms. Romanosky of $617.85. ECF 13 at 1-2; ECF 19 at 5; *and* ECF 83 at 7 (at n. 5); *see* **Exhibit 1** at ¶ 60).

Plaintiff's counsel sent Carolina One a Cease & Desist Letter on or about June 24, 2019. ECF 51-1 (**Exhibit 12**); *compare* ECF 1-5. Attached to that letter was the full three-page version of Copyright Certificate of Registration VAu 1-142-190. ECF 51-1 at 6-8 (**Exhibit 12** at 6-8); *compare* ECF 1-2; ECF 41-1 at 12-14; *and* ECF 41-27 at 2-3 & n.2. This lawsuit commenced December 30, 2019. ECF 1.

### III.    ARGUMENT

#### A.  Plaintiff's "Bait-and-Litigate" Scheme Estops Him from Asserting Counts I-IV.

Plaintiff has constructed a successful scheme over the years to attract people to his photographs on the Internet. Without hyperbole, that scheme may be called "Bait and Litigate." He baits the images he publishes online with keywords embedded in their metadata, ensuring they are easy to find. Then he ferociously pursues those who download and republish his images. He uses copyright law and the federal courts to extract a ransom from those he ensnares in his trap. Horribly, he knows that people are copying his images, but does nothing to stop them or warn them. Plaintiff knew since 2012 that a textual copyright notice does nothing to deter copyright infringement, yet he did nothing by the time of alleged infringement in 2016 to effectively protect his images from copyright infringement. Settling infringement claims is more profitable than sales and licenses of those images, in the Plaintiff's apparent estimation. Ms. Romanosky innocently fell into Plaintiff's trap. He should be estopped from asserting his copyright against her.

Fortunately, Estoppel in copyright infringement cases can be decided on summary judgment.  "[W]hen a copyright owner engages in intentionally misleading representations concerning his abstention from suit, and the alleged infringer detrimentally relies on the copyright owner's deception, the doctrine of estoppel may bar the copyright owner's claims completely, eliminating all potential remedies." Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 684 (2014) (*citing* 6 Patry § 20:58, at 20-110 to 20-112).  "[E]quitable estoppel applies both in law and in equity to deny a party the right to plead or prove an otherwise important fact – here, the act of infringement – because of something he has done or omitted to do." Tempo Music, Inc. v. Myers, 407 F.2d 503, 507 n. 8 (4th Cir. 1969)(*citing* 18 Am.Jur.2d Copyright and Literary Property, §§ 26, 27 (1965)).

> To avail oneself of the estoppel defense, it must be shown: (1) that the plaintiff had actual or constructive knowledge of the truth of a matter; (2) that he misrepresented or concealed material facts to the defendant; (3) that he intended or expected the defendant to rely upon those misrepresentations or concealments; (4) that the defendant did so act; and (5) that his reliance was both reasonable and detrimental.

Tavoy v. NTP, Inc., 495 F.Supp.2d 531, 537 (E.D.Va 2007) (*citing* Elmore v. Cone Mills Corp., 187 F.3d 442, 446–47 (4th Cir. 1999)(*per curiam*); Serv. & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 689 (4th Cir. 1992)). "[L]ong-standing silence" can satisfy the concealment element.  Tavoy, 495 F.Supp.2d, at 537, n. 4.

The five elements of the Estoppel defense present no genuine issues of material fact in the present case. **First**, Plaintiff knew, in 2012, that a prominent copyright notice was insufficient to deter or prevent infringement of his copyrights in his images. He stated, "I often hear from infringers that they left my copyright notice watermark intact on the photo. Many people have told me they thought they were entitled to commercially use my photos because they provided attribution when in fact they just committed willful copyright infringements by [using] my work with a prominent copyright notice." **Exhibit 11** at 4. That represents "actual or constructive knowledge of the truth of a matter:" that a "prominent copyright notice" would not deter or prevent copyright infringement.

**Second**, Plaintiff concealed that he would sue anyone who would use his images even with the attribution provided by a prominent copyright notice on the copied image. Plaintiff published the two images at issue in the present case, edited OPP5960 and edited OPP5964, on his Performance Impressions webpage, on or after October 29, 2014. *See* **Exhibit 21** at 3 and 12 ("Metadata Date: 2013:10:02") *and* **Exhibit 26** at 2-3 ("Uploaded October 29th, 2014"). He also published those images (or allowed them to appear) on the other collective Websites. **Exhibit 4** at 66:12 – 79:17; *see* **Exhibit 23**; **Exhibit 25**; **Exhibit 26**; **Exhibit 27**; *and* **Exhibit 33**. Drawing on his expertise in search engine optimization, Plaintiff added keywords to the metadata of each

image to make it easier to find those images with a search engine like Google®. **Exhibit 4** at 20:8 – 21:3 and 22:21 – 23:12; **Exhibit 5** at 131:9 – 135:5; *and* **Exhibit 21**; *see* **Exhibit 24** at 14-15. The keywords he added to the two images' metadata include: "real estate," "property," "buy," sell," "boat slips," "marina," "vacation property," "vacation homes," "Marsh Harbor," "Mount Pleasant," "Isle of Palms," "intracoastal waterway," among others. **Exhibit 21; Exhibit 25** at 2-5 and 9; *and* **Exhibit 26** at 2-4, 7-8, and 15-16. Those keywords in the metadata allowed a person searching for those words to find those images in search results. **Exhibit 4** at 14:15 – 23:12 *and* **Exhibit 5** at 89:24 – 91:21 and 131:9 – 134:15; *see* **Exhibit 10** at 6-7 (*Plaintiff's Response to ROG No. 4*) *and* **Exhibit 24** at 14-15. Indeed, Ms. Romanosky testifies that it was easy to find his images in 2016. **Exhibit 1** at ¶ 45.a.

Plaintiff made it easy to copy his images.  In his deposition, Plaintiff walked through how easy it is to download versions of both images at issue from his website. **Exhibit 4** at 114:9 – 119:20 (OPP5960) *and* **Exhibit 5** at 159:17 – 172:3 (OPP5964). In his deposition, Plaintiff walked through a demonstration of downloading a version of edited OPP5960 without a copyright notice. **Exhibit 4** at 114:9-119:20. Plaintiff also walked through a demonstration of sharing edited OPP5964 on Facebook. *Id.* at 98:10 - 102:15.

Plaintiff employed no textual warnings on or near the images at issue at the time of the alleged infringement, other than his copyright notice. **Exhibit 1** at ¶ 45.d; *see also*, **Exhibit 4** at 38:11 – 56:12, 61:13 – 64:15, 114:9 – 119:20, 127:13 – 130:7, and 143:7 – 150:5; **Exhibit 5** at 177:22 – 179:1; *and* **Exhibit 10** at 4-6 (*Plaintiff's Supplemental Response to ROG No. 2 &* n. 2) *and* 18-19 (*Plaintiff's Supplemental Response to ROG No. 18*). Plaintiff has employed no warning that attribution does not excuse copyright infringement. **Exhibit 4** at 42:5-12. Plaintiff testified that he has not used pop-up windows on his website. *Id.* at 64:8-15. Such a pop-up

window could warn an internet user away from infringing Plaintiff's copyright. An invitation to license may have appeared at the bottom of the main index page of his website (though not on gallery pages; *see* Section III.B.1., *infra*), but the avalanche of alleged infringements over the years informs that such invitation was ineffective to deter copying.

Plaintiff deployed no technological obstacles to prevent copying his images from his website. **Exhibit 1** at ¶ 45.g; *see also*, **Exhibit 4** at 38:11 – 56:12, 61:13 – 64:15, 114:9 – 119:20, 127:13 – 130:7, and 143:7 – 150:5); **Exhibit 5** at 177:22 – 179:1; *and* **Exhibit 10** at 4-6 (*Plaintiff's Supplemental Response to ROG No. 2* (n. 2)) *and* 18-19 (*Plaintiff's Supplemental Response to ROG No. 18*). Plaintiff testified that he included no removable watermarks across the face of his publications of the images at issue, even though he knows how to add them. *See* **Exhibit 4** at 53:22 – 56:12. Further, he is aware of others using watermarks to protect the images they offer for licensing online.  *Id.* at 53:6-15. When asked whether he has changed anything since 2012 to better protect against infringement, the Plaintiff testified that he has added more metadata to the photographs. *Id*. at 38:11 – 39:10. The Plaintiff expected that additional metadata would take advantage of a post-2016 change by Google® that provides a link to licensing information. *Id.* at 38:7 – 39:7. Significantly, he has not done anything else since 2012 to better protect his photos from copying.  *Id.* at 39:8-10.

Plaintiff did not include any features such as "shopping carts" to indicate payment was required, in many instances of his publication of the images at issue. *See, e.g.*, **Exhibit 5** at 178:13 - 179:1; *see also*, **Exhibit 25**; **Exhibit 26**; **Exhibit 27**; *and* **Exhibit 33.** Ms. Romanosky encountered no such indicia when she found the two images at issue. **Exhibit 1** at ¶ 45.e and g.

Plaintiff invited people to share his images on social media. In 2014, Plaintiff added a "share button" functionality to his website, making it even easier for persons browsing the

internet to publish his photographs to other places on the internet. **Exhibit 4** at 63:6-14 and

103:14 – 108:1; **Exhibit 5** at 69:3 – 80:23, 88:14 – 101:3, and 154:2 – 164:4; **Exhibit 14** at 10-

13 (*Plaintiff's Supp Response to RFA Nos. 20 and 22- 25*); **Exhibit 24; Exhibit 25** at 2-5 and 9-

10; *and* **Exhibit 26** at 2-4, 7-8, 12-14, 17-18, 22-24 and 26-27. Share buttons appeared with the

as-published images at issue in this suit, edited OPP5960 and edited OPP5964, on the Plaintiff's

website and elsewhere. **Exhibit 24; Exhibit 25** at 2-5 and 7; *and* **Exhibit 26** at 2-4 7-8, 11-16,

and 18-19; *see also*, Section III.B.1 *infra* (screenshot of Gallery circa 2018).

    The ease of copying and sharing Plaintiff's images, together with the copyright notice on

the face of the images that the Plaintiff knew was ineffective to deter copying, the invitation of

the "share" buttons, the meager request to license if present, along with a lack of further textual

warnings against copying and technical obstacles, and the lack of shopping carts or other indicia

of the need to pay, altogether amount to a misrepresentation or a concealment that Plaintiff will

sue if someone accepts the invitation and copies and republishes his images.

    **Third**, Plaintiff clearly expected a real estate agent like Ms. Romanosky to rely on his

concealment of the danger of copying his images. In 2012, he acknowledged that many people

copy his images in spite of prominent copyright notices. **Exhibit 11** at 4. Whatever else Plaintiff

will allege he was doing to deter copyright infringement, Plaintiff knew it was insufficient and

ineffective, and his numerous suits and settlements attest to that. The keywords he added to the

images at issue include real estate-focused terms. **Exhibit 21; Exhibit 25** at 2-5 and 9; *and*

**Exhibit 26** at 2-4, 7-8, and 15-16. Those keywords add a flavor of intentionality to Plaintiff's

expectation: he expected *and intended* that his images would be found and copied, in particular

by real estate agents. *See, e.g.*, **Exhibit 20** at 29:20 – 30:24. Moreover, since Plaintiff changed

virtually nothing about the way he published his images from 2012 until the time of the alleged

infringement (*see* **Exhibit 4** at 39:8-10), no reasonable jury could return a verdict other than in acknowledgement of this expectation of Plaintiff. *See* Scott v. Harris, 550 U.S. 372, 380 (2007) ("Courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion'" but "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'") (citations omitted); *see* First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968); Negash v. United States, 772 F. App'x 34, 36–37 (4th Cir. 2019); *and* Sims v. City of Greenville, 2009 WL 3152038, at *4 (D.S.C. Sept. 24, 2009). Doing nothing different, Plaintiff clearly expected "many people" to continue to copy his images in spite of "a prominent copyright notice." **Exhibit 11** at 4.

**Fourth**, Ms. Romanosky acted in reliance upon Plaintiff's misrepresentation and concealment of the infringement risk of copying the Plaintiff's images. To the best of her recollection, Ms. Romanosky performed a Google ® search looking for information on Toler's Cove in Marsh Harbor where the boat slip was located. **Exhibit 1** at ¶ 45. "Two images, now the subject of the present lawsuit, came up[.] " *Id*. Those two images were submitted with Ms. Romanosky's real estate listing for the boat slip to the MLS. *Id.* at ¶¶ 33, 46, and 50.b. One of those images was submitted to the Post & Courier newspaper with the text of a real estate advertisement for the boat slip. *Id.* at ¶¶ 34, 50 and Exhibit C (**Exhibit** 1 at 40-43).

Ms. Romanosky encountered no "pop up" window or warning of any kind, other than the copyright notice on the face of the images. **Exhibit 1** at ¶ 45.d. She was not required to select the images, put them in a "shopping cart," agree to a price, select "check out now," provide payment and shipping information, or authorize a purchase of the images at issue. *Id.* at ¶ 45.e and g. She did not have to acknowledge terms of service. *Id.* at ¶ 45.f and g. There was no warning that

"attribution does not excuse copyright infringement." *Id.* at ¶ 45.d; *see* **Exhibit 4** at 40:19 –

41:10. Ms. Romansky relied on Plaintiff's concealment. "I thought that since they appeared on

the internet the way they did that I could use them." *Id.* at ¶ 45.  Moreover, "Prior to this lawsuit,

I believed that, if I found an image through Google or another internet search engine search, such

images were publicly available and that I could use the image without facing any repercussions."

*Id.* at ¶ 44. Plaintiff capitalized on this common misunderstanding of copyright law with his

inviting presentation of the two images Ms. Romanosky found, and she relied on that misleading

presentation.

        **Fifth**, Ms. Romanosky's reliance was reasonable and detrimental.

        Ms. Romanosky's reliance was reasonable. She acted just the same way "many people"

had acted before her. **Exhibit 11** at 4. She acted exactly the way Plaintiff expected her to act. *See*

*id.* Her reasonableness finds reinforcement in the Realtors® Code of Ethics, prohibiting the use of

another's content "without either attribution or without permission." **Exhibit 1** at ¶¶ 10 and

45.h.; *c.f.* Exhibit A (**Exhibit 1** at 25) and Exhibit B (**Exhibit 1** at 36) (Standard of Practice 12-

10(4)). The relevant language of the Code of Ethics Standard of Practice 12-10(4) remains the

same in the 2013 and 2020 editions of the Code, spanning the time of the alleged infringement.

**Exhibit 1** at ¶ 10, Exhibit A (**Exhibit 1** at 25) and Exhibit B (**Exhibit 1** at 36). "Since this SOP

requires either attribution 'or' permission, I believe this means one or the other. I also believe

that if I adhere to the Realtor® Code of Ethics then I am also adhering to the law." **Exhibit 1**, at ¶

10.

        It is beyond question that if a person browsing the internet used Plaintiff's share buttons

and reposted his images to Facebook, for example, such person could reasonably assume that

Plaintiff would forego suing that person for copyright infringement, even though those images

included a prominent copyright notice. It would be outrageous and preposterous if Plaintiff filed

suit against anyone using a share button he installed with his images. It is equally unlikely that

Plaintiff possesses the capability to effectively and efficiently differentiate between "lawful" and

"unlawful" customers as he suggests. *See* **Exhibit 10** at 18-19 (*Plaintiff's Response to ROG No.

18*). Now comes Ms. Romanosky. How do we ascribe "unreasonableness" to her actions, in the

face of Plaintiff's invitation to share and in the absence of any technical obstacle to copying,

textual warning, or indicia of the need to pay for the images? Plaintiff can offer not a scintilla of

evidence nor any inference in his favor that creates a genuine issue of material fact on the issue

of Ms. Romanosky's reasonableness, relying on Plaintiff's misleading and concealing invitation

to use his images in the manner she did.

What is unreasonable, however, is how Plaintiff behaved in the almost five years

between his comment in 2012 and the alleged infringement in 2016. He added, among the

thousands of images published to his website and elsewhere on the Internet, the two at issue with

search-optimizing keywords embedded in their metadata. **Exhibit 21; Exhibit 25** at 2-5 and 9;

*and* **Exhibit 26** at 2-4, 7-8, and 15-16; *see also*, **Exhibit 22** at 19 ("Plaintiff has nearly 20,000

copyright-protected images in his inventory... [and] has identified hundreds (potentially

thousands) of separate infringers."). He added share buttons in 2014. *See* **Exhibit 24**. He was

aware of measures that could have further protected his images, but he took none. *See, e.g.*,

**Exhibit 4** at 38:7 – 39:10 and 53:22 – 56:5. When a person's home is broken into, they might

reasonably take a variety of measures: alarms, deadbolts, bars on the windows, a security

camera. In analogous circumstances, during those five years, Plaintiff surrounded his images

with share buttons, and laughed all the way to the courthouse. *See, e.g.*, **Exhibit 18** (*filed under

seal at ECF 84-1*). The actions and omissions of Plaintiff highlight the reasonableness of Ms.

Romanosky's actions: she fell into his trap, just as he expected, and just as so many have before and since.

Ms. Romanosky acted to her detriment, in reliance on Plaintiff's invitation to share his images and his concealment of her infringement liability risk. She testifies that she would do nothing to jeopardize her real estate agent license: no commission is worth the risk. **Exhibit 1** at ¶ 12; *see also*, **Exhibit 2** at ¶ 16. "The risk of infringement damages in any instance would not be worth the potential commission. It could cost me my license and my profession, which are far more important to me than any individual commission." **Exhibit 1** at ¶ 12.b; *see also*, **Exhibit 2** at ¶ 19.

Summary judgment holding a plaintiff estopped is common. A copyright plaintiff's silence as to his claims, along with his active facilitation of the defendants' acts that gave rise to his suit, estopped him from asserting his copyrights on summary judgment. *See* Armento v. City of Ashville Downtown Dev. Off., at *7-8 (W.D.N.C. Mar. 26, 1996). In Tavoy, deeply troubling circumstances regarding, *inter alia*, a plaintiff's long-standing silence as to his role in the authorship of the work at issue "militate[d] toward granting summary judgment." Tavoy, 495 F.Supp.2d at 537. Outside of the copyright context, summary judgment on equitable estoppel also occurs. *See* Hart v. Safeco Ins. Co., 2017 WL 603283, at *4 (D.S.C. Feb. 14, 2017) (*sua sponte* granting summary judgment on equitable estoppel claim) (*held in abeyance by* Hart v. Safeco Ins. Co., 2017 WL 11285491, at *2 (D.S.C. Mar. 3, 2017)).

For at least the foregoing reasons, Carolina One seeks summary judgment on its Estoppel defense, defeating Counts I-IV.

**B.  Plaintiff's "Bait and Litigate" Scheme Amounts to Copyright Misuse, Defeating Counts I-IV.**

Plaintiff's scheme amounts to Copyright Misuse, barring Counts I-IV. Copyright Misuse is an equitable defense that "has its historical roots in the unclean hands defense," precluding equity for those who act in bad faith. ABF Freight Sys., Inc. v. N.L.R.B., 510 U.S. 317, 329–30 (1994) (*quoting* Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814, (1945)); *see* Ass'n of Am. Med. Colleges v. Princeton Rev., Inc., 332 F. Supp. 2d 11, 17 (D.D.C. 2004) (*citing* Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 972 (4th Cir. 1990)). The misuse of copyright defense applies when the copyright is used "in a manner violative of the public policy embodied in the grant of a copyright." Thomas M. Gilbert Architects, P.C. v. Accent Builders & Devs., LLC, 629 F. Supp. 2d 526, 535 (E.D. Va. 2008), *aff'd sub nom.* Thomas M. Gilbert Architects, P.C. v. Accent Builders And Devs., LLC, 377 F. App'x 303 (4th Cir. 2010) (citation omitted). Courts remedy copyright misuse by denying the copyright holder the right to enforce his copyright during the period of misuse. MDY Indus., LLC v. Blizzard Ent., Inc., 629 F.3d 928, 941 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011). Whereas the equitable defense of unclean hands (*see* section III.D *infra*) relates to a party's conduct in a particular matter, copyright misuse looks more generally to the harm a party's use of copyright law has on society.

1.  Plaintiff has Constructed a Prolific "Bait-and-Litigate" Scheme.

In the last decade or so, Plaintiff has registered the copyrights on thousands of his photographs. *See, e.g.*, ECF 41-25 at 4 (*Plaintiff's Response to RFP No. 1*); ECF 51 at 9-10 *and* **Exhibit 5** at 27:17-25. He holds over 100 copyright registrations. **Exhibit 31**. The present Copyright Certificate of Registration VAu 1-142-190 includes over 7,000 images. **Exhibit 32**.

Once the images have been submitted to the Copyright Office for registration, Plaintiff takes the time to select, enhance, and publish many of his images to the Internet. **Exhibit 5** at 108:9 – 109:5, 118:10-16, and 127:6 – 129:2. That enhancement includes embedding "keywords" into the metadata of the images. **Exhibit 4** at 38:11 – 39:10, 80:23 – 85:5, and 114:9 – 137:5 *and* **Exhibit 5** at 131:9 – 139:17; *see* **Exhibit 21**. To illustrate the magnitude of this effort, Plaintiff typed 57 keywords into the metadata of the two images at issue in the present case. **Exhibit 21**; **Exhibit 25** at 2-5 and 9; *and* **Exhibit 26** at 2-4, 7-8, and 15-16. Those keywords represent "search engine optimization," making those images easier to find by Internet search engines, such as Google®. **Exhibit 4** at 14:15 – 23:12 *and* **Exhibit 5** at 89:24 – 91:21 and 131:9 – 134:15; *see* **Exhibit 10** at 6-7 (*Plaintiff's Response to ROG No. 4*) *and* **Exhibit 24** at 14-15. Plaintiff also adds a copyright notice to the face of the images he publishes.[1] **Exhibit 5** at 146:15 – 147:8. He then publishes those images to numerous websites across the Internet, including the Websites, and others. **Exhibit 23**. Since 2014, he has included "share" buttons next to the images he publishes on his website, and on "gallery pages" showing groups of his images. **Exhibit 24**; *see* **Exhibit 5** at 161:22 – 164:4; **Exhibit 25** at 2-5 and 7; *and* **Exhibit 26** at 2-4, 7-8. and 11-16. He even includes HTML computer code that allows another to display his images on other websites. **Exhibit 4** at 103:14 – 114:3; *see* **Exhibit 26** at 2-3 and 7. At his deposition, Plaintiff walked through demonstrations showing how easy it is to copy, download, and share his images. **Exhibit 4** at 114:9 – 119:20 (OPP5960) *and* **Exhibit 5** at 159:17 – 172:3 (OPP5964).

Significantly, Plaintiff does not employ commonly-used technological obstacles to hinder copyright infringement. Adding watermarks across the face of the images would be "a lot of

---

[1] Some examples of his published images do not have that facial copyright notice, or metadata, or both. *See, e.g.*, ECF 81 at 22:2 – 24:23; **Exhibit 4** at 80:23 – 89:12, 114:9 – 119:20, 127:13 – 130:7, and 143:7 – 150:5; *and* **Exhibit 5** at 121:1 – 140:19.

work." **Exhibit 4** at 52:21 – 56:5. He does not publish his images behind a paywall. **Exhibit 5** at 178:24 – 179:1. Besides a copyright notice in most instances, no textual warnings against copying appeared in close proximity to his published images. **Exhibit 4** at 61:13 – 64:15 *and* **Exhibit 10** at 18-19 *(Plaintiff's Supplemental Response to ROG No. 18); see* **Exhibit 7**; **Exhibit 25**; **Exhibit 26**; *and* **Exhibit 27**. Way down at the bottom of his website index page, according to a 2018 back-up of his website, an inconspicuous invitation to license appears –



Screenshot of https://www.performanceimpression.com/index.html
from 2018 local backup provided by Plaintiff
*See* https://web.archive.org/web/20161129174957/https://performanceimpressions.com/index.html

but there is no evidence that such text appeared on the pages displaying galleries or individual images in 2016:



Screenshot of
https://www.performanceimpressions.com/Charleston_SC_scenic_travel_photos_2013/content/index.html
showing OPP5964, page 20, accessed from Plaintiff-provided 2018 local backup; *see*
*https://web.archive.org/web/20161129235413/http://www.performanceimpressions.com/Charleston_SC_scenic_trav*
*el_photos_2013/content/index.html*

No pop-up window appears, warning against copying or indicating the need to license or buy an image. **Exhibit 33**. No warning appears that attribution will not substitute for permission to use, or that copying, reproducing, or sharing without permission is an infringement. *Id.; see* **Exhibit 4** at 33:21 – 39:10. But Plaintiff knew since 2012 that many in the public mistakenly believed attribution foreclosed infringement. **Exhibit 4** at 33:21 – 39:10; *see* **Exhibit 11** at 4. Terms and conditions of use did not appear on Plaintiff's website until 2020. **Exhibit 4** at 57:18 - 58:13. Plaintiff is aware of other vendors of images online use protective measures that he does not. *Id.* at 53:6 – 56:12; *see* **Exhibit 1** at Exhibit K (71-72); **Exhibit 2** at Exhibit F (52-53); *and*

**Exhibit 30** (*Exhibits 12 and 13 from Plaintiff's Deposition*)(note watermarks across the face of the Alamy® images).

 The trap is set.

 The trap catches many. Excluding settlements without associated litigations, Plaintiff has initiated no less than 130 separate copyright infringement litigations throughout the country. These cases follow the same formulaic five-count approach employed in this instance. For a sample of such cases filed in the Fourth Circuit (just within the Western District of North Carolina), *see* Oppenheimer v. Griffin, 2019 WL 7373784, at *7 (W.D.N.C. Dec. 31, 2019)(collecting cases). He has filed at least 18 such cases in the District of South Carolina alone. *See* Oppenheimer v. Williams et al., Dkt. 25-1 at n. 1 (D.S.C. July 1, 2021); *see also* ECF 81 at 37:10-13 (this Court noting 17 cases). Real estate brokerages appear to be one of Plaintiff's preferred "targets" - just within the District of South Carolina, approximately two-thirds of Plaintiff's infringement litigations name real estate brokerage defendants: Beach Residential LLC, No. 2:2014-cv-3425; Brand Name Real Estate of SC, Inc., No. 2:2016-cv-336; Carolina Sun Properties, LLC, No. 2:2017-cv-3266; Grossman Atlantic LP, No. 2:2015-cv-4504; Sand Dollar Real Estate Group, LLC, No. 2:2016-cv-1210; Shirley et al., No. 2:2017-cv-863; Century 21 Properties Plus et al., No. 2:2019-cv-303; Fuller et al., No. 2:2019-cv-409; High Tide Real Estate Group, Inc., No. 2:2021-cv-626; Liberatos et al., No. 2:2021-cv-2198; Scarafile et al., No. 2:2019-cv-3590; and Williams et al., No. 2:2020-cv-4219. Plaintiff's counsel explained to another court the difficulties that real estate agent defendants face in taking down MLS-distributed images. *See* Oppenheimer v. Griffin, No. 1:18-cv-272-MR Dkt. 23 (W.D.N.C. Mar. 13, 2020) at 30:20 – 32:9 (transcript) **(Exhibit 20)**. In addition to his litigations, Plaintiff testified that he settles additional claims of infringement without filing suit. **Exhibit 4** at 176:17 – 181:16;

*see, e.g.*, Oppenheimer v. Scarafile, 2:21-mc-517-RMG Dkts. 13-1 at 21:5 – 23:12 and 13-2

(Sept. 24, 2021, D.S.C.) (*exhibits filed under seal*); **Exhibit 18** (*filed under seal at ECF 84-1*);

*and* **Exhibit 19** (*filed under seal at ECF 84-2*).

 Tellingly, Plaintiff testified that none of his litigations have reached a jury. **Exhibit 4** at

176:17 – 181:16. Virtually all of his litigations settle or default. *Id.*; *see* Oppenheimer v.

Scarafile, 2:21-mc-517-RMG Dkts. 13-1 at 21:5 – 23:12 and 13-2 (Sept. 24, 2021, D.S.C.)

(*exhibits filed under seal*); **Exhibit 18** (*filed under seal at ECF 84-1*); *and* **Exhibit 19** (*filed

under seal at ECF 84-2*). As described by another court, once a victim falls into his trap, Plaintiff

files "strategic infringement claims of dubious merit in the hope of arranging prompt [inflated]

settlements with defendants who would prefer to pay… rather than be tied up in expensive

litigation." Oppenheimer v. Williams et al., 2021 WL 4086197, at *3 (D.S.C. Sept. 8, 2021)

(*quoting* Design Basics, LLC v. Lexington Homes, Inc., 858 F.3d 1093, 1097 (7th Cir. 2017)).

 Plaintiff generates revenue from leveling charges of copyright infringement. A

comparison of revenue generated from "Gross Income from License Sales" plus "Gross Income

from Print Sales," on one hand, versus "Lawsuit/Copyright Claim Settlement Proceeds" on the

other hand, for the years 2017-2019, tells the tale. *See* **Exhibit 18** (*filed under seal at ECF 84-1*).

The magnitude of license fees received in the absence of allegations of infringement illuminates

the caliber of revenue from settlements versus arms-length business transactions. *See* **Exhibit 19**

(*filed under seal at ECF 84-2*).

 2. Plaintiff Uses His Copyrights in a Manner that Violates Public Policy.

 "The Congress shall have Power . . . To promote the Progress of Science and useful Arts,

by securing for limited Times to Authors and Inventors the exclusive Right to their respective

Writings and Discoveries[.]" U.S. Const. Art. I § 8 cl. 8. The grant of copyright therefore

implicitly demands improving the collective good while balancing incentives to innovate. *See e.g.*, Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 928 (2005) ("The more artistic protection is favored, the more technological innovation may be discouraged; the administration of copyright law is an exercise in managing the tradeoff."). Congress honors this policy by, *inter alia*, including statutory "public policy defenses:" fair use (17 U.S.C. § 107), library use (17 U.S.C. § 108), and assistance for the disabled (17 U.S.C. § 121). The Supreme Court further recognizes the importance of applying equitable remedies in intellectual property matters, expressly highlighting the importance of the public interest and supporting the equitable defense of unclean hands. Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814-15 (1945) ("For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts injury to the public")); *see* ABF Freight Sys., Inc. v. N.L.R.B., 510 U.S. 317, 329–30 (1994). The Fourth Circuit identifies anticompetitive uses of copyright as against public policy, and explicitly extends the defense beyond a strict antitrust context. *See* Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 978 (4th Cir.1990). Those articulations of policy and defenses counsel limited, rather than absolute, rights for authors who contribute original works of authorship to the collective condition.

Unscrupulous copyright holders exploit the public by engaging in anticompetitive behavior when they abuse litigation to garner income the fair market otherwise would not allow. S*ee, e.g.*, Oppenheimer v. Griffin, 2019 WL 7373784 at *7 (W.D.N.C. Dec. 31, 2019) (*citing* ME2 Prods., Inc. v. Ahmed, 289 F. Supp. 3d 760, 764 (W.D. Va. 2018)). To have an anticompetitive effect, an action "'must harm the competitive *process* and thereby harm consumers.'" Loren Data Corp. v. GXS, Inc., 501 F. App'x 275, 282 (4th Cir. 2012) (*quoting*

United States v. Microsoft Corp., 253 F.3d 34, 70–71 (D.C.Cir. 2001) (*en banc*) (emphasis in original)). In the present case, Plaintiff's "Bait-and-Litigate" scheme harms the process by which legitimate online purveyors of images sell their wares to the public. Consumers such as real estate agents needing images are diverted from vendors such as Alamy® and Getty Images®. Those vendors offer suitable equivalent images. **Exhibit 30**; *compare* **Exhibit 7**; *see also* **Exhibit 4** at 53:6-15 (discussing image now part of **Exhibit 30**); **Exhibit 1** at Exhibit K (71-72); **Exhibit 2** at Exhibit F (52-53). Real estate agents, as consumers, fall into Plaintiff's trap, mistakenly thinking his images are free to use, or believing that attribution avoids copyright infringement. **Exhibit 1** at ¶¶ 10 and 45.h. Because of Plaintiff's scheme, those who fall into that trap are "required to forego utilization of the creative abilities" of legitimate vendors of images online. Lasercomb, 911 F.2d at 978. "Of yet greater concern, these creative abilities are withdrawn from the public," each time Plaintiff succeeds in diverting an image seeker into his trap and away from those vendors. *Id*. Rather than offering his images on competitive terms, Plaintiff harms the competitive process, prevents competitors from licensing their images, and usurps settlements and default judgments to himself. Consumers suffer the harm of the settlement and default judgment windfalls to Plaintiff.

3. Plaintiff Continues to Misuse His Copyrights, and so Should Be Barred from Enforcing His Copyright During this Period of Misuse.

It is possible for a copyright holder to purge himself of misuse. To do that, "the copyright holder must show that 'the improper practice has been abandoned and that the consequences of the misuse of the [copyright] have been dissipated.'" Altmayer-Pizzorno v. L-Soft Intern., Inc., 302 Fed.Appx. 148, 156-57 (4th Cir. 2008) (alteration in original) (*quoting* Morton Salt Co., 314 U.S. 488, 493 (1942)). Today, with at least three of Plaintiff's cases

pending resolution in this district alone, it is clear that Plaintiff's improper "Bait-and-Litigate" scheme has not been abandoned, and the consequences remain afflicting dozens of defendants.

For at least the foregoing reasons, Carolina One seeks summary judgment on its Copyright Misuse defense, defeating Counts I-IV.

### C. Plaintiff's Two Images Are Registered as Part of a Single "Work."

The two images at issue in this case form part of a single "work" for statutory damages calculations. *See* 17 U.S.C. § 504(c) (providing "an award of statutory damages for all infringements involved in the action, with respect to any one work[.]"). Thus, as a matter of law, Plaintiff is entitled to but a single award of statutory damages in this case. *See, e.g.*, Bryant v. Media Right Prods., Inc., 603 F.3d 135, 141–42 (2d Cir. 2010); *see also*, Yellow Pages Photos, Inc. v. Ziplocal, LP, 795 F.3d 1255, 1279 (11th Cir. 2015) (*citing* MCA Television Ltd. v. Feltner, 89 F.3d 766, 769 (11th Cir. 1996) and *stating,* "Although this Court held that the particular television episodes in *Feltner* were separate works because they could each 'live their own copyright life…' we certainly do not read the *Feltner* decision as foreclosing the application of 17 U.S.C. § 504(c)(1)'s directive that 'all parts of a compilation ... constitute one work' for all cases").

When Plaintiff applied to register a collection of over 7,000 photographs on August 31, 2013, he included a subtitle in his application: "Previous or Alternative Title: Group Registration of Unpublished Individual Works." *See* ECF 51-1 at 6-8 and ECF 66-4. The Copyright Office responded on the Certificate stating:

| Copyright Office notes: | Regarding title information: Registered as an unpublished collection, not as a published group. 37 CFR 202.3(b)(4)(i)(B) |
| --- | --- |

*See* ECF 51-1 at 7. The Copyright Office must have been responding to the "Group" and "Individual Works" portions of Plaintiff's subtitle; there was no reason for the Office to

comment on the "unpublished" nature of the photographs. Effective from July 18, 2013 – March

7, 2017, that cited portion of the CFR states:

> (b) Administrative classification and application forms—
> (4) Registration *as a single work*.
> (i) For the purpose of registration on a single application and upon payment of a single registration fee, *the following shall be considered a single work*:
> (B) In the case of unpublished works: all copyrightable elements that are otherwise recognizable as self-contained works, and are combined in a single unpublished "collection." For these purposes, a combination of such elements shall be considered a "collection" if:
> (1) The elements are assembled in an orderly form;
> (2) The combined elements bear a single title identifying the collection as a whole;
> (3) The copyright claimant in all of the elements, and in the collection as a whole, is the same; and
> (4) All of the elements are by the same author, or, if they are by different authors, at least one of the authors has contributed copyrightable authorship to each element. Registration of an unpublished "collection" extends to each copyrightable element in the collection and to the authorship, if any, involved in selecting and assembling the collection.

(emphases added). *See also*, 78 FR 42875 (July 18, 2013), 82 FR 29413 (June 29, 2017), *and* 82

FR 47415 (Oct. 12, 2017). The Office considered that Plaintiff's registration application met all

the elements of 37 C.F.R. 202.3(b)(4)(i)(B) (2013), and the aggregate of all the deposit images

therefore collectively "shall be considered a single work." This is not unfair to the Plaintiff. He

took advantage of paying a single fee for a single application to register thousands of

photographs, so he must accept that the entire collection is a single work.

Moreover, the Copyright Office's actions leading to its pronouncement on its own

Certificate deserves *Chevron* deference. *See* Chevron, U.S.A., Inc. v. Nat. Res. Def. Council,

Inc., 467 U.S. 837, 842–44 (1984) (recognizing a Congressional delegation of authority to

administrative agencies and requiring deference where "the agency's answer is based on a

permissible construction of the statute"). Further, the citation to 37 C.F.R. 202.3(b)(4)(i)(B),

identifying the scope of coverage as relating to a single work, represents "final agency action."

*See* S.C. Coastal Conservation League v. United States Army Corps of Engineers, Charleston Dist., 2020 WL 858599, at *6 (D.S.C. Feb. 21, 2020) (*citing* Bennett v. Spear, 520 U.S. 154, 177-78 (1997)). Review of final agency action "is highly deferential, with a presumption in favor of finding the agency action valid." *Id.*, 2020 WL 858599 at *2 (*quoting* Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 2009)). A searching and careful inquiry of the record, including Plaintiff's proposed alternative title, reveals nothing arbitrary, capricious, an abuse of discretion, or not in accordance with the law in the Copyright Office's conclusion that Certificate VAu 1-142-190's entire unpublished collection "shall be considered a single work."

Unfortunately, Plaintiff dishonestly concealed the single-work nature of his registration in this litigation. Certificate VAu 1-142-190 contains three pages, labeled "Page 1 of 2," "Page 2 of 2," and a third unlabeled page. *See* ECF 51-1 at 6-8 (**Exhibit 12**). All three pages accompanied Plaintiff's Cease & Desist Letter dated June 24, 2019. *See id*. However, the Complaint filed just six months later includes only the first and third page, omitting the second page that includes the Copyright Office's pronouncement regarding Plaintiff's title information. *See* ECF No. 1-2 at 2-3. A yellow sticky note appears over the words "Page 1 of 2," concealing the indication of the second, missing page. *See id.* at 2; *compare* ECF 51-1 at 6-8 (showing "Page 1 of 2"). Plaintiff has strenuously argued throughout this litigation that his two images are two "works," hoping for two bites at the statutory damages apple. But the Copyright Office has spoken, and so should this Court: Copyright Certificate of Registration No. VAu 1-142-190 covers a single "work" for statutory damages purposes.

**D. Plaintiff's Conduct Gives Him Unclean Hands, Barring Counts I-V.**

1.  Unclean Hands Bars Copyright Counts I-IV.

In addition to the Yellow Sticky Note and missing Page 2 of 2 of the Copyright Certificate of Registration (*see* ECF No. 1-2 at 2-3), Plaintiff has crossed the line further into inequitable conduct that bars his recovery. In correspondence with Carolina One's counsel strenuously arguing "two works," on July 9, 2021, Plaintiff's counsel asserted in a footnote that the words "unpublished collection" do not appear on the Certificate:

> [2] Which is not present on the official Certificate of Registration issued by the US Copyright Office – affirmatively stating that it is a *Group Registration of Unpublished Individual Works*. See Oppenheimer-Scarafile000345-000346.

*See* ECF 41-27 at 3 (n. 2). Plaintiff's false assertion cites a two-page version of the Certificate produced in discovery, not the full three pages. *See* ECF 41-27 at 2-3 & n.2 *and* **Exhibit 28**. But, in fact, the words "unpublished collection" do appear on the Certificate, on the omitted and concealed Page 2 of 2:

> **Copyright Office notes:** Regarding title information: Registered as an unpublished collection, not as a published group. 37 CFR 202.3(b)(4)(i)(B)

*See* ECF 51-1 at 7 (**Exhibit 12** at 6-8).

The nefarious intention behind that false assertion is made plain by contemporaneous presentations of all three pages of the Certificate. On April 18, 2019, in a different copyright infringement case, Plaintiff included the full three pages of the Certificate of Registration No. VAu 1-142-190. *See* Oppenheimer v. Seago et al, No. 1:19-cv-132-MR, Dkt. No. 1-2 (W.D.N.C.). On June 24, 2019, Plaintiff included all three pages of the Certificate in the Cease & Desist Letter sent to Carolina One. *See* ECF 51-1 (**Exhibit 12** at 6-8). On July 19, 2021, Plaintiff asserted all three pages of the Certificate in yet another copyright infringement suit. *See* Oppenheimer v. Liberatos et al, No. 2:21-cv-2198-DCN, Dkt. No. 1-2 (D.S.C.); *see also,* ECF 48 at 2. The LeJune Law Firm represented the Plaintiff on all three presentations.

The falsification of the evidence and the dishonest statement in support are material to the present case. Each "work" is entitled to its own measure of statutory damages. *See* 17 USC § 504(c). Statutory damages range $750 to $30,000 for each infringed "work," which can be boosted to $150,000 if the infringement is found willful. *See id.* By asserting that the two images are each a separate work, Plaintiff has sought up to $150,000 in ill-deserved extra damages for the alleged second work. To date, Plaintiff maintains his "two works" position. *See* ECF 82 at 4.

"Courts, including the Fourth Circuit, have 'on occasion invoke[d] the equitable doctrine of unclean hands as a defense in a copyright infringement action.'" BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc., 149 F. Supp. 3d 634, 677 (E.D. Va. 2015) (*alteration in original*), *aff'd in part, rev'd in part,* 881 F.3d 293 (4th Cir. 2018) (*quoting* 4-13 Nimmer on Copyright § 13.09[B]). "Although it is an equitable defense, courts have applied the doctrine to preclude both equitable relief and damages at law." *Id.* at n. 32 (*citing* Tempo Music, Inc. v. Myers, 407 F.2d 503, 507 n. 8 (4th Cir.1969)). There must be a close nexus between the unethical conduct and the subject of the present litigation, and the defendant must show injury by that conduct. *See id.* at 677 (*citations omitted*). "As Professor Nimmer has written, . . . 'the defense [of unclean hands] has been recognized when plaintiff misused the process of the courts by **falsifying a court order or evidence, or by misrepresenting the scope of his copyright to the court and opposing party**.'" Dream Games of Arizona, Inc. v. PC Onsit*e*, 561 F.3d 983, 990–91 (9th Cir. 2009) (*emphasis added*) (*quoting* 4 Nimmer on Copyright § 13.09[B]).

Here, Plaintiff's unethical conduct is the falsification of his Certificate of Registration asserted in this very litigation, followed by the lie that the Certificate does not recite the material words, "unpublished collection." *See* ECF 1-2; ECF 41-27 at 2-3 & n. 2; *and* **Exhibit 28**. Plaintiff has also misrepresented the scope of his copyright to the Court and to Carolina One, in

contrast to the clear indication by the Copyright Office that the Certificate covers a single work. *See* Section III.C. *supra*. Plaintiff's falsification has forced Carolina One to litigate the Certificate of Registration, including moving to compel discovery on all correspondence between Plaintiff and the Copyright Office to shed more light on the concealed page. *See, e.g.,* ECF 51 at 4-5. Injury to Carolina One is manifest in the protracted litigation over the Certificate and its scope – one work or two. *See* ECF 18 at 2 and 5-6; ECF 26 at 1-2; ECF 41-1 at 12-14; ECF 41-26 at 3; ECF 41-27 at 2-3; ECF 42 at ¶14; ECF 51 at 5-7, 9, 11, 16-17, 19, 24, 29, and 35; ECF 82 at 2-3; *and* ECF 83 at 9. Moreover, Carolina One has had to litigate the issue of statutory damages from a different vantage point than if Plaintiff had honestly presented the Certificate of Registration in ECF No. 1-2 in the first place, and produced it honestly in discovery in the second place. *See, e.g.*, ECF 79 and ECF 83. The concealed second page of the Certificate of Registration finally appeared in Plaintiff's production only hours before discovery closed. *See* ECF 51-1 (**Exhibit 12** at 6-8) *and* **Exhibit 29**. Accordingly, Plaintiff's copyright infringement Claims I-IV should be barred under the Doctrine of Unclean Hands.

    2.   Unclean Hands Bars DMCA Count V.

Plaintiff's unclean hands taint Count V as well. In his Complaint, Plaintiff alleged "(at least) 100 separate URLs" displayed Carolina One's alleged infringement. *See* Complaint, ECF No. 1, at ¶ 14. To support that allegation, Plaintiff listed those 100-plus URLs in his Exhibit 4. *See* ECF No. 1-4. Yet 41 of those listed URLs are unfairly duplicative, with one URL being repeated *eight times*. *See* ECF 48 at 2 (n. 2); ECF 51 at 7-8; ECF 52 at 7; ECF 83 at 10; *and* **Exhibit 12** at 9-15 (repeated URLs highlighted for convenience in **Exhibit 13**); *compare* **Exhibit 16** at 4-6 (*Plaintiff's Responses to 4RFA (Nos. 88-97)*).

That duplication of URLs is material. Plaintiff has received statutory minimum damages of $2,500 for each website where alleged DMCA violations appear. *See* Oppenheimer v. Griffin, 2019 WL 7373784 (Dec. 31, 2019, W.D.N.C.) (awarding $20,000 for eight separate DMCA violations). In each instance of alleged infringement detected online, Plaintiff has alleged the metadata CMI has been removed, making each of the "(at least) 100 separate URLs" potential instances of DMCA violation. *See* ECF 1 at ¶¶ 13-14 and 25; ECF 1-4; *and* **Exhibit 16** at 4-6 (*Plaintiff's Responses to 4RFA (Nos. 88-97)*). Moreover, Plaintiff testified in his deposition that he has not litigated a single infringement case to a verdict from a jury. *See* **Exhibit 4** at 177:3-6. Virtually all his copyright infringement and DMCA claim litigations either settle or are resolved on default judgment. *Id* at 177:3 - 179:3; *see also*, Scarafile, 2:21-mc-517 Dkts. 13-1 at 21:5 – 23:12 and 13-2 (Sept. 24, 2021, D.S.C.) (*filed under seal*); *compare* **Exhibit 18** (*filed under seal at ECF 84-1)*. By unfairly multiplying the number of URLs where the alleged violations of Plaintiff's rights under the DMCA appear, the Plaintiff has clearly sought to abuse the judicial process to increase the settlement value or default judgement value of his Complaint.

Horribly, Plaintiff's multiplication of URLs happened just weeks after a court wrestled an inflated number of websites down to size in another case brought by Plaintiff. On December 4, 2019, Plaintiff and Plaintiff's counsel attended a default judgment hearing in the Western District of North Carolina. In that hearing, the Plaintiff apologized for overstating the number of websites upon which the alleged violations of the DMCA appeared. **Exhibit 20** at 26:21 – 27:17 (Oppenheimer v. Griffin, No. 1:18-cv-272-MR Dkt. 23 (March 3, 2020, W.D.N.C.)). Of the twelve websites alleged, Plaintiff finally testified: "I'm counting eight complete different websites that displayed the work. I apologize again." *Id.* at 27:15-17. Then, on December 30,

2019, Plaintiff and Plaintiff's counsel filed the Complaint and its Exhibit 4 [ECF 1-4] in the present case.[2]

Plaintiff's dishonest duplication of URLs has injured Carolina One by forcing it to litigate those duplicative URLs. Detecting the duplication required a manual comparison of each URL to detect Plaintiff's multiplication. Only after two years of hard-fought litigation does it appear that Plaintiff focuses on 34 websites instead of over "100 separate URLs." *See* ECF 82.

While the defense of unclean hands has been applied as an affirmative defense directly to claims of copyright infringement, little case law directly establishes it as a defense to a DMCA claim. *See, e.g.*, MDY Indus., LLC v. Blizzard Ent., Inc., 629 F.3d 928, 957–58 (n. 24) (9th Cir. 2010); Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 841–42 (9th Cir. 2002); Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P., 948 F.3d 261, 267 (n. 4) (5th Cir. 2020); *and* BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc., 149 F. Supp. 3d 634, 677–78 (E.D. Va. 2015). However, legal precedent strongly supports the Court's inherent power to do equity where equity is required. *See* Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814–15 (1945) ("Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim"); *see generally*, Buchanan Home & Auto Supply Co. v. Firestone Tire & Rubber Co., 544 F. Supp. 242 (D.S.C. 1981) *and* Duplan Corp. v. Deering Milliken, Inc., 444 F. Supp. 648 (D.S.C. 1977), *aff'd in part, rev'd in part*, 594 F.2d 979 (4th Cir. 1979).

---

[2] "Image URLs," "listing URLs," and "websites" appear in the Griffin Transcript, and may be distinguished. Germane here, however, is that Plaintiff and Plaintiff's counsel were contemporaneously placed on notice of the need to honestly and accurately present the number of alleged DMCA violations to a court.

Carolina One therefore seeks favorable summary judgment based on its defense of Unclean Hands, defeating Counts I-V.

### E. Plaintiff's Count V Fails for Lack of Evidence Supporting "Intentional" or "Knowing" Elements Required for DMCA Violation.

Count V, alleging violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 *et seq.,* fails for a lack of evidence. A copyright holder may show a DMCA violation of 17 U.S.C. § 1202(b)[3] by showing any one of three acts by a defendant: (1) *intentional* removing or altering of copyright management information ("CMI"), (2) distributing or importing of CMI *knowing* that CMI has been removed or altered without authority, or (3) distribution or importation of copies of works *knowing* CMI has been removed or altered having actual or constructive *knowledge* that such removal or alteration will induce, enable, facilitate, or conceal an infringement. *See* 17 U.S.C. § 1202(b) (*emphases added*). Evidence of intent or knowledge is mandatory for proving the violation. *See* Mango v. Buzzfeed, Inc., 970 F.3d 167, 172-74 (2nd Cir. 2020), Victor Elias Photography, LLC v. Ice Portal, Inc., 2021 WL 2384618, at *3–5 (S.D. Fla. May 3, 2021), *and* GC2 Inc. v. Int'l Game Tech., IGT, Doubledown Interactive LLC, 391 F. Supp. 3d 828, 840-42 (N.D. Ill. 2019).

CMI may appear on the face of a copyright-protected image, for example. A DMCA violation may occur when a defendant crops the image to remove the facial CMI, if the requisite intent element is met. 17 U.S.C. § 1203(b); *see generally,* VHT, Inc. v. Zillow Group, Inc., 918 F.3d 723 (9th Cir. 2019) *and* Stevens v. CoreLogic, Inc., 899 F.3d 666 (9th Cir. 2018). Importantly, neither image at issue was cropped prior to deposit in the MLS database, since both images appear with facial CMI intact following migration from the MLS. *See* ECF 1-3; ECF 67

---

[3] Violations of 17 U.S.C. § 1202(a), involving *false* CMI, have not been alleged.  *See* Complaint [ECF No. 1] at ¶¶ 35-41.

at 12-13; *and* ECF 81 at 22:21 – 24:23. The one image submitted to the Post and Courier was not cropped to remove facial CMI, either. *See* ECF 51-4. The few alleged instances of cropped facial CMI occurred after Carolina One submitted its listing, and without meeting the knowledge and intent requirements of 17 U.S.C. § 1202(b). *See generally*, ECF 1-3. Images may be automatically cropped or "optimized" for lawful purposes that do not violate the DMCA. *See* Stevens, 899 F.3d 666 at 671-76. One such lawful alteration is in the upload, storage, and distribution of images from digital databases which function as central repositories, such as the MLS. *Id.; see, e.g.,* VHT, Inc., 918 F.3d 723 at 732. An instance of computer-generated cropping of facial CMI even befell the Plaintiff. *See* ECF No. 1-3 (showing facial CMI cropped from an image on page 26 and displayed over text on page 27). There is no evidence of "intentional" or "knowing" removal or alteration of Plaintiff's *facial* CMI in the present case. *Contrast,* **Exhibit 1** at ¶¶ 13, 14, 17, and 18; **Exhibit 2** at ¶¶ 9-10, 15-16, 19-20, and 42-51; *and* **Exhibit 3** at ¶ 13 and 16 – 33.

CMI may appear in the "metadata" of a digital image. Intentionally deleting or altering that digital CMI may also represent a DMCA violation. 17 U.S.C. § 1203(b); *see generally*, VHT, Inc., 918 F.3d 723 *and* Stevens, 899 F.3d 666. However, Plaintiff admits that he has published both images at issue in the present case in freely-accessible locations where facial and embedded CMI is lawfully either missing, altered, or could be automatically changed. *See, e.g.*, ECF 41-23 at 10 (*Plaintiff's Response to Defendants' RFA No. 86*); ECF 61-4 (**Exhibit 15** at 5) (*Plaintiff's Response to Defendants' RFA No. 112*) *and* **Exhibit 4** at 80:23 – 89:12 and 114:9 – 119:20. Second, he admits that he is not sure of all the locations where the images may be published. *See* **Exhibit 4** at 66:12 - 79:17; *see also* **Exhibit 23**. Ms. Romanosky testifies that she could not have altered the image metadata since she lacks the technical knowledge on how to

view or alter that metadata. **Exhibit 1** at ¶¶ 13, 14, 17, and 18. CORE's IT Director, Mr. Sease, testifies that real estate agents interacted directly with the MLS and the Post and Courier when creating listings, without oversight or intervention from Carolina One's corporate officers, marketing staff, or IT staff. **Exhibit 3** at ¶ 37 - 41. Accordingly, there is no evidence of "intentional" or "knowing" removal or alteration of Plaintiff's *digital* CMI in the present case, either.

For at least those reasons, Plaintiff's Count V alleging violation of the DMCA fails, and Carolina One is entitled to summary judgment on that claim.

## IV.    CONCLUSION

For the foregoing reasons, Carolina One prays this Court grant summary judgment in its favor on its Estoppel, Copyright Misuse, and Unclean Hands defenses. Further, Carolina One prays for summary judgment that Plaintiff's Copyright Certificate of Registration VAu 1-142-190 covers a single work, such that Plaintiff is entitled to but a single measure of copyright statutory damages in this case, if any. Carolina One prays for summary judgment on Plaintiff's DMCA Count V, for lack of evidence of intent or knowledge. Carolina One further prays for such other relief as the Court deems appropriate.

Dated: April 8, 2022

/s William La Salle III

William La Salle III, Esq.
Stipkala & Klosowski d/b/a Thrive IP®
100 Spinnaker Run Ln
Smithfield, VA 23430
Tel: 757.755.2257
Fax: 757.542.3811
WLaSalle@Thrive-IP.com
*Pro Hac Vice*

/s Jeremy M. Stipkala

Jeremy M. Stipkala, Esq.
Fed. ID No. 10479
Stipkala & Klosowski d/b/a Thrive IP®
5401 Netherby Ln. Suite 1201
North Charleston, SC 29420
Tel: 843.580.9057
Fax: 866.747.2595
Jeremy.Stipkala@Thrive-IP.com

*Attorneys for Defendants*