**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

David Oppenheimer,                    )
                                      )    CASE NO:  2:19-cv-3590-RMG
          Plaintiff,                  )
                                      )
v.                                    )    **Memorandum in Support of Defendants'**
                                      )    **Motion for Summary Judgment**
Michael C. Scarafile, Patricia R. Scarafile,   )
Sheila Glover Romanosky, and          )    **Exhibit #4**
O'Shaughnessy Real Estate, Inc., d/b/a   )
Carolina One Real Estate,             )
                                      )
          Defendants.                 )
                                      )
                                      )
_____   )

EXHIBIT # 4

August 3, 2021 Deposition of David Oppenheimer

Case Name:         David Oppenheimer v. Michael C. Scarafile, et al.
Case Number:       2:19-cv-3590-RMG
Dep. Date:         August 3, 2021
Deponent:          David Oppenheimer
Reporter:          Deidre Osborne, RPR

## AFFIDAVIT OF DEPONENT

I, David Oppenheimer, have read the transcript of the deposition which was given by me in the above-captioned case on August 3, 2021.  I would like to correct, add, and/or change the following:

| Page | Line | Correction |
|------|------|------------|
| 43 | 25 | Uncertain |
| 172 | 2-3 | I'm not saying that it wasn't infringed 13 times either |
| 183 | 3 | I recall tickets were around $700 each if not mistaken |

Signature:  David Oppenheimer
David Oppenheimer

SWORN TO BEFORE ME THIS _____ DAY
OF _____, 2021


_____
NOTARY PUBLIC FOR SOUTH CAROLINA
MY COMMISSION EXPIRES: _____ _____

LEGAL EAGLE
(864) 467-1373
depos@legaleagleinc.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

- - -

| | | |
|---|---|---|
| DAVID OPPENHEIMER, | : | |
| Plaintiff, | : | CASE NO.: |
| vs. | : | 2:19-cv-3590-RMG |
| MICHAEL C. SCARAFILE, | : | VOLUME I |
| PATRICIA R. SCARAFILE, | : | |
| SHEILA GLOVER ROMANOSKY, | : | |
| AND O'SHAUGHNESSY REAL | : | |
| ESTATE, INC., D/B/A | : | |
| CAROLINA ONE REAL ESTATE, | : | |
| Defendants. | : | |

VIDEOTAPED DEPOSITION OF DAVID OPPENHEIMER

| | |
|---|---|
| DATE TAKEN: | Tuesday, August 3, 2021 |
| TIME BEGAN: | 9:47 a.m. |
| TIME ENDED: | 4:25 p.m. |
| LOCATION: | Remote Deposition |
| REPORTED BY: | Deidre Osborne, RPR |

LEGAL EAGLE

Post Office Box 5682

Greenville, South Carolina 29606

864-467-1373

depos@legaleagleinc.com

```
1    APPEARANCES:  (via videoconference)

2

3        LEJUNE LAW FIRM

4        BY:  SCOTT FRANCIS, ESQUIRE

5        1225 North Loop West, #825,

6        Houston, Texas   77008

7        713-942-9898

8        dlejune@triallawyers.net

9        paralegal@triallawyers.net

10               and

11       ALLEN LEGAL

12       BY:  SAMUEL K. ALLEN, ESQUIRE

13       1417 Ashley River Rd #5305

14       Charleston, South Carolina   29407

15       843-481-4000

16       sam@allenlegal.net

17               Attorneys for Plaintiff

18

19       STIPKALA & KLOSOWSKI d/b/a THRIVE IP

20       BY:  JEREMY M. STIPKALA, Ph.D., J.D.

21       5401 Netherby Lane, Suite 1201

22       North Charleston, South Carolina   29420

23       864-580-9057

24       jeremy.stipkala@thrive-ip.com

25               and
```

Videotaped Deposition of David Oppenheimer

3

```
1        STIPKALA & KLOSOWSKI d/b/a THRIVE IP
2        BY:  WILLIAM LA SALLE, III, J.D.
3        100 Spinnaker Run Lane
4        Smithfield, Virginia   23430
5        757-755-2257
6        wlasalle@thrive-ip.com
7             Attorneys for Defendants
8
9    ALSO PRESENT:
10       Michael Arrison, CLVS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Videotaped Deposition of David Oppenheimer

4

1                       I N D E X

2                                                    PAGE

3       Examination By Mr. Stipkala              7

4       Certificate of Reporter               191

5

6

7                  E X H I B I T S

8                 (None marked.)

9                     - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Videotaped Deposition of David Oppenheimer

5

1  (It is hereby stipulated and agreed by and

2  between counsel for the respective parties that

3  this deposition is being taken in accordance with

4  the Federal Rules of Civil Procedure and that the

5  deponent does not waive reading and signing of

6  this deposition transcript.)

7                        - - -

8                     PROCEEDINGS

9                        - - -

10        THE VIDEOGRAPHER:   This begins media label

11  number one of the videorecorded deposition of

12  Mr. David Oppenheimer in the matter of David

13  Oppenheimer v. Michael Scarafile, et. al., filed

14  in the US District Court for the District of

15  South Carolina, Charleston Division.   Case number

16  is 2:19-cv-3590.

17        This deposition is being held remotely on

18  Tuesday, August the 3rd, 2021, at approximately

19  9:47 a.m.   My name is Michael Arrison, and I am a

20  certified legal videographer in association with

21  Legal Eagle.   Our court reporter is Deidre

22  Osborne, also in association with Legal Eagle.

23        Due to the severity of COVID-19 and upon the

24  practice of social distancing, I will not be in

25  the same room with the witness but will record

Videotaped Deposition of David Oppenheimer

6

1    this videotaped deposition remotely.  The
2    reporter will also not be in the same room and
3    will swear the witness remotely.
4        Will counsel please introduce yourselves and
5    indicate for the record whether or not you
6    stipulate to the validity of this videorecording
7    and remote swearing, that it will be admissible
8    in the courtroom as if it had taken following
9    Rule 30 of the Federal Rules of Civil Procedure.
10        Counsel?
11        MR. FRANCIS:  I'll get started.  This is
12    Scott Francis, counsel for Plaintiff David
13    Oppenheimer.  Plaintiff stipulates to the
14    videorecording and -- the remote videorecording
15    and remote swearing in of the witness.
16        MR. STIPKALA:  Sam, you want to go?
17        MR. ALLEN:  Yeah.
18        Sam Allen here on behalf of the plaintiff.
19    I'm in agreement also.
20        MR. STIPKALA:  I am Jeremy Stipkala, counsel
21    for the defendants, and we stipulate to the
22    remote recording and also the remote swearing by
23    the court reporter.
24        MR. LA SALLE:  I'm William La Salle for the
25    defendants, and I stipulate as well.

Videotaped Deposition of David Oppenheimer

7

1          THE VIDEOGRAPHER:   Thank you.

2          Will the court reporter please swear in the

3     witness.

4          THE COURT REPORTER:   Mr. Oppenheimer, can I

5     have you raise your right hand, please?  Do you

6     swear to tell the truth, the whole truth and

7     nothing but the truth?

8          THE WITNESS:  Yes, I do.

9          THE COURT REPORTER:   Thank you.

10          THE WITNESS:  Excuse me one second.  I'm

11     going to get my glasses.

12          MR. STIPKALA:  Shall we go off the record?

13          THE WITNESS:  Sorry.  I forgot where I put

14     my glasses.

15          MR. STIPKALA:  He's back.

16          THE WITNESS:  They were in my headphone

17     case.

18          MR. STIPKALA:  Okay.

19          THE WITNESS:  Pardon me.

20                              - - -

21       DAVID OPPENHEIMER, after having been first

22     duly sworn, was examined and testified as

23     follows:

24                              - - -

25                      EXAMINATION

Videotaped Deposition of David Oppenheimer

1                           - - -

2    BY MR. STIPKALA:

3         Q.    Good morning, Mr. Oppenheimer.

4         A.    Good morning.

5         Q.    I apologize.  We have just a couple of

6    preliminaries.  Then we can get started.  I will be

7    asking questions of you, Mr. Oppenheimer, in your

8    personal capacity, and you will be answering those

9    questions under oath.  Do you understand that?

10        A.    Yes.

11        Q.    Before we begin the questions, I wish to

12   read from you -- I wish to read to you from the local

13   rules of civil procedure for the District of South

14   Carolina governing the conduct of this deposition.

15   Rule -- our local Rule 30.04 says, "Conduct During

16   the Deposition, Section A: At the beginning of each

17   deposition, deposing counsel shall instruct the

18   witness to ask deposing counsel rather than the

19   witness's own counsel for clarifications, definitions

20   or explanations of any words, questions or documents

21   presented during the course of the deposition.  The

22   witness shall abide by these instructions."

23              Do you understand these instructions?

24        A.    Yes.

25        Q.    In accordance with that local Rule 30.04,

Videotaped Deposition of David Oppenheimer

1    Mr. Oppenheimer, has your attorney affirmatively
2    informed you that unless he makes an objection on
3    privilege, a limitation on evidence directed by the
4    Court or to make a motion to the Court, the question
5    must be answered?
6        A.    I don't recall my attorney saying that
7    specifically, but that's my understanding.
8        Q.    Do you understand the -- the -- do you
9    understand those instructions?
10       A.    Yes.
11       Q.    Do you understand that if you have a
12   conversation with your attorney during a break in
13   this deposition, I get to ask you about it?
14       A.    Yes.
15       Q.    And do you understand that your attorney has
16   to tell us about it as well pursuant to that local
17   rule?
18       A.    Yes.
19       Q.    Again, I apologize, Mr. Oppenheimer.  This
20   is your deposition, but I'm doing all the talking.
21   Just a few more items.  In this deposition, I will
22   ask you questions, and my questions and your answers
23   will be reported by Deidre Osborne and by -- also by
24   our videographer, Michael Arrison.  Do you understand
25   that you need to speak up and answer vocally in

Videotaped Deposition of David Oppenheimer

1  giving your answers so that Deidre and Michael can

2  hear you clearly?

3      A.    Yes, I do.

4      Q.    Now, as we learned yesterday, I may ask a

5  question or two that is not stated very well, and if

6  for some reason you don't understand, please do not

7  answer the question.  It is my job to ask you a good

8  question.  So just let me know if you don't

9  understand a question I ask you, and I will ask a

10 better one.  Does that sound good?

11     A.    Yes.

12     Q.    Let us all endeavor to not interrupt each

13 other nor to speak over each other.  Deidre will

14 prepare a transcript of what we say here today, and

15 it will be far more clear if everybody is allowed to

16 get their statement out before somebody else's

17 statement begins.  Does that sound okay?

18     A.    Yes.

19     Q.    Also want you to know that if you need a

20 break at any time for any reason, please let me know.

21 We will finish your answer to any question that I've

22 asked, and then we can see about taking a break.

23 Okay?

24     A.    Okay.

25     Q.    And feel free to grab a drink of water, a

Videotaped Deposition of David Oppenheimer

11

1    cup of coffee, a snack or whatever you like during

2    any breaks in the deposition, and feel free to have

3    something with you during the deposition.  That's

4    fine.  Is that understood?

5        A.    Yes, thank you.

6        Q.    Sometimes it will happen that you will give

7    an answer and then some time later, maybe five

8    minutes or maybe two hours later, you might remember

9    additional information.  If that happens, just let me

10   know, and we can add to or clarify your earlier

11   answer right then while it is on your mind.  Is that

12   clear?

13       A.    Yes.

14       Q.    Are you taking any medications or drugs of

15   any kind that might make it difficult for you to

16   understand and answer my questions today?

17       A.    No.

18       Q.    Have you had anything alcoholic to drink in

19   the last eight hours?

20       A.    No.

21       Q.    Are you sick at all today?

22       A.    I'm uncertain of that.

23       Q.    Okay.  I wish you the best health.  Are you

24   in a condition where you feel you might not be able

25   to fully understand and honestly answer my -- my

Videotaped Deposition of David Oppenheimer

1    questions today?

2         A.    No.

3         Q.    If that --

4         A.    I think I -- I think you asked a negative

5    question.  I'm not sure if I answered that properly.

6    Could you ask the last question again?

7         Q.    Okay.  Are you -- are you in a condition

8    such that you feel you might not be able to fully

9    understand and honestly answer my questions today?

10   Are you okay to testify?

11        A.    Yes, yes, yes.

12        Q.    Okay?

13        A.    The first part of the question threw me off.

14        Q.    Yeah.  Sorry.  Well, exactly.

15        A.    Sorry.

16        Q.    You know, ask -- ask me, and I'll ask a

17   better question.

18              Are you under a doctor's care for any

19   illness that might prevent you from fully

20   understanding and honestly answering my questions

21   today?

22        A.    No.

23        Q.    If your condition changes such that you, you

24   know -- you feel -- just feel awful and, you know,

25   you feel like, "Wow, it's -- it's time to call it

Videotaped Deposition of David Oppenheimer

13

1   quits," you know, please let me know.  We can take a
2   break.  We can call it quits.  We can do whatever you
3   need to.
4        A.    I appreciate that.
5        Q.    Sure.  Is there any reason at all that you
6   can think of where you will not be able to answer my
7   questions fully and truthfully today?
8        A.    No.
9        Q.    I expect this deposition will be a little
10  bit more fun, Mr. Oppenheimer, because you will get
11  to tell your story.  Are you the plaintiff in this
12  case, Oppenheimer v. Scarafile?
13       A.    Yes.
14       Q.    What do you do for a living,
15  Mr. Oppenheimer?
16       A.    I work as a photographer, and I also run
17  Hamlit that rents properties, and that's pretty much
18  it that I could recall.
19       Q.    What do you do for Hamlit, LLC?
20       A.    Maintain and rent properties, residential,
21  single-family homes.
22       Q.    Anything else?
23       A.    Real estate investment in general, but
24  that -- that's part of the same answer.
25       Q.    Uh-huh.  Does anyone else have an ownership

Videotaped Deposition of David Oppenheimer

```
 1   interest in Hamlit, LL --
 2        A.    No.   Sorry.  I thought you were done.
 3        Q.    Sorry.  I thought I was too.
 4              And Hamlit is spelled H-a-m-l-i-t, correct?
 5        A.    Yes.
 6        Q.    That's just for Deidre.
 7              Does Hamlit, LLC, own properties, or is it
 8   just a property management company?
 9        A.    Both.
10        Q.    Okay.  How many properties would you say
11   Hamlit manages?
12        A.    Currently five.
13        Q.    And how many properties does Hamlit own?
14        A.    I believe three.
15        Q.    Does the name Surpass Marketing, LLC, mean
16   anything to you?
17        A.    Yes.
18        Q.    What is Surpass Marketing, LLC?
19        A.    I'm sorry.  I think the screen is locked up.
20   A couple times it seemed like it moved, but I -- I
21   don't know if you were just being motionless or the
22   video locked up.  It's happened a couple times, just
23   letting you know.
24        Q.    Okay.  Thank you.  Did you fully hear my
25   last question?
```

Videotaped Deposition of David Oppenheimer

15

1        A.    I'm not sure.

2        Q.    What does Surpass Marketing, LLC, do?

3        A.    Yeah.   That -- that question did not come

4    through.   Surpass Marketing doesn't do anything.

5    It's a dissolved company.

6        Q.    When did it dissolve?

7        A.    I don't recall.

8        Q.    Did you own Surpass Marketing, LLC?

9        A.    Yes.

10       Q.    Did anybody else have an ownership interest

11   in Surpass Marketing, LLC?

12       A.    Not that I recall.

13       Q.    Okay.   What did Surpass Marketing, LLC, do

14   when it existed?

15       A.    It provided services including web design

16   and online marketing.

17       Q.    And who actually did those services that

18   Surpass Marketing, LLC, offered?

19       A.    I did primarily, and I believe I engaged two

20   independent contractors through Surpass Marketing to

21   do work on behalf of Surpass Marketing's clients.

22       Q.    Okay.   Who were those two independent

23   contractors?

24       A.    One was Courtney Tiberio, and the other, I

25   don't know his name, but I know that -- or I recall

Videotaped Deposition of David Oppenheimer

16

1    that I retained somebody, and I think you have the

2    communication about those pay-per-click ads that we

3    discussed yesterday.

4        Q.    So the name of the other person would be in

5    the -- in that communication.

6        A.    It might be.  It -- and if not, I could try

7    to find it.

8        Q.    Was that person -- that person was not

9    McClary, was it?

10       A.    No.

11       Q.    That's M-c-C-l-a-r-y.

12       A.    Correct.

13       Q.    And John McClary, I think you said he  --

14   you hired him about a year ago, and he's done some

15   things on and off for you, but that's not the guy

16   we're talking about here; is that correct?

17       A.    Yes, that's correct.

18           MR. STIPKALA:  Okay.  Could we take a look

19       at Exhibit 136, Will, if you please.  Scroll to

20       the top of the first page, please.

21   BY MR. STIPKALA:

22       Q.    Mr. Oppenheimer, can you see what is on --

23   well, what can you see on your screen?

24       A.    I see -- oh, it looks like the home page of

25   Surpass Marketing that's captured in the Wayback

Videotaped Deposition of David Oppenheimer

1    Machine.

2              MR. STIPKALA:  Okay.  Will -- wait a second.

3    BY MR. STIPKALA:

4        Q.    It says, "Surpass Marketing - Economic

5    Search Engine Marketing."  What does that mean?

6        A.    "Economic Search Engine Marketing"?  Are you

7    asking me the whole thing?  Well, "Surpass Marketing"

8    is the name of the company.

9        Q.    Yeah.

10       A.    And "Economic Search Engine Marketing" was

11   kind of, like, a branded d/b/a name that Surpass

12   Marketing also used.

13       Q.    Oh, I see.

14       A.    I don't -- I don't know what else to call

15   it.  And it's self-explanatory.  The words, I think,

16   speak for itself.  "Economic" meaning that it would

17   be cost-effective to market your business to search

18   engines.

19       Q.    I see.  And then below that, it says,

20   "Guaranteed first page indexing in Google."  What

21   does that mean?

22       A.    That means we would offer a guarantee to

23   clients that we would get select words that they want

24   to appear and to show up in page 1 in Google for a

25   search of those terms.

Videotaped Deposition of David Oppenheimer

1          MR. STIPKALA:  Okay.  Will, if you can
2      scroll down just a little bit so we can see that
3      next paragraph.
4  BY MR. STIPKALA:
5      Q.    It says -- in bold text under the title, it
6  says, "Internet and Search Engine Marketing."  Do you
7  see that?
8      A.    Yes.
9      Q.    And then underneath it says -- I'll read the
10  full second sentence.  It says, "We use pioneering
11  tools that avail highly valuable internet and search
12  engine marketing SEM assessment data."
13          Do you see that?
14      A.    Yes.
15      Q.    What were those pioneering tools?
16      A.    Can we go off the record for a second?
17      Q.    Can we at least try and finish this -- is
18  there -- unless there's a privileged matter or
19  something like that that you want to speak with Scott
20  about.
21      A.    No.  No.  I want to speak with you but off
22  the record.  The reason I have concern is, is that I
23  did a lot of work developing proprietary trade
24  secrets, and I feel like this should be not part of a
25  public deposition.

Videotaped Deposition of David Oppenheimer

1    Q.    Okay.   Fair enough.

2    A.    I have no problem answering the question.   I

3  just don't want that to be public, and that's what I

4  wanted to discuss.

5    Q.    Okay.   Well, that's -- I think that could

6  answer my question, that you developed proprietary

7  trade secret tools to do that, and you want to keep

8  that secret.   Is --

9    A.    I want to clarify because your answer was

10 partially accurate, and I don't want to just say yes

11 to something that's not fully accurate.   I didn't

12 develop tools.   I developed techniques and systems

13 using available tools.

14   Q.    And your techniques and systems, you feel,

15 are your trade secrets; is that correct?

16   A.    I do.

17   Q.    Okay.   I don't believe I need to know what

18 those trade secret techniques and systems are today,

19 but thank you for that.   And please, just like that,

20 if you have any concern, please bring it to our

21 attention.   I don't want to -- I don't want you to

22 blurt out any confidential information or anything

23 like that.   So thank you for that.

24   A.    Thank you.

25   Q.    You see in the yellow box below that?

Videotaped Deposition of David Oppenheimer

20

```
1        A.    Yes.
2        Q.    You see it says -- I'll read the second
3   sentence again.  It says, "We can correct your
4   website for maximum search engine optimization, SEO,
5   or build you a new site quickly and
6   cost-effectively."  Do you see that?
7        A.    Yes.
8        Q.    What is search engine optimization?
9        A.    Search engine optimization is techniques and
10  efforts to design a web page or website so that it
11  will appear in search engines for the relevant terms
12  that would best suit a business.
13       Q.    I see.  How long did you do search engine
14  marketing and search engine optimization services
15  with Summit Marketing, LLC?
16       A.    I'm sorry.  You broke up.  You said -- I
17  imagine you said Surpass Marketing, LLC?
18       Q.    I'm sorry.  Yes.  How long did you do those
19  services?
20       A.    Yeah.  Just the thing broke up.  I didn't
21  hear the whole question.
22             I can't recall.  A few years, give or take.
23  Two or three years.
24       Q.    Did you --
25       A.    It might have been more.  Yeah.  I can't
```

Videotaped Deposition of David Oppenheimer

21

```
1    recall.
2         Q.    Okay.  But a few years, correct?
3         A.    Give or take.
4         Q.    Where did you get those search engine
5    marketing and search engine optimization skills?
6         A.    I developed them myself through reading and
7    studying.
8         Q.    Excellent.  Excellent.  Did you offer those
9    services in any other context?
10        A.    Can you define -- be more specific?
11        Q.    So you offered those services for Surpass
12   Marketing, correct?
13        A.    Yes.
14        Q.    Did you offer them -- those -- let me start
15   again.
16              Did you offer those services working with
17   any other company?
18        A.    Not that I recall.
19        Q.    Okay.  Were you successful with search
20   engine optimization?
21              MR. FRANCIS:  Objection, form, vague.
22   BY MR. STIPKALA:
23        Q.    Let me ask you a better question.
24              MR. STIPKALA:  Thank you, Scott.
25   BY MR. STIPKALA:
```

Videotaped Deposition of David Oppenheimer

22

1    Q.    Offering your search engine optimization
2  services with Surpass Marketing, LLC, did you ever
3  help a customer reach the first page of Google?
4    A.    I believe so, but I can't recall
5  specifically.
6    Q.    Okay.  Do you recall during your deposition
7  yesterday that we were looking at some metadata of
8  the images at issue in the present case?
9    A.    Yes.
10    Q.    And in that metadata, we saw some keywords
11  in the metadata that you entered.  Do you recall?
12    A.    Yes.
13    Q.    Would you say that those keywords entered in
14  the metadata are part of a search engine optimization
15  program for those images?
16    A.    I don't -- I don't think I heard or
17  understood that question.  Could -- did you say
18  "program"?
19    Q.    I said "program."
20    A.    And I don't understand that context.
21    Q.    Let me try that again.  You added keywords
22  to the metadata of the images at issue, correct?
23    A.    Yes.
24    Q.    Adding those keywords to the metadata, is
25  that search engine optimization?

Videotaped Deposition of David Oppenheimer

23

1      A.    It would be, in my opinion, if you added
2  them and then uploaded it to the internet.  You know,
3  just adding keywords isn't search engine
4  optimization, but if it's for a photo going onto a
5  website, I believe it would be.
6      Q.    And you did put those photos onto the --
7  your website, performanceimpressions.com; is that
8  right?
9      A.    Yes.
10     Q.    After you added those keywords to the
11 metadata, right?
12     A.    Correct.
13     Q.    Okay.  Let us talk about photography.  When
14 did you become a photographer?
15     A.    Well, I recall first starting -- I mean, I
16 took photographs in summer camp as a child, and so,
17 you know, I've enjoyed photography in the past.  In
18 2000 -- 1998 is when I recall first taking my camera
19 to concerts and taking photographs and where I made a
20 concerted effort to become a professional
21 photographer.
22     Q.    In 1998, going to that rock concert, did you
23 have any special access, backstage or otherwise, so
24 that you could take those pictures?
25     A.    The first concert, I don't recall.

Videotaped Deposition of David Oppenheimer

24

1       Q.      Have you gotten special access to rock
2    concerts to take pictures since then?
3       A.      Yes.
4       Q.      How do you get that backstage pass?
5       A.      There's different ways.  Sometimes it's
6    reaching out to a publicist or -- the band management
7    is primary.
8       Q.      Do you like the music -- let me rephrase.
9               Who do you photograph at these rock
10   concerts?  Which -- which acts?  Which artists?
11      A.      I photograph probably hundreds of different
12   artists.
13      Q.      Any favorites?
14      A.      Excuse me.  Not -- nothing that comes to
15   mind.  You know, there's been great experiences with
16   different shows and events and festivals and
17   performances that -- yeah.  I've never been one to
18   say, "Oh, that's my best friend/favorite food."
19      Q.      Sure.  Sure.  But I have to imagine -- let
20   me ask you:  Is it correct that it's pretty cool to
21   go backstage at a rock concert and take photographs?
22      A.      You know, I think taking photographs of the
23   performance is cooler than being backstage taking
24   photos.  It can be boring sometimes.  Some people,
25   sitting there on their cell phones or -- you know?

Videotaped Deposition of David Oppenheimer

1    So, it's not as cool as the performance.

2        Q.    All right.   What do you like about the

3    performance?

4        A.    The energy, the music itself.

5        Q.    I understand you also take aerial

6    photographs.   Is that correct?

7        A.    Yes.

8        Q.    And you mentioned yesterday that you

9    chartered a helicopter; is that right?

10        A.    I've chartered several helicopters.

11        Q.    Do you charter anything else, any other

12    aircraft?

13        A.    I don't recall chartering an airplane

14    before.

15        Q.    How long is it --

16        A.    I guess -- well, go ahead.  I just want to

17    clarify my answer.   Yeah.   It -- I've had pilots take

18    me up on private flights for aerial photography, but

19    I wouldn't consider it a charter.

20        Q.    So that's a buddy giving you a ride.

21        A.    More like an acquaintance taking me up for

22    gas money.

23        Q.    Okay.   Okay.   Have you ever been skydiving?

24        A.    Once.

25        Q.    Did you take photos on the skydive?

Videotaped Deposition of David Oppenheimer

1    A.    No, not that I recall.

2    Q.    Mental images, I'm sure, were enough.

3         Mr. Oppenheimer, would you say that you're a

4    celebrity among photographers?

5         MR. FRANCIS:  Objection, form.

6         You can answer the question, David.

7         THE WITNESS:  I wouldn't consider myself a

8    celebrity.

9    BY MR. STIPKALA:

10    Q.    Would others?

11    A.    I can't speak for others.

12    Q.    Would -- would you say that you are known

13    for your expertise at the intersection of photography

14    and copyrights?

15         MR. FRANCIS:  Objection, calls for

16    speculation.

17         THE WITNESS:  Can you repeat the question?

18    BY MR. STIPKALA:

19    Q.    Would you agree that you are known for your

20    expertise at the intersection of photography and

21    copyrights?

22         MR. FRANCIS:  Objection, speculation and

23    vague.

24         THE WITNESS:  That's a really vague

25    question, and I don't -- it's not well-defined.

Videotaped Deposition of David Oppenheimer

27

```
 1          You know, has somebody heard of me in a
 2      situation?  Probably, yes.  Am I known for that?
 3      I would say no.  But I just can't really give a
 4      clear answer to that, the way the question's
 5      worded.
 6          MR. STIPKALA:  Okay.  Can we please look at,
 7      Will, if you will, Exhibit Number 40, and scroll
 8      to the top of the first page.  Okay.  Right
 9      there.
10  BY MR. STIPKALA:
11      Q.   Do you see where it says -- at the top, at
12  the very top, in smaller print it says, "An Easy Way
13  to Find the ISP For DMCA Takedown Notices - Photo
14  Attorney."  And then it has the R and a circle.  Do
15  you see that?
16      A.   Yes.  Yes.
17          MR. STIPKALA:  Okay.  Scroll down so we can
18      see that -- that picture of -- I think it's a
19      wolf and then that text below there.
20  BY MR. STIPKALA:
21      Q.   Mr. Oppenheimer, this page that we're
22  looking at is -- has Bates number of Carolina One
23  14519.  Do you see that small paragraph that starts
24  with, "Even copyright attorneys get infringed"?  Do
25  you see that?
```

Videotaped Deposition of David Oppenheimer

1    A.    Yes.

2    Q.    Can you read that for me?

3    A.    "Even copyright attorneys get infringed.

4  David Oppenheimer of Performance Impressions, a

5  client of our firm, recently found 14 of my photos on

6  a different attorney website.  He figured correctly

7  that the uses, two examples shown below, weren't

8  authorized.  Note: Not only is the text not mine;

9  it's not correct for the most part."

10    Q.    Thank you.  Is -- is that you mentioned in

11  that paragraph?

12    A.    Yes.

13        MR. FRANCIS:  Objection, calls for

14     speculation.

15        Let me get my objections in, David.

16        THE WITNESS:  Sorry.

17        MR. FRANCIS:  That's okay.

18  BY MR. STIPKALA:

19    Q.    Do you recall mentioning this, these 14

20  photographs?

21    A.    Not specifically.  I have, like, a very

22  vague memory of, you know, looking at this, that I'd

23  contacted Carolyn about what I had found, and

24  that's -- but I wouldn't have known it was 14 or what

25  the photographs were because it's so long ago.

Videotaped Deposition of David Oppenheimer

29

1    Q.    Do you know who wrote this article?

2    A.    No.

3    Q.    You mentioned Carolyn.  Who is Carolyn?

4    A.    She was an attorney of mine.

5          MR. STIPKALA:  Will, can you scroll down?  I

6    think it's two pages.  It's going to be the top

7    of Carolina One 14521.  Yeah.  Go up some.  Right

8    there.

9    BY MR. STIPKALA:

10   Q.    It says -- do you see where it says,

11   "Author: Carolyn Wright"?

12   A.    Yes, I do.

13   Q.    It says, "Carolyn E. Wright A/K/A The Photo

14   Attorney," R in a circle.

15   A.    Correct.

16   Q.    Is that -- is that the author of this

17   article?

18   A.    According to what it says on this document,

19   yes.

20   Q.    And was she the attorney of whom you spoke a

21   moment ago?

22   A.    Yes.

23   Q.    Do you still keep in touch with Ms. Wright?

24   A.    We are not in touch.  I believe I was in

25   touch with her a couple years ago, but I just don't

Videotaped Deposition of David Oppenheimer

30

| | |
|---|---|
| 1 | recall when we last spoke or emailed. |
| 2 | Q.    I see.   Can you recall when this was, |
| 3 | this -- these 14 articles and your discussion about |
| 4 | that with Ms. Wright? |
| 5 | MR. FRANCIS:   Objection, calls for |
| 6 | speculation. |
| 7 | You can answer. |
| 8 | BY MR. STIPKALA: |
| 9 | Q.    Let me ask a better question.   Do you recall |
| 10 | when this conversation happened? |
| 11 | A.    No. |
| 12 | Q.    Do you see -- just on the screen right now, |
| 13 | do you see underneath there's another smaller picture |
| 14 | of Carolyn Wright?  It says, slash, February 4, 2012. |
| 15 | A.    Yes, I do. |
| 16 | Q.    Does that refresh your recollection as to |
| 17 | when this conversation might have happened? |
| 18 | A.    No, it doesn't.   I mean, it seems apparent |
| 19 | that that's when it occurred, but it's not making me |
| 20 | remember. |
| 21 | Q.    Sure, sure. |
| 22 | MR. STIPKALA:   Let us call up, if you |
| 23 | please, Exhibit 43, and scroll down to the first |
| 24 | page, top of the first page. |
| 25 | BY MR. STIPKALA: |

Videotaped Deposition of David Oppenheimer

31

1      Q.    Do you see where it says, "Photo Attorney"?
2  And then it says, "Using Internet Tools to Gather
3  Evidence of an Infringement - Part 2."  Do you see
4  that?
5      A.    Yes.
6      Q.    Then there's a picture of a lioness wading
7  through water.  Do you see that?
8      A.    I do.
9           MR. STIPKALA:  And then below that, if you
10          could, show the bottom of that page.  It's
11          Carolina One 14526.
12  BY MR. STIPKALA:
13      Q.    Can you see that text underneath the
14  lioness?
15      A.    Yes.
16      Q.    Can you read that text please?
17      A.    "As follow-up to" --
18          MR. FRANCIS:  Objection.  The document
19          speaks for itself.
20          You can -- you can read the text.
21          THE WITNESS:  "As follow-up to my first blog
22          entry on using internet tools to gather evidence
23          of an infringement, David Oppenheimer of
24          Performance Impressions provided some more
25          excellent tips: save a text file with the web

Videotaped Deposition of David Oppenheimer

32

```
 1          page's source code; save copy of the full HTM or
 2          HTML web page in a subfolder on your computer;
 3          save a text file that includes the URL of the web
 4          page and the URL where the image(s) is/are
 5          hosted; do a WHOIS search because some sites will
 6          have their information available now but later
 7          could subscribe to privacy services; and maybe
 8          the most important to add: download and save a
 9          copy of the photograph as used on the infringer's
10          website.
11  BY MR. STIPKALA:
12          Q.    And then what does it say?
13          A.    "Thanks, David!"
14          Q.    Did you give those tips to Ms. Wright?
15          A.    Yes, I did.  That I recall, I did.
16          Q.    Okay.  Do you recall when this was?
17          A.    No.
18          Q.    Do you see at the very top of the next page?
19  Just visible on my screen, I don't know if you can
20  see it on your screen.  Do you see the date, July 8,
21  2012?
22          A.    Yes.
23          Q.    Does that refresh your memory as to when
24  this conversation may have happened?
25          A.    Not really.  I mean, I knew it was a long
```

Videotaped Deposition of David Oppenheimer

1  time ago, give or take a decade, and that's -- that

2  doesn't really make me --

3        Q.    And do you know --

4        A.    -- remember more, you know.

5        Q.    I'm sorry for interrupting.

6        A.    Okay.  I was just saying --

7        Q.    Please continue.

8        A.    I was saying it doesn't make me remember

9  more, and no.

10        Q.    Okay.  And who wrote that article?

11        A.    I don't know.

12        Q.    Was it Ms. Wright, Ms. Carolyn Wright, Photo

13  Attorney?

14        A.    I'd like to change my last answer from "I

15  don't know" to "I'm not sure" because I assume

16  Carolyn wrote these, but, of course, I can't be

17  certain, and I don't recall a specific conversation,

18  but it was my understanding that she wrote the

19  articles on her website.

20        Q.    I see.  I see.

21            MR. STIPKALA:  Can we take a look at

22        Defendants' Exhibit 24, please.  And scroll to

23        the top of the first page.

24  BY MR. STIPKALA:

25        Q.    Mr. Oppenheimer, can you see this document

Videotaped Deposition of David Oppenheimer

34

1    on your screen?

2        A.    Yeah.

3        Q.    What is this document?

4        A.    It looks like an article on the website

5    called Techdirt.

6        Q.    And you see the title, "How Important Is

7    Attribution in Copyright Issues"?

8        A.    Yes.

9        Q.    Do you see below that a little bit it says,

10   "Tuesday, March 27, 2012, 11:33 p.m. - Mike Masnick,"

11   M-a-s-n-i-c-k?  Do you see that?

12       A.    Yes, I do.

13       Q.    Does it appear to be an article posted March

14   27, 2012, by Mike Masnick?

15       A.    It does.

16            MR. FRANCIS:  Objection.  The document

17       speaks for itself.

18            You can answer.

19            THE WITNESS:  It does.

20   BY MR. STIPKALA:

21       Q.    Okay.  Do you understand what attribution

22   is?

23       A.    I believe so.

24       Q.    What does that word mean to you?

25       A.    When credit is provided.

Videotaped Deposition of David Oppenheimer

35

1    Q.    What context?

2    A.    Where a source of the material is
3    identified.

4    Q.    Okay.  So if I were to write an article,
5    say, discussing one of your photographs and I said
6    that this is Mr. Oppenheimer's photograph, that
7    statement, "This is Mr. Oppenheimer's photograph,"
8    would that be attribution?

9    A.    I would consider that to be a attribution.

10        MR. STIPKALA:  Okay.  We're looking at --
11        Will, if you can, scroll slowly.  Just for
12        reference, this is Bates numbered Carolina One
13        014449, and there it is on the screen.  If you
14        could scroll further, Will, I think it's the next
15        page.  Yes.  I'm sorry, Will.  Scroll up a little
16        bit.  It's going to be Carolina One 14450.  Right
17        there.

18    BY MR. STIPKALA:

19    Q.    Do you see in about the middle of your
20    screen where it says, "David Oppenheimer, 28 Mar 2012
21    at 6:39 a.m."?

22    A.    Yes.

23    Q.    Is that 28th of March 2012?

24    A.    Yes.

25    Q.    And is that "David Oppenheimer" you to your

Videotaped Deposition of David Oppenheimer

36

1    knowledge?

2        A.    Yes.  I believe so.

3        Q.    And then it says sort of a title, "Copyright

4    Infringement."  Do you see that?

5        A.    Yes.

6        Q.    Underneath that it says, "Good points, and,

7    yes, I will work for less if credit is given with a

8    link to my site."  Is that your statement?

9        A.    I -- I don't recognize that icon next to my

10   name which makes me just wonder what account this is,

11   but I can't say for sure -- certain or not.

12       Q.    Okay.  Then underneath that it says another

13   point.  Can you read that paragraph for me?

14       A.    Yeah.  "Another point about attribution and

15   copyright.  I often hear from infringers that they

16   left my copyright notice/watermark intact on the

17   photo.  Many people have told me they thought they

18   were entitled to commercially use my photos because

19   they provided attribution, when, in fact, they just

20   committed willful copyright infringements by use --

21   by use my work with a prominent copyright notice."

22       Q.    Did you make that statement?

23       A.    I believe I did.  But I'm not certain.

24       Q.    Okay.  Is this a true and correct copy of

25   the statement that you posted on March 28, 2012, to

Videotaped Deposition of David Oppenheimer

37

1    this article?

2             MR. FRANCIS:  Objection, calls for

3        speculation.

4             You can answer.

5             THE WITNESS:  As far as I could tell.

6    BY MR. STIPKALA:

7        Q.    Is it fair to say that a prominent copyright

8    notice is not enough to ward off infringers?

9             MR. FRANCIS:  Objection, speculation.

10            You can answer.

11            THE WITNESS:  I think it warns quite a few

12       that would be infringers, so I -- I can't say yes

13       or no.

14   BY MR. STIPKALA:

15       Q.    Are you aware of any infringement of your

16   photographs that include a prominent copyright

17   notice?

18       A.    Yes.  In this case your client took two of

19   my photographs with prominent copyright notices.

20       Q.    It says in the comment that many people have

21   told you that they thought they were entitled to

22   commercially use your photos because they provided

23   attribution.  My question is how many is "many

24   people"?

25       A.    I do not recall.

Videotaped Deposition of David Oppenheimer

1    Q.    Do you recall when they told you this?

2    A.    No.

3    Q.    Was it in the course of resolving claims of

4    infringement against those people?

5    A.    I can't recall, but I would imagine that

6    would be when.

7    Q.    Have you changed anything in the way that

8    you publish your photographs since 2012 to better

9    protect against infringement?

10    A.    Yes.

11    Q.    What have you done since 2012 to better

12    protect your images?

13    A.    I have started adding more metadata to the

14    photographs.

15    Q.    And how does that additional metadata

16    further protect your photographs?

17    A.    Google changed their policy in the last

18    couple of years or last year, and there's metadata

19    fields for the licensor and one or two other fields,

20    and when you now add your information to those

21    fields, when photos index in Google Images, Google

22    Images is placing those notices below the photograph

23    so people will know: "This photo is available for

24    licensing.  Click here."  And it has that, like, link

25    and will take you, and it lets people know in

Videotaped Deposition of David Oppenheimer

39

1    addition to the notice of copyright.

2        Q.    So there's a -- because you add these words

3    to metadata, there's now going to appear with the

4    image a prominent copyright notice and also a link to

5    seek a license for that photograph; is that correct?

6        A.    That's my understanding of the change Google

7    implemented.

8        Q.    I see.  Have you done anything else since

9    2012 to better protect your photos from copying?

10       A.    Not that I recall right now.

11       Q.    Okay.  Have you added any text -- well, let

12   me back up.

13             We spoke about your galleries yesterday.  Do

14   you recall?

15       A.    To some extent.

16       Q.    Sure.  So you'll post a group of images in a

17   gallery on your website, performanceimpressions.com.

18   Is that true?

19       A.    Yes.

20       Q.    And that gallery will have an index page,

21   correct?

22       A.    I -- not always.  I don't believe the -- I

23   can't say for certain.  Some do, and I'm not certain

24   with all of them.

25       Q.    Sure.  But each gallery will have a main

Videotaped Deposition of David Oppenheimer

40

1   page that shows, perhaps, all the images that are in
2   that gallery; is that fair to say?
3       A.    I think it's really links to the
4   photographs.  It's showing thumbnails and links.
5   It's not really showing the full photograph, so I
6   don't think it's fair to say.
7       Q.    Okay.  But if I go to the main page of a
8   gallery, on my screen I will see a bunch of images,
9   not just a single image; isn't that right?
10      A.    You'll see thumbnails and links to images
11  that are in itself images, but it -- so it's a
12  misleading question.  I don't feel comfortable with
13  the way -- it's not a yes-or-no type thing.
14      Q.    Sure.  What do you call that main page of
15  the gallery that acts as you just described?
16      A.    The -- the -- the main page.
17      Q.    The main page of the gallery?
18      A.    Yeah.
19      Q.    Okay.  On the main page of your galleries
20  that you've created since 2012, have you added any
21  text that says something like, "Attribution does not
22  excuse copyright infringement"?
23            MR. FRANCIS:  Objection, argumentative.
24            Go for it.  You can answer, David.
25            THE WITNESS:  Not that I recall.

Videotaped Deposition of David Oppenheimer

41

1          Oh, I just want to correct.  I have a
2     recollection that there's a few galleries that do
3     show.  Like, it's one page, and it's just the
4     whole photo in several.
5  BY MR. STIPKALA:
6     Q.   Okay.  Explain that comment.  "It's one
7  page" and "the whole photo."  What does that mean?
8     A.   I mean, like -- like, the photos are shown
9  in their entirety on that page, and that's the
10 entirety of that gallery.
11    Q.   Okay.  And it's not --
12    A.   I mean, you don't -- I might be -- I'm
13 thinking -- I think I'm -- I'm recollecting Concert
14 Photos Magazine, I think.  You know, no.  Actually,
15 no.  I'm thinking of my website.  Yeah.  I'm going
16 back 15 years in my brain.  I think there's a few
17 galleries that have all the photos just shown on one
18 page.
19    Q.   Okay.  Regardless of how the images are
20 displayed on the main page of the gallery, we can say
21 that galleries have a main page; is that right?
22    A.   Yes.
23    Q.   Okay.  And then when you click on an image
24 in that gallery from that main page of the gallery,
25 you see an individual image.  Isn't that right?

Videotaped Deposition of David Oppenheimer

1    A.    Again, there's different galleries on the
2  website, and I was just saying that I believe there's
3  some galleries from a long time ago that do not have
4  that functionality.
5    Q.    I see.  But when you look at an image on
6  your website, performanceimpressions.com, do you see
7  any warning such as, "Attribution does not excuse
8  copyright infringement"?
9    A.    Not that I'm aware of.
10    Q.    Has there ever been such a warning on your
11  web page?
12    A.    Not that I'm aware of.
13    Q.    Let's look, if you please -- well, before we
14  call it up, we spoke yesterday about watermarks.  Do
15  you recall?
16    A.    Yes.
17    Q.    And we looked at online a watermark placed
18  on an image, and the text of that watermark is Fine
19  Art America.  Do you recall that?
20    A.    Yes.
21    Q.    And is it correct that you -- well, I'm not
22  going to ask you to recite word for word your
23  testimony, but didn't we talk about how the Fine Art
24  America watermark would be removed when the image is
25  purchased?  Do you recall?

Videotaped Deposition of David Oppenheimer

1      A.    Yes.

2      Q.    Okay.   Could you use watermarks like that to

3  better protect your images from copying?

4      A.    I believe the answer is no.

5      Q.    Why not?

6      A.    Well, you know, it's a -- it's a compound

7  question in a way.   There were, I think, two

8  components of that question.   Can you repeat it?

9      Q.    We're talking about the kind of watermark

10  that Fine Art America uses, and when we were looking

11  at Fine -- at your "Shop For Prints" section reached

12  from your website, performanceimpressions.com, we saw

13  that on some of the images there was a watermark, the

14  text of which was Fine Art America.   Do you recall

15  that?

16      A.    Yes.

17      Q.    And then we discussed how -- that if

18  somebody were to purchase a print from that screen,

19  they would receive a print but without the Fine Art

20  America watermark appearing on the print; isn't that

21  right?

22      A.    Yes.

23      Q.    So that is a removable watermark; isn't that

24  right?

25      A.    Yes.

Videotaped Deposition of David Oppenheimer

1    Q.    And my question, I suppose -- let me just
2    phrase the question: Couldn't you use a removable
3    watermark on your images to better protect them from
4    copying?
5    A.    That's two questions.  I'll answer it in two
6    parts.  Yes, I could use a watermark like that.  No,
7    I don't think it would better protect my photos.  I
8    think the one I use which is not removable is a
9    better protecting watermark than the Fine Art America
10   watermark.
11   Q.    Why wouldn't a removable watermark help
12   protect your images from copying?
13   A.    Because I believe that it would be easier
14   for somebody to wipe clean and remove a removable
15   watermark than one that's permanently embedded.
16   Q.    Could you use both, a permanently embedded
17   watermark and a removable watermark?
18   A.    Yes.
19   Q.    Are you aware of any instances where Fine
20   Art America's removable watermark has been removed by
21   an infringer?
22   A.    Not that I recall.
23        MR. STIPKALA:  Let's look, if you please, at
24        Defendants' Exhibit 13.
25        THE WITNESS:  Excuse me for a second.  I got

Videotaped Deposition of David Oppenheimer

45

1        to blow my nose.

2            MR. STIPKALA:  Shall we go off the record?

3            THE WITNESS:  Is that all right?

4            MR. FRANCIS:  Ms. Osborne, can you take down

5        the blowing of the nose?

6            THE WITNESS:  I'll be right back.

7            MR. STIPKALA:  Are we off the record?

8            THE VIDEOGRAPHER:  No, sir.

9            MR. FRANCIS:  Let's go off.

10            THE VIDEOGRAPHER:  Okay.  Off the record at

11        10:47 a.m.

12                        - - -

13          (There was a recess from 10:47 to 11:02.)

14                        - - -

15            THE VIDEOGRAPHER:  On the record at

16        11:02 a.m.

17            MR. STIPKALA:  Thank you, Michael.

18  BY MR. STIPKALA:

19        Q.    Before we look at Exhibit 13,

20  Mr. Oppenheimer, just very briefly, did you consult

21  with your attorney during that break?

22        A.    No.

23        Q.    Okay.  Thank you.

24            MR. STIPKALA:  Thank you, Will.  If you

25        could, put up Exhibit 13, and scroll down to the

Videotaped Deposition of David Oppenheimer

1     first page.
2  BY MR. STIPKALA:
3     Q.    Mr. Oppenheimer, can you see that image on
4  your screen?
5     A.    Yes.
6     Q.    What is that image?
7     A.    It looks like a photo of Marsh Harbor.
8     Q.    Would you agree with me that it captures
9  approximately the same subject as the second image,
10 the one that we have been calling 5964?
11    A.    Yes.
12    Q.    Okay.  Do you see in the image -- just a
13 little bit to the right of the bottom center of the
14 image, you see the words Alamy?  That's spelled
15 A-l-a-m-y, and it's sort of at an angle.  Do you see
16 that word?
17    A.    Yes.
18    Q.    And that word also appears on the left-hand
19 side of the image.  Do you see that?
20    A.    Yes.
21    Q.    And it also appears over the marina.  Do you
22 see that?
23    A.    Yes.
24    Q.    Well, it also appears over the houses over
25 on the right-hand side near what we've called the

Videotaped Deposition of David Oppenheimer

47

1   Seven Dock.  Do you see that?
2       A.    Yes.
3       Q.    And do you see sprinkled over this image are
4   little small letter A -- small letters A?  You see
5   those small As all over the image?
6       A.    I do.
7       Q.    What are those words Alamy and those little
8   letter As?
9       A.    A watermark.
10      Q.    Are those removable watermarks as we have
11  been discussing?
12            MR. FRANCIS:  Objection.
13            THE WITNESS:  I do not know.
14  BY MR. STIPKALA:
15      Q.    Okay.  Could they be removable watermarks?
16            MR. FRANCIS:  Objection, form, speculation.
17            You can answer, David.
18            THE WITNESS:  I'm not sure.  Oh, could they
19      be is the question.  Yes, they could be.
20  BY MR. STIPKALA:
21      Q.    Do you see the words at the bottom of the
22  image?  It says, "Alamy Stock Photo."
23      A.    Yes.
24      Q.    What is a stock photo?
25      A.    A photograph that is available for

Videotaped Deposition of David Oppenheimer

1    licensing.

2        Q.    Okay.    So this is an image that is available

3    for licensing.

4            MR. FRANCIS:    Objection, form, speculation.

5    BY MR. STIPKALA:

6        Q.    Could this be an image that is available for

7    licensing?

8        A.    Yes.

9        Q.    Okay.    If these are removable watermarks,

10   the Alamy and the little letters A, and they are

11   removable watermarks, wouldn't that be very similar

12   to the removable watermark that Fine Art America puts

13   on its images?

14       A.    I'm uncertain.

15       Q.    If I purchase this image from Alamy at

16   alamy.com and in the purchased image those watermarks

17   are removed, wouldn't that be removable watermarks?

18   I'm sorry.    I object to that question.

19           If I purchase this image and the image that

20   I purchased after I paid for it did not have those

21   words Alamy and the little letters A, wouldn't that

22   mean that Alamy and the little letters A are

23   removable watermarks?

24       A.    Not necessarily.

25       Q.    Why not?

Videotaped Deposition of David Oppenheimer

49

1      A.    It's possible that they did something
2   different.
3      Q.    Like what?
4      A.    Could you repeat the question?
5      Q.    Like what?
6      A.    No.   The -- the underlying question.
7            MR. STIPKALA:   Sure.
8            Could the court reporter read back the long
9      question.   Perhaps it's two questions ago.
10                          - - -
11      (The court reporter read back the requested
12      portion of the deposition transcript.)
13                          - - -
14           MR. FRANCIS:   I'm going to object to that
15      question as compound, but you can answer, David.
16           THE WITNESS:   I'm sorry.   Can you read it
17      one last time, please, because Scott threw off my
18      train of thought.
19           MR. FRANCIS:   Oh, I'm sorry.
20           THE WITNESS:   No.   It's not to be sorry.
21      It's just --
22   BY MR. STIPKALA:
23      Q.    If I may -- if I may, let me ask better
24   questions.   So the advertised image here in Exhibit
25   13 has these words Alamy and little letters A on the

Videotaped Deposition of David Oppenheimer

50

1    image, correct?

2        A.    Yes.

3        Q.    And that's the advertised image --

4        A.    Yes.

5        Q.    -- would you agree with that?

6              Then suppose I purchase this image.  Okay?

7        A.    Yes.

8        Q.    And I get the purchased image now, and the

9    purchased image does not have the Alamy and the

10   little letters A.  Understand?

11       A.    Yes.

12       Q.    Could we agree that the words Alamy and the

13   little letters A in that circumstance are removable

14   watermarks?

15       A.    No.

16       Q.    And why not?

17       A.    Because I can't be certain.

18       Q.    They appear on the advertised image.  They

19   do not appear on the purchased image.  Therefore,

20   they are removable.  Do you not agree?

21       A.    I do not agree.

22       Q.    Okay.  Why?

23       A.    Because they could have made two copies.

24       Q.    Ah.  I could have purchased an image that

25   never had watermarks.  Is that what you're saying?

Videotaped Deposition of David Oppenheimer

51

1        A.    Correct.

2        Q.    Or I could receive an image that never had

3    watermarks, correct?

4        A.    Correct.

5        Q.    Would you say --

6        A.    So, therefore, it wouldn't have been

7    removed.

8        Q.    I understand.  So Alamy could be advertising

9    one image that has these watermarks, correct?

10       A.    Uh-huh.

11       Q.    And then Alamy could actually deliver, upon

12   payment, a different image that looks substantially

13   the same except it does not have those watermarks in

14   it.  Is that what you're saying?

15       A.    Yes.

16       Q.    Okay.  Would you agree with me then that the

17   image that does not have the watermarks on it in that

18   circumstance is behind a paywall?

19       A.    That -- that's something I couldn't answer,

20   but -- I wouldn't know.  With the information I have

21   in front of me, no.

22       Q.    Okay.  So we're -- in one circumstance I'm

23   proposing to you that these are removable watermarks

24   such as what Fine Art America uses, and do you agree

25   that that is one possibility that we're looking at

Videotaped Deposition of David Oppenheimer

52

1    here?

2         A.    Yes.

3         Q.    And then another different possibility that

4    you astutely have raised is that we could be looking

5    at one advertised image that has the watermarks

6    embedded in them, and then if we purchase a licensed

7    image or a print thereof, we then receive -- after

8    payment is received, then we receive an entirely

9    different image from Alamy.  Is that the second

10   possibility that you're describing?

11        A.    Yeah.  Same image, different copy.

12        Q.    Sure, sure.  So two different copies of the

13   same image, one with the watermarks, one without,

14   correct?

15        A.    Correct.

16        Q.    Okay.  And the one without is hidden until

17   we pay for it, correct?

18             MR. FRANCIS:  Objection.

19             THE WITNESS:  I couldn't be certain of that.

20   BY MR. STIPKALA:

21        Q.    Okay.  Have you considered using watermarks

22   such as what we see on this Alamy photo in Exhibit 13

23   in your own work?

24        A.    Can you define the word "considered"?

25        Q.    Were you ever aware of an instance of

Videotaped Deposition of David Oppenheimer

53

1    watermarks that appear substantially over the entire

2    image such as what we see here in this Alamy photo?

3        A.    I'm sorry.  I did not understand the -- the

4    first part of your question, I didn't understand how

5    it was phrased.

6        Q.    Okay.  Have you ever been aware of an

7    instance of an image published on the internet for

8    sale or for license that has watermarks distributed

9    across the image such as what we see here in Exhibit

10   13?

11       A.    Yes.

12       Q.    Who does that?

13       A.    Alamy.

14       Q.    Anybody else?

15       A.    I've seen Getty Images do it.

16       Q.    Has it occurred to you to -- for you to try

17   and do that?

18       A.    Can you rephrase the question?  The word

19   "occurred" --

20       Q.    Yes.

21       A.    -- was hard for me to answer.

22       Q.    Sure.  Being aware of Alamy and Getty Images

23   using watermarks across the whole image, like what we

24   see in this image in Exhibit 13, did you consider

25   deploying watermarks in a similar fashion on the

Videotaped Deposition of David Oppenheimer

images that you post to performanceimpressions.com?

A.    I may have thought of the idea, but I
wouldn't go as far as to say that I considered.  I
think considering is a little more into the, like,
planning stages or -- so...

Q.    So you thought of it.

A.    Yes.

Q.    What did you think of it?

A.    Thought it was a bad idea.

Q.    How come?

A.    For a couple of reasons.  One of them was --
I'm trying to remember.  One of them -- well, one of
them is: It really detracts from the photographs when
there's a big watermark or watermarks across the
photograph.

The second reason is: It's a lot of work,
putting watermarks on the photograph, and I try to do
it in a way that it's a final usable product where
that -- it's not intrusive to a viewer, but it's
apparent and legible to a business owner or a editor,
and so that way when somebody needs a photograph to
use, I have the final product ready for them with the
notice of copyright on the face that they can use
that's not detracting to the photograph.

For example, when you opened up my

Videotaped Deposition of David Oppenheimer

55

photographs yesterday and you looked at a similar

photo of Marsh Harbor, you paid two compliments to

the photograph, at how good it looked, and I don't

see you saying that about this photograph.

Q.    You have talent, sir.  I will give you that.

A.    Thank you.

Q.    But why would a watermark detract from the

experience of shopping for an image if I know that

when I purchase that image, the watermark won't be

there?

A.    I think that first impressions go a long

way.  I have read that there's been studies that have

established that fact, but I haven't read them, so I

don't know the details, but -- and now I'm not even

sure what the question was.

       MR. STIPKALA:  Could you read back the last

   question because I'm not sure what the last

   question was either.

                        - - -

   (The court reporter read back the requested

   portion of the deposition transcript.)

                        - - -

       THE WITNESS:  I believe I answered that.

BY MR. STIPKALA:

Q.    Is it technologically feasible for you to

Videotaped Deposition of David Oppenheimer

56

1    add watermarks across the whole of your images before
2    you post them to performanceimpressions.com?
3        A.    Yes.
4        Q.    Do you know how to do that?
5        A.    I know a way to do that.
6        Q.    Okay.  Who adds the copyright notice to the
7    lower right-hand corner of your images that you post
8    to performanceimpressions.com?
9        A.    I do.
10       Q.    And you could add another watermark; is that
11   correct?
12       A.    Yes.
13            MR. STIPKALA:  If you please, Will, could we
14       look at Exhibit 31.  Okay.  And scroll down to
15       the top, first page.  Yes.
16   BY MR. STIPKALA:
17       Q.    Mr. Oppenheimer, do you recognize this
18   document?  At least through the part that you can see
19   on the top of the screen there?
20       A.    Yes, vaguely.
21       Q.    And what is that document?
22       A.    Terms and conditions of Performance
23   Impressions.
24       Q.    And would that be the terms and conditions
25   of your -- using your website,

Videotaped Deposition of David Oppenheimer

57

1    performanceimpressions.com?

2        A.    Correct.

3        Q.    And it says that it was last updated

4    February 21, 2021.  Do you see that?

5        A.    Yes.

6        Q.    Are you aware of -- let me start again.

7              Do you recall what changes or updates were

8    made February 21st?

9        A.    Not specifically.

10       Q.    Okay.  Generally?

11       A.    Actually, no --

12       Q.    Okay.

13       A.    -- I don't recall.  That -- on that specific

14   date, that date doesn't trigger any memories.

15       Q.    Okay.  Yesterday, we explored the

16   establishment of your website; do you recall that?

17       A.    Yes.

18       Q.    And you recalled that you launched your

19   website over a decade ago.  Do you recall what year

20   that you launched your website

21   performanceimpressions.com?

22       A.    Yes.

23       Q.    What year?

24       A.    2002.

25       Q.    Okay.  I apologize.  I've lost that detail

Videotaped Deposition of David Oppenheimer

58

| | |
|---|---|
| 1 | at the moment.  Did you always have, since 2002, |
| 2 | terms and conditions for your website? |
| 3 | A.    No. |
| 4 | Q.    Do you recall when you added terms and |
| 5 | conditions to your website? |
| 6 | A.    No.  Oh, I mean, well, Dolo did it when they |
| 7 | built the new website, so... |
| 8 | Q.    And that was in 2020. |
| 9 | A.    Yeah.  And I recall yesterday saying that I |
| 10 | believe it was launched on December 15th of 2020. |
| 11 | Q.    Okay.  Before December 15, 2020, did your |
| 12 | website have terms and conditions? |
| 13 | A.    I don't think so. |
| 14 | Q.    Okay.  When you go to your website now, do |
| 15 | your terms and conditions -- let me rephrase. |
| 16 | When you visit performanceimpressions.com, |
| 17 | are the terms and conditions available there? |
| 18 | A.    I'm not certain. |
| 19 | Q.    Okay. |
| 20 | A.    It's under development, and so last time I |
| 21 | looked, I believe it was there. |
| 22 | MR. STIPKALA:  Okay.  Oh, let me finish with |
| 23 | this. |
| 24 | Let's scroll down through this document, |
| 25 | Will, if you please.  Okay.  Keep going.  Okay. |

Videotaped Deposition of David Oppenheimer

59

1          Stop there.
2     BY MR. STIPKALA:
3          Q.    Okay.  Can you read that sentence for us?
4     It's --
5          A.    Which one?
6          Q.    It's number one, "Permission is granted."
7     What does that say?
8          A.    "Permission is granted to temporarily
9     download" --
10              MR. FRANCIS:  Objection.  Document speaks
11         for itself.
12              David --
13              THE WITNESS:  Sorry.
14              MR. FRANCIS:  -- I'll let you read it.  I
15         don't have a problem with you answering the
16         question.
17              Objection that the document speaks for
18         itself.
19              THE WITNESS:  "Permission is granted to
20         temporarily download one copy of materials,
21         information or software on Performance
22         Impressions' website for personal,
23         non-commercial, transitory viewing only.  This is
24         the grant of a license, not a transfer of title
25         or under this license you may not"...

Videotaped Deposition of David Oppenheimer

60

1    BY MR. STIPKALA:
2        Q.    Okay.    You can stop there.    But just for
3    completeness, on the top of the next page, it says
4    five things that you may not do; is that correct?
5        A.    Yes.
6        (Simultaneous cross-talk.)
7        Q.    I'm sorry.    Please complete your sentence.
8        A.    I can't -- I want to take back my last
9    answer because I didn't review what I -- I just
10   glanced at it.    There -- I see numbers one through
11   five below that seem to be part of the terms.
12       Q.    Yes.    And it says -- the sentence bridging
13   those two pages concludes with, "And under license
14   you may not," and then it lists those five things; is
15   that right?
16       A.    Yes.
17       Q.    And among them it says, "You may not, number
18   one, modify or copy the materials;" is that right?
19       A.    Yes.
20       Q.    Okay.    Okay.    I'm going to ask you now:    Is
21   this a true and correct copy of the terms of
22   conditions that govern your website to the extent
23   that it's published on your website?    So let us --
24   that's going to be my question, a true and correct
25   copy.

Videotaped Deposition of David Oppenheimer

1          And I'm going to ask Will to scroll up and
2     down at your direction so that you may satisfy
3     yourself whether this is a true and correct copy.  So
4     if you like, have Will to scroll down to see more of
5     the document.
6               THE WITNESS:  Will you scroll through the
7          whole document, please?
8               I can't say for certain, but this does
9          appear to be a true and correct copy.
10              MR. STIPKALA:  Okay.  Thank you.  We can
11         stop screen-sharing now.
12    BY MR. STIPKALA:
13         Q.   Are you familiar, Mr. Oppenheimer, with the
14    idea of a pop-up window?
15         A.   Yes.
16         Q.   What is a pop-up window?
17         A.   A window that pops up on a internet screen.
18         Q.   Under what circumstances?
19         A.   It could be a variety of circumstances.
20         Q.   For example?
21         A.   An error code.
22         Q.   Anything else?
23         A.   Security warning.
24         Q.   How would a security warning work?
25              MR. FRANCIS:  Objection, form, calls for

Videotaped Deposition of David Oppenheimer

62

1     speculation.

2          You can answer, David.

3          THE WITNESS:  If software on your computer

4     detected, like, a suspicious hacking attempt, you

5     might get a pop-up that says, "Warning: Someone's

6     trying to access your computer."

7  BY MR. STIPKALA:

8     Q.    What if I was on a website and I moused over

9  a link that was suspect?  Could I get a security

10 pop-up then?

11    A.    I'm not sure.

12    Q.    Have you ever seen a security pop-up window?

13    A.    Like the one I was referring to.  I'm not

14 sure if I've seen one like the one you were referring

15 to.

16    Q.    Have you ever encountered a pop-up window

17 while surfing the internet?

18    A.    Yes.

19    Q.    In what circumstance?

20    A.    I've seen security warnings like, "The site

21 you're about to enter is malicious.  Do not proceed."

22    Q.    And how were you about to enter a site?

23    A.    Clicking on a link.

24    Q.    Do you know how to create a pop-up window?

25    A.    No.

Videotaped Deposition of David Oppenheimer

63

1    Q.    Is it feasible in your understanding to add
2    a pop-up window to emerge when somebody clicks on an
3    image that you post?
4    A.    I'm sorry.  I lost the first part of that
5    question.
6    Q.    Given your understanding of your website and
7    HTML coding -- well, let me -- let me preface.  We
8    spoke a little bit about HTML coding yesterday; do
9    you recall?
10   A.    Yes.
11   Q.    And you -- we looked at an email between you
12   and Ms. Courtney in which you provided some HTML code
13   for a share button; is that correct?
14   A.    Yes.
15   Q.    Given -- and then you said -- and I don't
16   want to mischaracterize what you said, so please
17   correct me if I mischaracterize.  But you said that
18   you had some understanding of HTML coding.  Is that
19   correct?
20   A.    Yes.
21   Q.    Given that understanding of HTML coding and,
22   of course, other experiences you may have had, is it
23   technologically feasible to add a pop-up window to
24   your performanceimpressions.com?
25   A.    That's kind of a compound question, I think.

Videotaped Deposition of David Oppenheimer

64

1    My knowledge of HTML -- I don't know anything about
2    pop-up window coding that I could recall ever knowing
3    in the past, and so I don't think it would be HTML
4    that would make a pop-up work.
5         Q.    Okay.  What would make it work?
6         A.    Something like JavaScript which I don't know
7    anything about.
8         Q.    Okay.  Okay.  Are you aware of any reason
9    why a pop-up window would not be possible on your
10   website, performanceimpressions.com?
11        A.    I cannot think of a reason why one would not
12   be possible.
13        Q.    And you have never used pop-up windows on
14   your website, have you?
15        A.    Not that I recall.
16             MR. STIPKALA:  Okay.  Okay.  I'm at a good
17        transition if anybody wants to take very short
18        break.
19             MR. FRANCIS:  David, that's up to you.
20             THE WITNESS:  I'll give you five, Jeremy, if
21        you want it.
22             MR. STIPKALA:  Okay.
23             THE WITNESS:  Or ten, whatever.
24             MR. STIPKALA:  You want to take ten?
25             THE WITNESS:  Sure.

Videotaped Deposition of David Oppenheimer

65

1          MR. STIPKALA:  We can do that.

2          THE WITNESS:  11:43.

3          THE VIDEOGRAPHER:  All right.  Off the

4      record at 11:33 a.m.

5                        - - -

6        (There was a recess from 11:33 to 11:48.)

7                        - - -

8          THE VIDEOGRAPHER:  On the record at

9      11:48 a.m.

10  BY MR. STIPKALA:

11     Q.    Hello, Mr. Oppenheimer.  Did you speak with

12  your attorney during the break?

13     A.    Yes.

14     Q.    And would your attorney like to make a

15  report pursuant to Local Rule 30.04 about what you

16  spoke of with him?

17     A.    I don't know the answer to that question.  I

18  can't answer for my attorney.

19          MR. STIPKALA:  Scott, local rule says that

20      you make a report that you talked about stuff,

21      and it was all right and good and improper.  Do

22      you need that rule?

23          MR. FRANCIS:  I did not speak with

24      Mr. Oppenheimer during the break.

25          MR. STIPKALA:  Oh.

Videotaped Deposition of David Oppenheimer

66

1    BY MR. STIPKALA:

2        Q.    Which attorney did you speak?

3        A.    I spoke with Dana.  I talked about his dog

4    and bioflavanoids.

5        Q.    Okay.  Did you speak about your testimony --

6        A.    No.

7        Q.    -- with him?

8              Did you speak about this case with him?

9        A.    No.

10       Q.    Okay.  Are his dogs okay?

11       A.    Yes.

12       Q.    Okay.  Good.

13             Okay.  Let's talk about where you publish

14   your images.  You do not post your photographs just

15   to performanceimpressions.com; is that correct?

16       A.    Correct.

17             MR. STIPKALA:  Okay.  Let us open, Will, if

18       you please, Defendants' Exhibit 72.  And scroll

19       down to show the top of the first page.

20   BY MR. STIPKALA:

21       Q.    Mr. Oppenheimer, do you recognize this

22   document?

23       A.    I assume --

24       Q.    We can scroll through it.

25       A.    Yeah.  I assume it's part of the discovery

Videotaped Deposition of David Oppenheimer

67

1    production of where the photo was published, the

2    photos in this case were published.

3        Q.    Yes.    And do you see about the middle of the

4    screen it says, "Marsh Harbor, Mount Pleasant Real

5    Estate Opp5960.jpg"?

6        A.    Correct.

7        Q.    And that's our first image at issue in this

8    case, right?

9        A.    Correct.

10       Q.    Or shall I say the file name for a version

11   of the first image at issue in the case, right?

12       A.    Yes.

13       Q.    And below that, we see a similar file name

14   ending in Opp5964.jpg.    Do you see that?

15       A.    Yes.

16       Q.    And can we agree that that is perhaps a file

17   name for the second image at issue in the case or a

18   version of that image?

19       A.    Yes.

20       Q.    Okay.    Okay.    So, now, looking at the top of

21   the screen, we see a URL that starts with

22   performanceimpressions.com.    Do you see that?

23       A.    Yes.

24       Q.    And that's your website, correct?

25       A.    Yes.

1    Q.    Do you recognize that website?  I'm sorry.
2    Let me rephrase.
3         Do you recognize that URL as a place where
4    you published the 5964 image?
5    A.    I'd just like to make a correction that I've
6    noticed that I made a mistake, and I guess I
7    didn't -- it didn't copy when I pasted, and I
8    didn't -- I overlooked that, but that -- it looks
9    like there's two duplicate links.  In one of those,
10   the four should be a zero if I'm not mistaken.
11   Q.    We're looking at the two sections of text at
12   the top of this page; is that right?
13   A.    Yeah.
14   Q.    So one is -- I'm going to look at the URL,
15   but I'm going to just talk about the very end of it
16   where it says Opp5964_large.html.
17   A.    Correct.
18   Q.    I'm sorry.  I screwed that up.  It's -- it
19   refers to 5964 in the upper section, and then in the
20   second section it refers again to 5964.  Do you see
21   that?
22   A.    Yeah.
23   Q.    And --
24   A.    The second set of text in the link.
25   Q.    Right.  Yes.  And are you saying that one of

Videotaped Deposition of David Oppenheimer

1  those should refer to 5960?

2      A.    I'm all but certain.  I'm not positive, but

3  I believe so.  So I believe that that was

4  typo/clerical error in production, and I apologize,

5  and I will look at that to clarify it when I get

6  home, but I'm fairly certain that one of those fours

7  should be a zero.

8      Q.    Sure, sure.  Sure, sure.  And you --

9      A.    Since it's for two web pages and not the

10  same web page.

11     Q.    Yeah.  And you've got a notation under both

12  of those that says, "Old website page removed but

13  still archived and hosted online on GoDaddy server

14  but not available to be viewed online."

15            Do you see that note?

16     A.    Yes.

17     Q.    What does that note mean?

18     A.    I was trying to explain to you in production

19  that herein is the old version of the website that's

20  no longer online, but it's hosted on GoDaddy.

21     Q.    Right.

22     A.    I spoke to GoDaddy maybe two months ago

23  about this, and I said, "Is there any way" -- it was

24  my understanding in the past that there was a way --

25  even if a site was not connected online to a

Videotaped Deposition of David Oppenheimer

70

1    dot-com -- I don't know the term -- that you could
2    still get a bunch of numbers to be a URL and get to
3    see that page.  And GoDaddy informed me that the
4    hosting account that I have, it will only allow it to
5    be viewed online if it's connected to a website --
6        Q.    I see.
7        A.    -- and so that's what I was trying to
8    explain.
9        Q.    Okay.  And then we see in the third section
10   of text a URL that includes the text godaddy.com.  Do
11   you see that?
12       A.    Yes.
13       Q.    What does that URL do?
14       A.    That, when I logged into my hosting account,
15   if I'm not mistaken, I found this URL which was where
16   I was able to identify the two photos still hosted on
17   the GoDaddy server, and that's why I placed those two
18   incomplete URLs below that.
19       Q.    I see.  So that GoDaddy URL provides those
20   two file names that follow the 5960.jpg and the
21   5964.jpg file names; is that correct?
22       A.    I don't think that's exactly stated
23   properly, your question.  Can you please rephrase it
24   or restate it?
25       Q.    I'm just trying to synthesize what you just

Videotaped Deposition of David Oppenheimer

1    told me.  So GoDaddy has your old pictures that you

2    can access when you log into your GoDaddy account; is

3    that fair to say?

4         A.   That -- that's more accurate, yes.

5         Q.   Okay.  Okay.  And then below that, we see

6    two URLs that refer to flickr.com.  Do you see those?

7         A.   I do.

8         Q.   Okay.  So you post your photos to

9    flickr.com; is that right?

10        A.   Yes.

11        Q.   Do you -- have you posted the two images at

12   issue in this case to flickr.com?

13        A.   I believe those two links are where those

14   two photos are published, on Flickr.

15        Q.   Okay.  And I see photoshelter.com.  Is that

16   another place where you have posted the images?

17        A.   Yes.

18             MR. STIPKALA:  All right.  Scroll down,

19        Will, if you please.

20   BY MR. STIPKALA:

21        Q.   I see facebook.com.  Do you see that

22   Mr. Oppenheimer?

23        A.   Yes.

24        Q.   Okay.  Is that a place where you have

25   published your -- one or both of your images in the

Videotaped Deposition of David Oppenheimer

72

1    present case?

2         A.    I can't recall specifically.

3         Q.    Do you recall listing this Facebook URL on

4    this document?

5         A.    I don't recognize the URL.

6         Q.    Did you -- do you recall ever posting

7    your -- let me start over.  Do you recall posting

8    either one of the two images at issue in the present

9    case to Facebook?

10        A.    No.

11        Q.    You don't recall?

12        A.    Correct.

13        Q.    Okay.  And then I see -- in the next bit of

14   text, I see a URL that includes the text

15   1-performance-impressions.pixels.com.  Can you tell

16   me why there's -- if you know, can you tell me why

17   there's a performanceimpressions.pixels.com URL?

18        A.    Yes.

19        Q.    If I recall, we actually looked at a URL

20   yesterday that had that combination of text.  Do you

21   recall that?

22        A.    Vaguely.

23        Q.    And we may have gotten to that if we clicked

24   on the "Shop For Prints" button or something like

25   that.  I'm not looking for precision here.  I'm just

Videotaped Deposition of David Oppenheimer

73

1    trying to understand, "Oh, yeah.  Okay.  This is

2    where this could be."  So, no -- no question there.

3            I see below that fineartamerica.com.  Is

4    that a place where you posted your photos that are at

5    issue in this case?

6    A.    Yes.  But the question's a little

7    misleading.  Pixels and Fine Art America are one and

8    the same.

9    Q.    Okay.  But this Fine Art America URL here

10   that's just a few lines up from the bottom on the

11   page Bates numbered Oppenheimer Scarafile 200, was

12   that published there by you or at your --

13   A.    I'm sorry.  I don't know what you're

14   talking -- the -- can you show me the "Oppenheimer

15   Scarafile 200"?

16   Q.    It's there at the bottom lower right-hand --

17   A.    Oh, sorry.  It was -- it was blocked up by

18   the --

19   Q.    I'm sorry.

20   A.    By the videos.

21   Q.    Okay.

22   A.    All right.

23   Q.    Okay.  So I'm just asking if you're aware

24   that your images are published on fineartamerica.com

25   either by you or with your permission?

Videotaped Deposition of David Oppenheimer

1      A.    Yes.

2      Q.    And then it says, "Currently on my website

3   here," and then it shows performanceimpressions.com,

4   right?

5      A.    Correct.

6      Q.    And what does that note say?  It says,

7   "Specific page URLs are coming up but not currently

8   there."  What does that mean?

9      A.    Meaning that the individual photo pages

10   currently do not have an individual specific web page

11   URL.

12      Q.    I see.  And then at the bottom there, you

13   list several URLs: Facebook, Fine Art America,

14   PhotoShelter and performanceimpressions.com.  What --

15   what are those URLs?

16      A.    Those are terms of use of those websites.

17      Q.    And why did you include them here?

18      A.    I was trying to respond to discovery

19   requests.  I can't recall the exact question, but I

20   was trying to be responsive.

21      Q.    Okay.  And let's scroll to the top of the

22   next page, please.  It says, "Photos may have been

23   published on."  Do you see that?

24      A.    Yes.

25      Q.    And you list panoramio- -- I'll spell that,

Videotaped Deposition of David Oppenheimer

1    p-a-n-o-r-a-m-i-o -- -.com.   Google Maps.   Picassa,

2    that's P-i-c-a-s-s-a.   They also have been published

3    on mobypicture- -- that's m-o-b-y-p-i-c-t-u-r-e --

4    -.com.   And then it says, "May have been published on

5    LinkedIn and/or Twitter but uncertain and cannot

6    find."  Do you see that?

7         A.    Yes.

8         Q.    Is it fair to say those are publications

9    that you made but perhaps they're dead now?  You

10   can't find them?  They're no longer active?

11        A.    I'm uncertain.  And if you're -- yeah.   Can

12   you be more specific?

13        Q.    Yeah.   That was a little bit compound there.

14   Are these links that you've listed here at the top of

15   the page -- let me start over.   Are these websites

16   that you've referred to at the top of the page here

17   places where you may have published your images at

18   issue in the present case but you can no longer find

19   them there?

20        A.    Correct.   Yes.

21        Q.    Okay.   Is it fair to say that of the images

22   appearing at the several URLs listed on this page --

23   excuse me.   Let me start over.

24             Is it fair to say that the URLs listed in

25   this document contain your image published there by

Videotaped Deposition of David Oppenheimer

1    your hand or with your permission?

2        A.    Oh, man.  There's, like, three parts to that

3    question.

4        Q.    Let me try again.

5        A.    At -- one of the problems is the current

6    tense.  I'll tell you that.  I'll just give you a

7    heads-up.

8        Q.    Okay.  Did you authorize the publication of

9    your image to these URLs?

10       A.    Some of them.  Some images.  I can't say

11   which ones with certainty.

12       Q.    Are any of the URLs in this exhibit

13   unauthorized publications of your images?

14       A.    I couldn't answer that.

15             MR. STIPKALA:  Okay.  I think -- well, let's

16       scroll up, please, Will.

17   BY MR. STIPKALA:

18       Q.    Okay.  At the top -- we're, again, at the

19   top of the first page of this exhibit, Exhibit 72,

20   and the URL includes performanceimpressions.com.  And

21   did you authorize publication of your images to that

22   website?

23       A.    Yes.

24       Q.    And the next one is also

25   performanceimpressions.com, but we've modified it to

Videotaped Deposition of David Oppenheimer

1    include 5960 instead of 5964 because that's

2    duplicative.  Did you authorize publication of your

3    image to performanceimpressions.com?

4         A.   Yes.

5         Q.   And then it says godaddy.com.  Did you

6    authorize the appearance of your images at

7    godaddy.com in this URL?

8         A.   Can you say the third word of that question?

9         Q.   URL.

10        A.   Oh, no.  The third word in the question.

11        Q.   I'm looking at the GoDaddy URL.

12             THE WITNESS:  All right.  Can you repeat the

13        question, Deidre?

14                          - - -

15        (The court reporter read back the requested

16        portion of the deposition transcript.)

17                          - - -

18             THE WITNESS:  The word "appearance."  The

19        word appearance is, I think, the word that's

20        throwing me off and making --

21   BY MR. STIPKALA:

22        Q.   Sure.

23        A.   -- the question --

24        Q.   Sure.

25        A.   Because "appearance" means like -- to me

Videotaped Deposition of David Oppenheimer

1    that means display, and they're not being displayed

2    on godaddy.com, and so --

3        Q.    Sure.  Did you authorize the presence of

4    your images on the godaddy.com server at that

5    address?

6        A.    Yes.

7        Q.    Okay.  Did you authorize the appearance of

8    your images on flickr.com at those two URLs?

9        A.    I believe so.

10       Q.    Did you authorize the appearance of your

11   images at photoshelter.com at those two listed URLs?

12       A.    I believe so.

13       Q.    Did you authorize the appearance of your

14   image at the facebook.com URL?

15       A.    I don't recognize that URL.

16       Q.    Okay.  We may come back to that.  And I

17   think we've already looked at the others yesterday,

18   and I don't need to keep doing that.

19            So let us -- oh, yeah.  Let's skip to the

20   top of the next page.  Sorry.  It says "Photos" at

21   the top of this page.  This is page 201, Oppenheimer

22   Scarafile 201, at the bottom.

23            MR. STIPKALA:  Will, if you could, just

24        scroll down just to eyeball that.  Okay.  And

25        then back up.

Videotaped Deposition of David Oppenheimer

79

1    BY MR. STIPKALA:
2        Q.    It says, "Photos may have been published
3    on," and I'm not going to read it again.    Panoramio,
4    Google Maps, et cetera.    If those photos may have
5    been published there, was that with your
6    authorization?
7        A.    Yes.    Well, again, I can't speak for
8    unknowns.    So the answer is yes, but if somebody else
9    infringed and put one of my photos on Panoramio and I
10   didn't know it, the answer would also be no, so I
11   can't really answer a question -- that maybe explains
12   to you why I can't answer that question.
13       Q.    You know what?    That's -- that's actually
14   very sound because you can speak to a specific URL,
15   but you can't speak to the whole of Panoramio.    I
16   appreciate that.
17       A.    Correct.
18            MR. STIPKALA:    Okay.    Okay.    Yeah.    Very
19       good.    All righty.
20            Will, if you please, stop sharing that
21       screen.    We're in the noon hour.    I appreciate
22       that people might want to grab lunch.    What I'm
23       about to do is going to take a little while.
24       We're going to go look again at some -- some of
25       those URLs that we've just been looking at.

Videotaped Deposition of David Oppenheimer

1          But if -- Mr. Oppenheimer, especially if you
2     would prefer to take a lunch break at any time,
3     you please let me know.  Okay?
4          THE WITNESS:  Thanks.  I'm good to go.
5          MR. STIPKALA:  Okay.
6          MR. FRANCIS:  FYI, I got to run home and let
7     my dog out.  My wife is not able to do it today,
8     so I have to do it at lunchtime.  It's only 11:00
9     here, so I'm in no rush.
10          THE WITNESS:  What's the best time for you
11     to take lunch, Scott?
12          MR. FRANCIS:  You know, at 1 p.m. Eastern
13     time works for me, or even in an hour or even
14     after that.  However -- however long anybody
15     wants to go, I'm in no rush.  I'm just saying --
16     and I only live five minutes away from my office
17     here, so it's not going to take me forever, but
18     I'm just going to need more than, like, a half
19     hour lunch break is all I'm saying.
20          MR. STIPKALA:  Okay.  Very good.  I'll keep
21     that in mind.
22          MR. FRANCIS:  Uh-huh.
23          MR. STIPKALA:  Okay.  Will, if you could, go
24     to -- Will, if you could, go to
25     performanceimpressions.com.

Videotaped Deposition of David Oppenheimer

81

1    BY MR. STIPKALA:

2        Q.    Mr. Oppenheimer, do you see the screen?

3        A.    Yes.

4        Q.    What do you see on the screen?

5        A.    It looks like Performance Impressions' home

6    page.

7            MR. STIPKALA:  Okay.  Will, if you could, go

8        to the menu, and go to "Travel and Aerial

9        Photography."

10            And let me ask Michael:  Are you able to see

11        the manipulations that Will is performing?

12            THE VIDEOGRAPHER:  Yes, sir.

13            MR. STIPKALA:  Okay.  Thank you.

14            Okay.  Let's -- let's see.  I'm going to

15        look for -- can you -- oh, city or state.  Can

16        you look at that drop-down menu?  And do you see

17        Charleston?  Can you select Charleston?  Okay.

18    BY MR. STIPKALA:

19        Q.    And then -- oh, I see -- Mr. Oppenheimer, do

20    you see on the screen "Charleston Scenic Travel

21    Photography - August 2013"?  Do you see that?

22        A.    It's -- I can only see the edge of it.  It's

23    covered up by the -- the video.

24            MR. STIPKALA:  Okay.  Will, if you could --

25        is there any way to scoot over, Will?

Videotaped Deposition of David Oppenheimer

82

| | |
|---|---|
| 1 | THE WITNESS:  I could probably move the |
| 2 | videos.  I don't know. |
| 3 | MR. FRANCIS:  David, yeah, you should be |
| 4 | able -- mine is -- you might be able to make |
| 5 | your -- it -- |
| 6 | (Simultaneous cross-talk.) |
| 7 | THE WITNESS:  All right.  Yeah.  I was |
| 8 | just -- |
| 9 | MR. FRANCIS:  The video is on a -- |
| 10 | THE WITNESS:  I can't just drop a photo. |
| 11 | That didn't work.  I don't know what I just did. |
| 12 | I was afraid to hit these buttons because, like, |
| 13 | I don't know what I'm going to do.  Oh, here we |
| 14 | go.  Minus.  Oh, there we go.  I got it.  I can |
| 15 | see now.  The whole page got small.  Hold on. |
| 16 | MR. ALLEN:  Yeah.  You could also grab the |
| 17 | top of the -- of the videos and drag them to |
| 18 | where you want to. |
| 19 | THE WITNESS:  All right.  Here you go.  I've |
| 20 | used Zoom, but I never mess with it.  You know, |
| 21 | I'm not -- I just don't touch it.  I can see it |
| 22 | fine. |
| 23 | BY MR. STIPKALA: |
| 24 | Q.  Okay.  And do you see where it says -- |
| 25 | there's sort of a rectangle.  It says, "Charleston |

Videotaped Deposition of David Oppenheimer

83

1   Scenic Travel Photography - August 2013."

2       A.    Yes.

3       Q.    What is -- what is that rectangle that we're

4   looking at?

5       A.    It's a thumbnail to take you to the

6   photographs from Charleston, August 2013.

7             MR. STIPKALA:  Okay.  Will, could you please

8       click on that?

9   BY MR. STIPKALA:

10      Q.    Okay.  And now what are we looking at?  Can

11  we say that this is the main page of the gallery?

12      A.    Yes.

13      Q.    And didn't we visit here yesterday?

14      A.    I believe so.

15            MR. STIPKALA:  Okay.  Will, if you could,

16      click on "Shop Prints From This Gallery."  And

17      then in that search window, there's a little

18      rectangle that -- yes.  Can you type in "Marsh

19      Harbor, Mount Pleasant."  Okay.

20            THE WITNESS:  Can I ask you to open this up

21      to full screen?  Thanks.

22  BY MR. STIPKALA:

23      Q.    And what are we looking at there?

24      A.    We're looking at aerial photographs that

25  I've taken.

Videotaped Deposition of David Oppenheimer

84

1      Q.    And the title is "Marsh Harbor, Mount
2    Pleasant Wall Art."  Do you see that?
3      A.    Correct.   Yes.
4      Q.    What is the significance of that?
5      A.    It took your search term and put in wall
6    art, and so it brought up -- it basically is the --
7    your search listed, so it's showing the results from
8    what you searched.
9           MR. STIPKALA:  Will, can we scroll down?
10   BY MR. STIPKALA:
11     Q.    While he's scrolling, I note that there's --
12   we talked yesterday about the keywords in the
13   metadata, and as I recall, Marsh Harbor was one of
14   the keywords.  Is that correct?
15     A.    Yes.
16     Q.    Did that keyword help us find these images
17   when we did that search just now?
18     A.    Seems so.
19     Q.    Okay.  Because the keywords included "Marsh
20   Harbor" and "Mount Pleasant;" isn't that right?
21     A.    It's a compound question.
22     Q.    Do you recall that the keywords in the
23   metadata in the images at issue in this case include
24   the words "Marsh Harbor"?
25     A.    Yes.

Videotaped Deposition of David Oppenheimer

1    Q.    Do you recall that the keywords that you
2    entered into the metadata in the images at issue in
3    this case include the words "Mount Pleasant"?
4    A.    I don't recall, but I would assume they
5    would.
6    Q.    Okay.  Looking at the screen right now, do
7    you see any of the images at issue in the present
8    case?
9    A.    Yes.
10   Q.    Where?
11   A.    The bottom left and the top right.  Oh,
12   excuse me.  Yeah.  No.  Just the bottom left.
13        MR. STIPKALA:  Okay.  Will, if you could --
14        let me see.
15        THE WITNESS:  Can you open that up to full
16        page, please?
17        MR. STIPKALA:  Sure.
18        THE WITNESS:  I don't know why it keeps
19        going small.
20        MR. STIPKALA:  Will, can you right-click on
21        that image?  That one, yes.  That is the 5964.
22        Can you right-click on it?  Can you copy the
23        image address?
24   BY MR. STIPKALA:
25   Q.    Mr. Oppenheimer, I'd like to attempt to look

Videotaped Deposition of David Oppenheimer

1    at the metadata.

2              MR. STIPKALA:  So, Will, if you can open a

3         tab and go to -- where did we go?

4    BY MR. STIPKALA:

5         Q.    We went to metapics.com; isn't that right,

6    Mr. Oppenheimer?

7         A.    I believe so.

8         Q.    Okay.  And is that metapics.com that we see

9    on your screen?

10        A.    It is.

11             MR. STIPKALA:  Okay.  Will, can you paste in

12        that URL that you've just copied.  And wait

13        before you press go.

14   BY MR. STIPKALA:

15        Q.    Mr. Oppenheimer, what's going to happen

16   here?

17        A.    I would imagine it's going to search the

18   metadata that's in the photo.

19        Q.    And that would be 5964, the second image at

20   issue in the case; is that right?

21        A.    I believe so, but I'm not certain.

22        Q.    Okay.  We can go back and look if you want.

23        A.    If you want me to answer with certainty, I

24   would like to see the two photos, the published

25   versions.

Videotaped Deposition of David Oppenheimer

1      Q.    Yes.

2            MR. STIPKALA:  Will, can you click on that

3      tab that shows performanceimpressions.com.

4   BY MR. STIPKALA:

5      Q.    Okay.  You've said that there was an image

6   at issue in this case appearing at the lower

7   left-hand corner of the screen.

8      A.    Correct.

9      Q.    Can you identify that image?

10     A.    Yes.

11     Q.    And what is it?

12     A.    It's a photo of Marsh Harbor.

13     Q.    Do you know the file name of it?  I mean,

14  not the whole thing, but aren't we calling that 5964,

15  or am I mistaken?

16     A.    I believe it's 5944, but I got 5964 and

17  5960.  I don't have certainty in my mind that that

18  one's not the zero instead of the four, so I don't

19  want to say with certainty, but I believe it's the

20  four.

21     Q.    Is it one or the other?

22     A.    I would say yes.  Yes.

23     Q.    Okay.

24           MR. STIPKALA:  Okay.  Will, if you could,

25     click on the tab that is metapics.com.  And is

Videotaped Deposition of David Oppenheimer

88

1        the URL still in -- either -- here.  Why don't

2        you re-paste that URL just to make sure that we

3        have the right URL.  Okay.  You've re-pasted it?

4        Go ahead, press go.

5    BY MR. STIPKALA:

6        Q.    Okay.  What are we looking at,

7    Mr. Oppenheimer?

8        A.    The metadata from the photograph.

9        Q.    Okay.  I don't see any metadata.

10       A.    Yeah.  Well, I guess -- yeah.  That -- we're

11   looking at the metadata search results of the

12   photograph.

13       Q.    Okay.

14       A.    Correcting my last answer.

15       Q.    Sure.  Where is the metadata then?

16            MR. FRANCIS:  Objection, calls for

17       speculation.

18            You can answer, David.

19            THE WITNESS:  I believe it's been removed.

20   BY MR. STIPKALA:

21       Q.    Who removed it?

22            MR. FRANCIS:  Same objection.

23            THE WITNESS:  I can't recall if I uploaded

24       it in that condition or if it was removed by Fine

25       Art America.

Videotaped Deposition of David Oppenheimer

1    BY MR. STIPKALA:

2        Q.    If Fine Art America removed it, was that

3    with your authorization?

4        A.    I would say yes.

5        Q.    What happens if I were to copy that image

6    without the metadata?  Could you tell that Fine Art

7    America removed it or that I removed it?

8        A.    Can you repeat that question?

9        Q.    Let me rephrase.  If I copied that image and

10   you later found it as an alleged infringement, would

11   you be able to tell who removed the metadata?

12       A.    Not necessarily.

13            MR. STIPKALA:  Okay.  Will, if you could,

14       close that tab, and go ahead and click on that

15       image that we have been looking at.  Okay.  Can

16       you back up just a moment?  Yeah.  Go back.

17   BY MR. STIPKALA:

18       Q.    Okay.  We're back in the main page of the

19   gallery.  And what is the watermark if you can see it

20   on the face of that image?

21       A.    It says "Fine Art America."

22       Q.    Okay.  And is that the removable watermark

23   we spoke of yesterday?

24       A.    Yes.

25            MR. STIPKALA:  Okay.  All right.  Let's go

Videotaped Deposition of David Oppenheimer

| | |
|---|---|
| 1 | ahead and click on that again, Will.  Let's open |
| 2 | that up. |
| 3 | BY MR. STIPKALA: |
| 4 | Q.    And what are we looking at, Mr. Oppenheimer? |
| 5 | A.    What's the third word you said? |
| 6 | Q.    Mister. |
| 7 | A.    Oh.  What's the -- |
| 8 | Q.    What are we -- what are we looking at here? |
| 9 | A.    The photo for sale on Marsh -- of Marsh |
| 10 | Harbor on Fine Art America. |
| 11 | Q.    Okay.  Can you see where it says up in the |
| 12 | URL window, it starts with |
| 13 | 1-performance-impressions.pixels.com.  Can you see |
| 14 | that small text? |
| 15 | A.    Yes. |
| 16 | Q.    Okay.  And that is similar to a URL we |
| 17 | looked at in Exhibit 72.  Do you recall that? |
| 18 | A.    I can't place Exhibit 72. |
| 19 | Q.    Okay.  Well, that was the -- no worries.  No |
| 20 | worries. |
| 21 | Okay.  Do you see a green box on your |
| 22 | screen? |
| 23 | A.    I do. |
| 24 | Q.    Yeah.  What is that green box about? |
| 25 | A.    To open up the photo to get a larger view. |

Videotaped Deposition of David Oppenheimer

1     Q.     I see.  And you're --

2     A.     Or a portion of the photograph.

3     Q.     Okay.  So --

4     A.     You know, what -- yeah.  Go ahead.

5          MR. STIPKALA:  Will, can you click on that

6     for me?  Okay.

7  BY MR. STIPKALA:

8     Q.     And what are we -- we're looking at that

9  little green box now?  Well, you tell me.  What are

10 we looking at now?

11    A.     A close-up of a portion of the photograph.

12    Q.     Okay.  Would you describe that as a pop-up

13 window?

14    A.     I guess so.

15    Q.     Okay.  And we see that angle of the Seven

16 Dock; isn't that right?

17    A.     Yes.

18         MR. STIPKALA:  Okay.  Will, can you close

19    that?  Okay.

20 BY MR. STIPKALA:

21    Q.     I see -- I see some -- a little blue

22 rectangle with an F in it and a little light blue

23 rectangle.  I can't quite make out what's in it.  I

24 think there's a bird in it, and then there's a little

25 orange rectangle with a P in it.  Do you see those?

Videotaped Deposition of David Oppenheimer

92

1      A.    Yes.

2      Q.    What are those?

3      A.    Share buttons.

4      Q.    Those are share buttons.  Okay.

5            And I also see -- I think we discussed

6  what -- you know, we could get a canvas print for

7  $215.  I think we talked about that yesterday.  I'm

8  not going to go over that.

9            MR. STIPKALA:  Let's scroll down a bit,

10      Will, if you please.  Yes.

11  BY MR. STIPKALA:

12      Q.    Okay.  We see the Fine Art America

13  watermark; isn't that right?

14      A.    I'm just going to repeat an answer to the

15  question because it didn't all come through.  I do

16  see the Fine Art America watermark on the photograph.

17            MR. STIPKALA:  I'm sorry.  Will, scroll up,

18      so we can see the whole photograph again.

19  BY MR. STIPKALA:

20      Q.    Mr. Oppenheimer, on this photograph, do you

21  see a copyright notice on the face of the photograph?

22      A.    No.

23            MR. STIPKALA:  Okay.  Scroll down, Will,

24      please.

25  BY MR. STIPKALA:

Videotaped Deposition of David Oppenheimer

1     Q.    Mr. Oppenheimer, I'm going to ask Will to --
2   to enlarge, zoom in, so we can all see on this page.
3         MR. STIPKALA:  If that's possible, Will.
4         Yes.  Thank you.  Okay.  And just scroll up just
5         a little bit so we can see the bottom of that --
6         that photograph to just confirm we're on the same
7         page.  Okay.  Very good.  Now scroll back down.
8         Okay.  Now, a little bit -- you see where it says
9         "Colors"?  Scroll down a little bit further,
10        please.  Okay.  Stop there.
11  BY MR. STIPKALA:
12    Q.    Do you see the word "embed,"
13  Mr. Oppenheimer?
14    A.    Yes.
15    Q.    And then you see what appears to be a HTML
16  text?  I mean, is that fair to say that that's what
17  that is?
18    A.    Yes.
19    Q.    What does that HTML text do?
20    A.    I have not looked at it before.  I'm not
21  sure.
22    Q.    Okay.  What does embedding mean?
23    A.    To -- my understanding of it is adding code
24  to make something appear or incorporate.
25    Q.    Okay.  So if I took that HTML code and put

Videotaped Deposition of David Oppenheimer

94

1    it somewhere, what would happen?  And -- I'm sorry.
2    I'm sorry.
3         If I had a web page and I took that HTML
4    code in that embed little rectangle, what would
5    happen on my web page?
6         A.   I have not examined this embed code, so I
7    can't answer.
8         Q.   Okay.  Are you aware of any other embed
9    code?
10        A.   Roughly.
11        Q.   Okay.  And what happens when you use that
12   embed code on your web page?
13        A.   That question is stated like a fact.  Can
14   you rephrase?
15             MR. STIPKALA:  Oops.  Will, I'm going to ask
16        you to open up a Notepad if you, please.  Do you
17        know what that is, Will?  Well, I guess Will is
18        on mute.  Can you open up a notepad, Will?  And
19        can you cut and paste that embed HTML text to
20        that notepad?
21   BY MR. STIPKALA:
22        Q.   Okay.  And what does that notepad text do?
23        A.   Can you go to Word Wrap, please?
24        Q.   Okay.
25        A.   This code from my understanding of HTML

Videotaped Deposition of David Oppenheimer

1    would put a link on wherever the embed code was

2    placed on a web page and show the image as a

3    thumbnail link going back to the source, and on

4    rollover, it would say, "Sell Art Online, Sell Art

5    Online."

6        Q.    Okay.

7        A.    So this would enable somebody on somebody

8    else's website that embedded this --

9        Q.    Yes.

10       A.    -- to click on the photograph, go directly

11   to my site and purchase it.

12       Q.    Okay.  But on somebody else's website, it

13   would have a small image of your image; is that

14   right?

15       A.    I believe so.

16       Q.    Okay.  So it would put a small thumbnail of

17   your --

18       A.    I'm not sure -- I take that -- I'm not sure

19   of the size.  But it would show the image as a link,

20   and the image itself would be a link, so if it was

21   clicked, it would direct somebody to the URL that's

22   listed right after the HREF equals possibly.

23       Q.    Would it show an image, or would it show a

24   URL in text?

25       A.    It would just show the image, from what I'm

Videotaped Deposition of David Oppenheimer

1  seeing.

2      Q.   Okay.

3      A.   I'm not certain.  I don't know if the title

4  code -- if that would display or not.

5      Q.   Sure, sure, sure.  Okay.

6          MR. STIPKALA:  Can we -- Will, if you could

7      quit this.  And I'd like you to go back to -- if

8      you please, to the main page of the gallery that

9      we've been looking at.  I can talk you through

10     that if you need to, if you go to

11     performanceimpressions.com.  Yeah.  Let's go

12     there.

13 BY MR. STIPKALA:

14     Q.   Okay.  Mr. Oppenheimer, do you see that

15 we're back on Performance Impressions -- okay.

16 There's -- do you see, Mr. Oppenheimer, that

17 rectangle that says, "Charleston Scenic Travel

18 Photography - August 2013"?

19     A.   Yes.

20         MR. STIPKALA:  Okay.  Will, please click on

21     that.  Will, please scroll down a little bit

22     further.  Okay.  And stop there.  Go up a little

23     bit.  Okay.  Yes.  There we go.  Okay.  I'm --

24     I'm sorry.  I want to -- I want to go shopping

25     for images.

1    BY MR. STIPKALA:

2        Q.    Do you see, Mr. Oppenheimer, the two images

3    at issue in this case?

4        A.    Yes.

5            MR. STIPKALA:   Okay.   Let's scroll up to the

6        top again, Will, if you please.   And click on

7        "Shop Prints From This Gallery."   And can you run

8        that search again?   It was Marsh Harbor, Mount

9        Pleasant.

10           THE WITNESS:   In maybe five minutes, I'd

11       like to get a five-minute bathroom break.

12           MR. STIPKALA:   Okay.   I think I can break in

13       five minutes.

14           Okay, Will.   If you could, scroll down and

15       see if we can spot an image that's at issue in

16       this case.   We've already been through this.   I

17       think this is our third time, so if you can,

18       scroll quickly.

19   BY MR. STIPKALA:

20       Q.    Okay.   We're at the bottom, and we've looked

21   at that image on the lower left-hand side.

22   Mr. Oppenheimer, is that the image we've been calling

23   5964?

24       A.    Yes, I believe so.   If it's not the zero,

25   it's the four.   But, yeah, I believe it's the four.

Videotaped Deposition of David Oppenheimer

1     Q.    Okay.  Is there any reason why you didn't

2  publish the other one here, the 5960?

3     A.    Not a specific reason.

4     MR. STIPKALA:  Okay.  Will, can you click on

5     that, please?  Okay.  Again, we see the -- Will,

6     I want to see what happens when you share this to

7     Facebook.  Can you do that?  Okay.  Wait, wait,

8     wait.  Don't go so fast.

9  BY MR. STIPKALA:

10     Q.    Okay.  We're looking at -- this is the image

11  5964, and it has Fine Art America in the lower

12  right-hand corner.  And, Mr. Oppenheimer, this is the

13  page where we would go to buy this image in print

14  form; is that correct?

15     A.    Correct.

16     Q.    And it has the share buttons for Facebook,

17  Twitter and Pinterest; is that correct?

18     A.    Right.

19     MR. STIPKALA:  Will, can you click on the

20     Facebook image?  Excuse me.  The Facebook share

21     button.  Okay.  And blow that up for us.

22  BY MR. STIPKALA:

23     Q.    Okay.  Is that a -- would that -- would you

24  say that was a pop-up window, Mr. Oppenheimer?

25     A.    I wouldn't call that a pop-up window.

Videotaped Deposition of David Oppenheimer

1            MR. STIPKALA:  Okay.  Will, can you close

2       that a second, hopefully without closing the

3       underlying window.  Okay.  Will, go slowly and

4       mouse over the Facebook button.  Okay.  And now

5       right-click on that.  I'm sorry.  Get rid of that

6       drop-down window.  Left-click.  Okay.  You

7       left-clicked on it.

8  BY MR. STIPKALA:

9       Q.    And then, Mr. Oppenheimer, what happened?

10      A.    It opened up a new window on a new web page

11  which is different than a pop-up window which is part

12  of the original -- if it was a pop-up window, it

13  would be on the original picture, so it opened up a

14  new -- a new browser window.

15      Q.    Okay.  Is it possible that a new browser

16  window could contain terms of use or a warning

17  against copyright infringement?

18      A.    Can you repeat that?

19      Q.    Is it possible that a new browser window

20  like this one could contain terms of use or a warning

21  against copyright infringement?

22      A.    Yes, I believe so.

23            MR. STIPKALA:  Okay.  Will, can you expand

24       that new window that says, "Share on Facebook."

25       Okay.

Videotaped Deposition of David Oppenheimer

100

1      THE WITNESS:  When we get through with this

2   question, I'd like to take a quick bathroom

3   break.

4   BY MR. STIPKALA:

5      Q.    Absolutely.  So what is about to happen

6   here, Mr. Oppenheimer?  Would you agree with me that

7   it looks like Will -- William La Salle is about to

8   share this image, 5964, to his Facebook account?  Is

9   that correct?

10     A.    It does appear that way, yes.

11     Q.    And the image itself would appear on the web

12   page of -- excuse me.  Let me start over.

13         The image itself would appear on Mr. La

14   Salle's Facebook page; is that correct?

15     A.    Not completely.

16     Q.    Okay.  Please explain.

17     A.    What I'm seeing is not the entire image, and

18   I'm not certain if the caption below it -- it looks

19   like that has become part of the image.

20     Q.    Okay.  I see.

21         MR. STIPKALA:  Will, can you complete the

22   posting to your web page.  Wait a second.

23         Before we -- before we have Will post this,

24   and then I propose that he takes it off, can we

25   all agree that this is a fair use just for a

Videotaped Deposition of David Oppenheimer

101

1    quick demonstration, and then he's going to

2    remove it?

3         MR. FRANCIS:  Yeah.  No objection from

4    plaintiff.  We won't go after Will.

5         MR. STIPKALA:  Okay.  Thank you.

6         Will, will you please complete whatever

7    comes next.  Okay.  What has happened here?

8    Will, can you scroll up and down to see what

9    we're looking at?  I mean, what happened to your

10   Facebook page?

11        MR. LA SALLE:  It appears that once I

12   completed the post, it closed that window that

13   was previously open.

14        MR. STIPKALA:  Do you have your Facebook

15   page open, and can you share it?

16        MR. LA SALLE:  Yeah.  Give me one second.

17        MR. STIPKALA:  I'm sorry, Mr. Oppenheimer.

18   We're working very quickly to get to a break.

19        THE WITNESS:  It's -- I'm -- it's okay.

20   It's not that urgent.

21        MR. FRANCIS:  Would it be a good time --

22   maybe Will wants to look at his Facebook page

23   real quick to make sure there's stuff that he

24   doesn't want to share in a deposition either?

25   Maybe right now might be a good time for a

Videotaped Deposition of David Oppenheimer

102

1        five-minute break.

2            MR. STIPKALA:  We got it.  Here we go.

3            MR. FRANCIS:  Or if -- yeah.

4            MR. STIPKALA:  Okay.  Well, very --

5            MR. FRANCIS:  It's up to you, David.  Yeah.

6    BY MR. STIPKALA:

7        Q.    So would you agree with me that what we're

8    looking at is Mr. La Salle has just posted an image,

9    5964, to his Facebook page?

10       A.    Yes.  If it's not the -- I -- if it's not

11   the zero, it's the four, but, yes.

12       Q.    Okay.  And that happened because he clicked

13   on the Facebook "Share" button on the previous

14   screen; is that correct?

15       A.    Yes.

16           MR. STIPKALA:  Okay.  We can take a

17       five-minute break.

18           Michael, if you want to take us off the

19       record.

20           THE WITNESS:  I'll be right back.

21           THE VIDEOGRAPHER:  All right.  Off the

22       record at 12:43 p.m.

23                        - - -

24       (There was a recess from 12:43 to 1:48.)

25                        - - -

Videotaped Deposition of David Oppenheimer

```
 1              THE VIDEOGRAPHER:  This is the continuation
 2        of the deposition of Mr. David Oppenheimer.  This
 3        is video number two.  We're on the record at
 4        1:48 p.m.
 5   BY MR. STIPKALA:
 6        Q.    Good afternoon, Mr. Oppenheimer.
 7        A.    Afternoon.
 8        Q.    Did you have any conversations with your
 9   attorneys during lunch?
10        A.    Not about this case.
11        Q.    Okay.  And did you discuss your testimony
12   today?
13        A.    No.
14              MR. STIPKALA:  Okay.  All righty.  Will, if
15        you could, please call up Exhibit 14, Defendants'
16        Exhibit 14, and scroll to the top of the first
17        page.
18   BY MR. STIPKALA:
19        Q.    Mr. Oppenheimer, do you recognize what you
20   see on your screen?
21        A.    Yes.
22        Q.    What is it?
23        A.    It's one of my photographs of Marsh Harbor
24   on Fine Art America.
25        Q.    Would you agree with me that that is 5964,
```

Videotaped Deposition of David Oppenheimer

1    the second image?

2        A.    Yes, if not zero.  I get them flipped, but I

3    believe that's 5964.

4        Q.    Okay.  And I'm going to ask you if you can

5    confirm that this is a true and correct copy of that

6    image on that web page such as we've been looking at

7    in recent testimony.

8        Q.    So I'm going to ask you to direct Will, my

9    colleague, to scroll up and down so that you can

10   satisfy yourself whether this is a true and correct

11   copy of that image as it appears on Fine Art America.

12            THE WITNESS:  I can't see the full image.

13       Can you scroll up, please?  All right.  Now down.

14       There you go.  I believe so.  It's fine.  You're

15       fine scrolling.

16            I believe that the answer is yes.

17            MR. STIPKALA:  Scroll down, Will.  Okay.

18       Just for the record, scroll up a tiny bit so I

19       can see a Bates number.  Okay.  Stop there.

20   BY MR. STIPKALA:

21       Q.    For the record, we did not look at Bates

22   number Carolina One 181 or further in this exhibit.

23   Did we, Mr. Oppenheimer?

24       A.    I don't recall.

25            MR. STIPKALA:  Okay.  Scroll down some more,

1     Will, please.

2   BY MR. STIPKALA:

3     Q.    Okay.  I'm sorry.  My exhibit has more pages

4   than what we looked at on your website.

5         MR. STIPKALA:  But please scroll up, Will.

6   BY MR. STIPKALA:

7     Q.    And, Mr. Oppenheimer, I'm going to ask you

8   whether the first two pages --

9         MR. STIPKALA:  Go up a little higher.

10  BY MR. STIPKALA:

11    Q.    Whether -- let me start over.

12        Okay.  From there up, so...

13        MR. STIPKALA:  Stop, please.

14  BY MR. STIPKALA:

15    Q.    Okay.  So Bates number Carolina One 179 and

16  180.  Are those pages a true and correct copy of that

17  image as it appears on fineartamerica.com?

18        THE WITNESS:  Can you scroll up, please,

19        Will, to show me 179 and 80 -- 180?  All right.

20        Stop for a sec.

21        All right.  I'm seeing some smaller images

22        and a large image.  I'm a little confused at

23        what -- what's being presented.

24        Will you scroll down again so I can see this

25        document, the -- file number of the document?

1       All right.  That's 179.  I was seeing the
2       recently viewed photos down there, and that's
3       part of what was throwing me off.  Can you -- all
4       right.  Scroll back up and -- all right.
5            Now show me 180, please.  Oh, is this 180?
6       I can't tell.  All right.  I'm sorry.  Can you go
7       back up?  There we go.
8            So 180, I believe, is a true and correct
9       copy of the photo as it is on Fine Art America.
10  BY MR. STIPKALA:
11      Q.   Okay.
12      A.   179 -- go ahead, Jeremy, sorry.  I'm not
13  sure I know -- I want to answer your question.  I'm a
14  little -- I just kind of lost focus.  Can we
15  re-orient?
16      Q.   Okay.  I'm asking you whether the pages
17  labeled Carolina One 179 and Carolina One 180 are a
18  true and correct copy of your image as it appears on
19  Fine Art America?
20      A.   Got it.  I'm sorry.
21           THE WITNESS:  Will, just go up to those --
22      to the main images on there again.
23           Yes, that looks -- true and correct copy.
24           Go up more, please, to the next -- the next
25      one.  Oh, no.  Up.  I think there's one above

Videotaped Deposition of David Oppenheimer

1       that, right?  179, yes.

2   BY MR. STIPKALA:

3       Q.    That there is --

4       A.    Yeah.

5       Q.    -- 179.

6       A.    All right.  Yep.  That -- that is a true and

7   correct copy of my photo on Fine Art America if I'm

8   not mistaken.

9       Q.    And is it a true and correct copy of the web

10  page that displays that image?

11      A.    At the time it -- well, you know, the -- the

12  syntax error symbol has been updated, so that's not

13  how it currently looks.

14          MR. STIPKALA:  Okay.  Will, if you could,

15      zoom in.  I want to look at the share buttons.

16  BY MR. STIPKALA:

17      Q.    Okay.  Do you see underneath the text "Marsh

18  Harbor Real Estate, Mount Pleasant, South Carolina,"

19  Mr. Oppenheimer?

20      A.    Yes.

21      Q.    And then it says, "By David Oppenheimer."

22  And below that do you see the three share buttons?

23      A.    Yes, I do.

24      Q.    And one is for Facebook, one is for Twitter,

25  and one is for Pinterest.

Videotaped Deposition of David Oppenheimer

1    A.    I believe that's accurate.

2    Q.    And then just below that we see a canvas

3  print and underneath that is a dollar sign, $215.  Do

4  you see that?

5    A.    Yes.

6         MR. STIPKALA:  Then let's scroll down

7      further, Will, please.

8  BY MR. STIPKALA:

9    Q.    And then we see -- on the right-hand side

10  still, we see -- underneath the word "colors" and

11  four squares of different colors we see the word

12  "embed."  Do you see that?

13    A.    Yes.

14    Q.    And do you see the HTML text underneath the

15  word "embed"?

16    A.    Yes.

17    Q.    Are those features that I just described the

18  same as what we were looking at a moment ago?

19         MR. FRANCIS:  Objection.  I think we need to

20      see the whole URL again.

21         THE WITNESS:  When you say "a moment ago" --

22  BY MR. STIPKALA:

23    Q.    Sure.

24    A.    -- can you be more specific because I don't

25  want to misanswer, and that was pretty vague.

Videotaped Deposition of David Oppenheimer

109

1    Q.    Sure, sure.  What I'm looking to see, was
2  this -- yeah.  Let me start over.
3         MR. STIPKALA:  Will, could I trouble you to
4    call up performanceimpressions.com.  Okay.  And
5    how did we get here?  Okay.  We're going to go to
6    "Menu," and we're going to look at "Travel and
7    Aerial Photography," and if you can, select
8    "Charleston" in the city or state.
9  BY MR. STIPKALA:
10   Q.    Okay.  And, Mr. Oppenheimer, you see there's
11 the "Charleston Scenic Travel Photography - August
12 2013."  Do you see that?
13   A.    Yes, I do.
14        MR. STIPKALA:  Will, can you click on that
15    rectangle?
16 BY MR. STIPKALA:
17   Q.    And then here we are at the main page for
18 the Charleston Scenic Travel Photography, August 2013
19 gallery; is that correct?
20   A.    Yes.
21        MR. STIPKALA:  And then, Will, I think we
22    click on "Shop Prints From This Gallery," and
23    then type in "Marsh Harbor, Mount Pleasant" in
24    the search window, and then I believe it's all
25    the way at the bottom, if you'll scroll down.

Videotaped Deposition of David Oppenheimer

1    BY MR. STIPKALA:

2        Q.    And then I think we said, Mr. Oppenheimer,

3    that it was that image on the lower left of your

4    screen.  Is that correct?

5        A.    Yes.  Yes, it is.

6             MR. STIPKALA:  Will, if you -- I believe

7        it's a right-click on that.

8    BY MR. STIPKALA:

9        Q.    Okay.  So what I'm asking you,

10   Mr. Oppenheimer:  Is this web page that displays 5964

11   accurately depicted in Exhibit 14?

12            MR. STIPKALA:  And to do that, Will, I'm

13       going to ask you to show side by side, if

14       possible, this web page and Exhibit 14.

15   BY MR. STIPKALA:

16       Q.    Okay.  Mr. Oppenheimer, we have Exhibit 14

17   on the left, and we have the web page live on the

18   right, and I invite you to ask Will to scroll up and

19   down in either place to -- then I'm going to ask you

20   whether Exhibit 14 on the left is a true and correct

21   copy of what is viewed on the web page on the right.

22       A.    From what I could tell, it's a true and

23   correct copy except for the one exception of the

24   updated correction of the copyright symbol.

25       Q.    Okay.  And can you direct me to that?

Videotaped Deposition of David Oppenheimer

1      A.    It's in the description.  And on the left
2  document, you'll see the error symbol which is a
3  question mark and a diamond.
4      Q.    I see that.  Yes.
5      A.    And you can see where I made that correction
6  after you brought this to my attention.
7      Q.    I see that.  Okay.
8          MR. STIPKALA:  Will, thank you for that.
9      Will, can I ask you to zoom out again just a
10     little bit?
11  BY MR. STIPKALA:
12     Q.    And, Mr. Oppenheimer, I'm just noticing that
13  there is some text underneath the main image in the
14  exhibit that does not appear on the web page
15  currently.
16          MR. STIPKALA:  Will, can you zoom in on that
17     text?  A little bit higher.  It's right over --
18     right there.
19  BY MR. STIPKALA:
20     Q.    Okay.  In the exhibit it says, "Marsh Harbor
21  Real Estate in Mount Pleasant, South Carolina is a
22  photograph by David Oppenheimer which was uploaded on
23  October 29, 2014."  Do you see that?
24     A.    Yes, I do.
25     Q.    And that text does not appear on the web

Videotaped Deposition of David Oppenheimer

1    page, does it?

2        A.    I missed that in my comparison, and I should

3    have asked to scroll down, but I do see that that is

4    different --

5        Q.    Okay.

6        A.    -- as well, and that was an oversight.  I

7    did not notice that, and I should have looked more

8    closely, but, yes, it's clear that I can see that

9    there is a difference.

10       Q.    Sure, sure.  I don't want you to agree to

11   something that is not true.

12             MR. STIPKALA:  Will, can you scroll out a

13        little bit or zoom out a little bit on Exhibit

14        14?  And I apologize.  Maybe I can't rescue this

15        endeavor, but can I -- scroll to the top a bit on

16        the web page, Will.

17   BY MR. STIPKALA:

18       Q.    Can we agree that the image depicted is the

19   same with the possible exception that the image in

20   the exhibit on the left has that green box in it?

21       A.    Correct.

22       Q.    Okay.  And can we agree that the share

23   buttons are the same?

24       A.    I would assume they are the same.

25       Q.    Do they look the same?

1      A.    Yes.

2      Q.    And the canvas prints for $215, is that the

3  same?

4      A.    Yes.

5           MR. STIPKALA:   And -- okay.  Will, pull --

6      scroll down some, if you please.

7  BY MR. STIPKALA:

8      Q.    And can we agree that the embed window is

9  the same?

10     A.    I would need you to paste the full code into

11 each -- into notepad so I can compare them.

12     Q.    Okay.  I don't know that the full text is

13 available in the PDF image -- excuse me -- the PDF

14 document that is Exhibit 14.  I don't think that's

15 available.

16     A.    I would imagine they're the same.  I don't

17 recall making any changes to that code or even that I

18 have the ability to make changes to that code.

19     Q.    Right.  Okay.  Okay.  Okay.  Very good.  I

20 apologize for dragging everybody through this --

21 through this exercise.  Let's -- yeah.  Let's --

22 let's come back to this issue.

23     A.    Oh, I was --

24     (Simultaneous cross-talk.)

25     Q.    We'll talk -- I'm sorry?

Videotaped Deposition of David Oppenheimer

114

1      A.    I thought I saw another difference, but I
2  noticed the tags are down lower on that one, so I
3  don't see any difference there.
4      Q.    Okay.  Okay.  My apologies, everybody.
5          MR. STIPKALA:  Will, if you could stop
6      screen-sharing all this.
7          THE WITNESS:  Stand up for a second.  Just
8      getting stretched.
9          MR. STIPKALA:  Okay.  Will, if you could, go
10     to -- go to the internet.  Share your -- open
11     the -- open your browser and share your screen,
12     and go to flickr.com.  Okay.  I'm going to ask
13     you to type in, let's say -- okay.  You already
14     have https://flickr.com.  You already have that
15     part.
16         MR. STIPKALA:  Now please add
17     "/photos/livemusicphotography/" and hit return or
18     go.  Okay.  If you could, click on "Albums."  Oh,
19     wait, wait.  I'm sorry.  Wait.  Can you hit the
20     back button?  And let me ask Mr. Oppenheimer what
21     we're looking at.
22         MR. LA SALLE:  I did.  We're back where we
23     were.
24 BY MR. STIPKALA:
25     Q.    Okay.  Mr. Oppenheimer, what do we see here?

Videotaped Deposition of David Oppenheimer

1      A.    It looks like my Flickr account.

2      Q.    Okay.  Very good.

3            MR. STIPKALA:  Will, could you click on

4      "Album," and scroll down some.  All right.  Keep

5      going.  Yeah.  Go to the next page, please.

6      We're on page 2.

7  BY MR. STIPKALA:

8      Q.    And, yes, you found what I am looking for.

9  It's called "Charleston Travel and Aerial Photography

10  - 2013," 254 photos.  Do you see that,

11  Mr. Oppenheimer?

12     A.    Yes, I do.

13           MR. STIPKALA:  Can you please click on that,

14     Will?  And scroll down some, please, Will.  I'm

15     sorry.

16  BY MR. STIPKALA:

17     Q.    Let me ask while Will is scrolling,

18  Mr. Oppenheimer:  What -- what are we looking at

19  here?

20     A.    Photographs that I've taken.  I see it looks

21  likes 5960 if I'm not mistaken on --

22     Q.    Yes.

23     A.    Right here at the page.  And I see 5964 on

24  the bottom left or middle left.

25     Q.    Okay.  All right.

Videotaped Deposition of David Oppenheimer

116

1    A.    If I have my numbers right.

2    Q.    Yes.

3         MR. STIPKALA:  Will, could I ask you to,

4    Will, mouse over -- Will, if you please, mouse

5    over 5960.

6  BY MR. STIPKALA:

7    Q.    Mr. Oppenheimer, is that 5960?

8    A.    I believe so.

9         MR. STIPKALA:  Okay.  Will, please go ahead

10    and left-click on that.

11  BY MR. STIPKALA:

12    Q.    Okay.  And what are we looking at here,

13  Mr. Oppenheimer?

14    A.    A aerial photograph I took of Marsh Harbor.

15    Q.    And is that 5960 then?

16    A.    I believe so.  I haven't looked at them with

17  the numbers, but I -- if -- it's one of the two.

18    Q.    So --

19    A.    I can't say with certainty until I see the

20  two.

21    Q.    Sure.  Okay.  Do you see -- below and to the

22  right of the image, you see a star?

23    A.    Yes, I do.

24    Q.    What is the purpose of that star?

25    A.    I believe it's similar to, like, a "Like"

Videotaped Deposition of David Oppenheimer

117

1    button.  It's a favorite button, if I'm not mistaken.

2        Q.    So you click on that, and it says, "Hey,

3    this image is one of my favorites"?

4        A.    I believe that's -- that's this case.

5        Q.    Okay.  And you see to the -- to the right of

6    that, you see a square.  It looks like a plus in it.

7    Do you see that?

8        A.    Yes, I do.

9        Q.    What does that button do?

10       A.    I believe it's a "Share" button or it's a --

11    it's to open up share.  It's a link to share buttons

12    is what I believe it is.

13       Q.    Okay.  And the -- there's a sort of curved

14    arrow to the right of that.  What does that button

15    do?

16       A.    I can't recall.

17       Q.    And then the -- next to that is an arrow

18    pointing down with a line underneath it.  What does

19    that button do?

20       A.    It's a download button.

21       Q.    Download button.  Okay.  What happens if we

22    click on the download button?

23       A.    It'll open up a pop-up window with different

24    sizes.

25           MR. STIPKALA:  Okay.  Will, could you

Videotaped Deposition of David Oppenheimer

```
 1        left-click that download arrow, and view all
 2        sizes.  Okay.
 3   BY MR. STIPKALA:
 4        Q.    Okay.  Mr. Oppenheimer, what are we looking
 5   at here?
 6        A.    This is where you could download the
 7   photograph in various sizes.
 8             MR. STIPKALA:  Okay.  Will, if you could,
 9        select -- I see square 150.
10   BY MR. STIPKALA:
11        Q.    Do you see square 150, Mr. Oppenheimer?
12        A.    Yes.  Or no.  Square 150.  Yes, I do.
13             MR. STIPKALA:  Will, can you click on that?
14   BY MR. STIPKALA:
15        Q.    Okay.  Now, what do we see?
16        A.    We see a thumbnail of the image.
17        Q.    Do we see the whole image?
18        A.    No.
19        Q.    Okay.  Do we see a copyright notice on the
20   face of that image?
21        A.    No.
22             MR. STIPKALA:  Okay.  Will, could you
23        right-click on that image and make a copy of it.
24        Let's say "Save Image."  Have you saved an image?
25        If you've saved an image, please open it and
```

Videotaped Deposition of David Oppenheimer

119

1      share it with everybody.

2    BY MR. STIPKALA:

3      Q.    Is that the image that we just created,

4    Mr. Oppenheimer?

5      A.    You downloaded it, not created it.

6      Q.    Yes.  Thank you.  Is that the image that we

7    just downloaded?

8      A.    Yes.

9           MR. STIPKALA:  Will, can you blow that up

10          some so it's larger?

11   BY MR. STIPKALA:

12     Q.    Does that image have a copyright notice on

13   the face of it, Mr. Oppenheimer?

14     A.    I believe you already asked me that, but the

15   answer's no.

16     Q.    If I were to then post this somewhere on the

17   internet and then you found it, would you be able to

18   tell how that copyright information got removed from

19   the face of the image?

20     A.    Not necessarily.

21          MR. STIPKALA:  Okay.  All righty.  Will, if

22          you could, go back to the -- where were we?  Go

23          back to the -- right.  Yes.  And then go back a

24          screen.  Okay.  Right there.  Perhaps one more

25          screen.  All righty.  Scroll down, please.  Okay.

Videotaped Deposition of David Oppenheimer

1        Hold right there.

2    BY MR. STIPKALA:

3        Q.    Do you see, Mr. Oppenheimer, there's an

4    image -- a line drawing of a camera?  Do you see

5    that?

6        A.    Yes.

7        Q.    And it says Nikon D4.  Do you see that?

8        A.    I do.

9        Q.    What is the significance of that?

10       A.    It's saying that this photograph was taken

11   on a Nikon D4 camera.

12       Q.    And is that your camera?

13       A.    Yes.

14       Q.    Okay.  It also says there too --

15       A.    I want to rephrase the answer to that.

16       Q.    Uh-huh.

17       A.    "Was."

18       Q.    Was what?

19       A.    "Was my camera."  It's not "is my camera."

20   It was my camera.  I sold that camera when I upgraded

21   to a newer camera.

22       Q.    Oh, okay.  Nice.  And it says, "Taken August

23   13, 2013."

24       A.    Yes, it does.

25       Q.    Yeah.  And did you capture these images with

Videotaped Deposition of David Oppenheimer

1    that camera?

2        A.    I'm not seeing any images, so I'm not sure

3    what images you're referring to.

4        Q.    I'm sorry.

5            MR. STIPKALA:  Please scroll up, Will.

6            THE WITNESS:  I see one image.  I took this

7        image with that camera if I'm not mistaken and

8        according to Flickr.

9            MR. STIPKALA:  Right.  Okay.  Okay.  Very

10        good.

11            Okay.  Will, could I ask you to scroll down

12        a bit further.  Yes.  Oh, stop right there.

13    BY MR. STIPKALA:

14        Q.    Okay.  Do you see the word "Tags,"

15    Mr. Oppenheimer?

16        A.    Yes, I do.

17        Q.    And do you see the tag "Marsh Harbor"?

18        A.    I do.

19        Q.    And the tag "Mount Pleasant"?

20        A.    Yes.

21        Q.    And where did those tags come from?

22        A.    I entered them into the metadata of the

23    photograph, and when I uploaded it to Flickr, Flickr

24    automatically extrapolated those keywords and created

25    the text on the page.

Videotaped Deposition of David Oppenheimer

122

1      Q.    So we can now see those metadata keywords

2  here on this page on Flickr?

3      A.    Yeah.  In fact, if you scroll up and click

4  on the "View EXIF" button.

5      Q.    That one?

6      A.    Yeah.  You'll see all the metadata.

7      Q.    Okay.  It says, "Show EXIF."

8          MR. STIPKALA:  Will, can you open that in a

9      new tab?

10  BY MR. STIPKALA:

11     Q.    Okay.  And -- okay.  So we're --

12     A.    That's where Flickr -- that's where Flickr

13  got the tags from.

14          MR. STIPKALA:  Okay.  All righty.  Will, if

15     you can go back to the previous tab.  Okay.

16     Will, if I could trouble you to work your magic

17     and open up Exhibit 17.  And scroll down.  Okay.

18     Stop there.

19  BY MR. STIPKALA:

20     Q.    Mr. Oppenheimer, can you see on this page

21  where it says "Flickr"?

22     A.    Yes.

23     Q.    And do you see at least part of that image

24  we're calling 5960?

25     A.    Yes.

123

| | |
|---|---|
| 1 | Q.    Do you see the whole image now? |
| 2 | A.    I believe that's the whole image.  Can't be |
| 3 | certain. |
| 4 | MR. STIPKALA:  Okay.  And scroll down |
| 5 | please, Will. |
| 6 | BY MR. STIPKALA: |
| 7 | Q.    And my question is going to be:  Is this a |
| 8 | true and correct copy of the web page that we were |
| 9 | just looking at?  And please direct Will to scroll up |
| 10 | and down as you need to. |
| 11 | THE WITNESS:  Please do, Will.  Can you |
| 12 | start from the top and slowly pan through it? |
| 13 | Can you scroll through my Flickr page to compare, |
| 14 | please? |
| 15 | BY MR. STIPKALA: |
| 16 | Q.    Okay.  We're seeing -- |
| 17 | A.    Can -- oh, you're doing them side by side. |
| 18 | That's... |
| 19 | Q.    Yes.  Let me just say that we are looking at |
| 20 | Exhibit 17 on the right-hand side of your screen, and |
| 21 | the live Flickr web page on the left-hand side of the |
| 22 | screen. |
| 23 | A.    They -- they do look slightly different, you |
| 24 | know.  The photograph, I believe, is the same.  I |
| 25 | believe some of the text is different.  Like, I don't |

Videotaped Deposition of David Oppenheimer

124

1    see the "Back to the Album" part.

2            MR. STIPKALA:  Will, if you could, zoom in.

3            THE WITNESS:  Oh, yeah, I do see it.  I do

4        see it.  Yeah, yeah, yeah.  It was just really

5        small.

6            MR. STIPKALA:  Will, zoom in because it

7        looks like it might be different.

8            THE WITNESS:  Let me see.

9    BY MR. STIPKALA:

10       Q.    "Back to Photo Stream."  Okay.  So we --

11       A.    Yeah.  One says "Back to Album."  So that's

12   one difference right there.

13       Q.    Okay.  And may I point out -- it's a shame

14   how quickly the internet moves, but the share buttons

15   appear to be different.

16       A.    I missed that, but, again, there's a lot

17   of -- you know, to really -- to compare each

18   component would take me a good little bit of time --

19       Q.    Sure, sure.

20       A.    -- and -- and to -- to do it accurately.

21   For example, can you scroll over on the exhibit to

22   the left a little?  Move -- move it.  You know, on

23   the one on the left, my logo in the pro is all the

24   way to the side.  In the exhibit it's more to the

25   right, and maybe it just shows more of the page.

Videotaped Deposition of David Oppenheimer

125

1    It's a wider capture, I guess.

2         So that -- and what's also odd is I -- oh,

3    that was your mouse.  I saw that plus button before.

4    That -- that threw me off.  Now it's on the -- that's

5    your cursor.  I thought that was something on the

6    page.

7    Q.    Okay.

8    A.    There might be some other nuances, but we'd

9    have to pan through to different areas for me to

10   really see this.  I don't want to waste time, so

11   if --

12   Q.    Sure.

13   A.    -- you have a specific question --

14   Q.    Yes.  I don't -- I don't want to waste time

15   either if I can't -- if I can't accomplish something

16   useful here, and I apologize very -- I want to be

17   very respectful of your time, Mr. Oppenheimer.

18   A.    And same here, same here.  I'm trying to

19   keep them coming.

20   Q.    Can we agree that the image is the same?

21   A.    To the best of my knowledge, yes.

22   Q.    Okay.  And we see at least the download

23   button is the same both on the --

24        THE WITNESS:  Will, can you slide to the

25        right on the exhibit, please?

Videotaped Deposition of David Oppenheimer

126

1           And, yep, they look the same.

2    BY MR. STIPKALA:

3        Q.    Okay.  So the download button appears to be

4    the same --

5        A.    Correct.

6        Q.    -- in both the website and the Exhibit 17.

7        A.    Correct.

8        Q.    Thank you.  Okay.

9           MR. STIPKALA:  Thank you, Will.  If you

10       could, stop screen-sharing for just a moment.

11           I'm going to ask Will for -- in a second

12       to -- I'm sorry.

13           It's been a day and a half.  Would you mind

14       if we took just a five-minute-...

15           THE WITNESS:  Yeah.  No problem.  You want

16       ten or five?

17           MR. STIPKALA:  Just five.  Just five.

18           THE WITNESS:  Okay.

19           MR. STIPKALA:  Sorry.

20           THE WITNESS:  We'll come on at 2:30.

21           MR. STIPKALA:  Sounds good.

22           THE WITNESS:  All right.  Thank you.

23           THE VIDEOGRAPHER:  Off the record at

24       2:24 p.m.

25                            - - -

Videotaped Deposition of David Oppenheimer

1        (There was a recess from 2:24 to 2:33.)

2                        - - -

3        THE VIDEOGRAPHER:  On the record at

4     2:33 p.m.

5        MR. STIPKALA:  Thank you all for that very

6     short break as I took a moment to organize and

7     make this just as efficient as I possibly can.

8  BY MR. STIPKALA:

9     Q.   Mr. Oppenheimer, during the break did you

10  speak with your attorneys?

11    A.   No.

12    Q.   Okay.  Very good.

13       MR. STIPKALA:  Will, I'd like you to open up

14    and screen-share your web browser, and we're

15    going to go to photoshelter.com.

16  BY MR. STIPKALA:

17    Q.   Okay.  And, Mr. Oppenheimer, do you see that

18  screen?

19    A.   Yes.

20    Q.   And what is it?

21    A.   Looks like the home page of PhotoShelter.

22       MR. STIPKALA:  Okay.  Will, can you -- in

23    the search window, can you search "Marsh Harbor

24    Real Estate"?  Okay.  And mouse off of that,

25    please, for a second.

Videotaped Deposition of David Oppenheimer

1   BY MR. STIPKALA:

2       Q.    Mr. Oppenheimer, do you see an image of

3   Marsh Harbor?

4       A.    Yes, I do.

5           MR. STIPKALA:  Okay.  Will, if you could,

6       click on that image.

7   BY MR. STIPKALA:

8       Q.    Okay.  And what are we looking at now,

9   Mr. Oppenheimer?

10      A.    This looks like my photograph of Marsh

11  Harbor on PhotoShelter.

12      Q.    Okay.  Would you agree with me that it is

13  like the images that are at issue in this case, but

14  it is not one of them?

15          MR. FRANCIS:  Objection, vague, calls for

16      speculation.

17          You can answer, David.

18          THE WITNESS:  Without seeing all six next to

19      each other, it's hard for me to make that

20      determination.

21          MR. STIPKALA:  Sure, sure.

22          Will, could you click on the second image

23      from the left.

24  BY MR. STIPKALA:

25      Q.    Okay.  Mr. Oppenheimer, what are we looking

Videotaped Deposition of David Oppenheimer

129

1    at here?

2         A.    I believe that's 5960 in the complaint.

3         Q.    Okay.  And do you see -- oh, my.  Do you --

4    I -- I apologize.  Let me start over.  Do you see

5    the -- the Facebook share button and the Twitter

6    share button?

7         A.    Yes.

8         Q.    And what happens if you click on either of

9    those?

10        A.    I would imagine it shares it to Facebook and

11   Twitter.

12        Q.    Okay.  And do you see the box to the left of

13   that with a heart in it?  What is that about?

14        A.    I'm not familiar with the heart.

15        Q.    Could it be a favorite button as well?

16        A.    I guess it is.

17             MR. STIPKALA:  Uh-huh.

18             Okay.  Can you -- Will, can you go to -- you

19        see just above the heart button, it says "More

20        Info"?  Will, can you click on that?

21   BY MR. STIPKALA:

22        Q.    Okay.  Now what are we looking at here?

23        A.    Another page showing -- showing the image.

24        Q.    And this is 5960?

25        A.    Yes, it is.  I believe it is.

Videotaped Deposition of David Oppenheimer

130

1   Q. Does it show any copyright notice on the

2 front of the image?

3   A. Not that I could see.

4   Q. What happened to the facial copyright

5 management information?

6   A. There's -- there's a technical glitch with

7 PhotoShelter, and they're working on fixing it.

8     MR. STIPKALA:  Will, can you -- I -- this

9    appears to have opened in a new tab.  Can you go

10   back to the previous tab?

11 BY MR. STIPKALA:

12   Q. Okay.  And do you see the facial copyright

13 notice in this image, Mr. Oppenheimer?

14   A. Yes, I do.

15   Q. And this is different from the one that

16 we've seen on performanceimpression.com; is that

17 right?

18   A. Yes, that's right.

19   Q. And this one is white text centered in the

20 bottom margin of the photo.  Would you agree with

21 that?

22   A. Yes.

23   Q. Is this a removable watermark or -- or --

24 let me start over.

25     Is this a removable watermark?

Videotaped Deposition of David Oppenheimer

131

1    A.    To my understanding, yes.

2    Q.    Okay.  And --

3    A.    Now, I'm not certain because, again, this

4    could be a permanent watermark, and PhotoShelter

5    could have a duplicate copy without the watermark

6    which it uses other times.  But from my understanding

7    of how these watermarks -- I can't really say because

8    it's a technical question on their platform which

9    is -- you know, over my head, and I'm not privy to

10   it.

11   Q.    Okay.  But -- so what we have done to go

12   from this screen here is we've clicked on "More

13   Info," and it opened up a new tab.

14        MR. STIPKALA:  Will, can you go to that new

15        tab again?  Okay.  And can you scroll down a

16        little bit?  All right.  Right there.

17   BY MR. STIPKALA:

18   Q.    Mr. Oppenheimer --

19        MR. STIPKALA:  Will, can you blow that up a

20        little bit so we can read the text a little bit

21        better?  Okay.

22   BY MR. STIPKALA:

23   Q.    And now we see the word "Keywords."  Do you

24   see that, Mr. Oppenheimer?

25   A.    Yes.

Videotaped Deposition of David Oppenheimer

132

1    Q.    And we see the keyword "1-987295442."  Do

2    you see that?

3    A.    Yes, I do.

4    Q.    What happens if you click on that button

5    with that number, if you know?

6    A.    If I had to guess, it would search for

7    photos that have that keyword elsewhere on

8    PhotoShelter.

9    Q.    Okay.  And isn't it true that that is the

10   service request number for the certificate of

11   registration that's at issue in our case today?

12   A.    I want to refresh my last answer, which

13   is -- I don't even know if that is a button.  For all

14   I know, if you click on that, nothing would happen.

15   Q.    Okay.

16   A.    Could you repeat the --

17   Q.    Well --

18   A.    -- question?  Go ahead.

19   Q.    Sure.  So your point is that maybe that's

20   not a button.

21        MR. STIPKALA:  Will, can you mouse over that

22        number without clicking on it?

23   BY MR. STIPKALA:

24   Q.    Okay.  What has happened is that that button

25   went from gray to now a kind of red.  Do you see

Videotaped Deposition of David Oppenheimer

133

1    that?

2        A.    Again, I'm still not certain it's a button.

3        Q.    Okay.  But can you --

4        A.    I did see it go to gray and red, yes.

5        Q.    Yes.  Okay.

6              Do you recognize that number as the service

7    request number for the copyright registration

8    application that yielded the copyright registration

9    certificate in the present case?

10       A.    I believe that's accurate.

11             MR. STIPKALA:  Okay.  Will, go ahead and

12       left-click on that.

13   BY MR. STIPKALA:

14       Q.    Okay.  And it says "Search Results."  Do you

15   see that?

16       A.    Yes.

17       Q.    And how many images does it say we found?

18       A.    200.

19       Q.    Is it fair to say that those 200 images that

20   it found are going to have that number in their

21   metadata?

22       A.    That's my understanding of how this -- these

23   appeared --

24       Q.    Okay.

25       A.    -- from that search, so I would -- I would

Videotaped Deposition of David Oppenheimer

134

1    say yes, to my understanding.

2            MR. STIPKALA:  Okay.  Will, if you could, go

3        to the second page, and scroll down for me, if

4        you please.  Okay.  A little further.  Okay.

5        Stop right there.

6    BY MR. STIPKALA:

7        Q.    Mr. Oppenheimer, do you see the first image?

8        A.    Yes.

9        Q.    And it's -- there it's the middle row or

10   it's the -- well, I guess it's the top row of visible

11   images here on this screen, page 2 of 2, and it's the

12   second one from the left.  Is that correct?

13       A.    Yes.

14       Q.    And do you see the second image that's at

15   issue in the case, 5964?

16       A.    No, I do not.

17       Q.    How about in the next row?  Is that it at

18   the end of the row?

19       A.    I think that's the -- a different image.

20       Q.    Okay.  Okay.

21       A.    It's hard to see it from the thumbs, but,

22   yeah, I believe that's different.

23            MR. STIPKALA:  Okay.  Will, if you could,

24       scroll back to the top of this.  Okay.  Can you

25       go back to the screen, Will?  Maybe it's -- maybe

Videotaped Deposition of David Oppenheimer

135

```
 1        it's on the other tab.  Go to the tab and move
 2        slowly so we can describe what's going on.  Okay.
 3        Scroll up a little bit so we can see where we
 4        are.
 5   BY MR. STIPKALA:
 6        Q.    Mr. Oppenheimer, do you recognize that we
 7   are back at the page on photoshelter.com that shows
 8   the first image, 5960?
 9        A.    Yes.
10              MR. STIPKALA:  Okay.  Will, I'd like you to
11        click on "More Info" again.
12   BY MR. STIPKALA:
13        Q.    Okay.  Now we're on the page, still
14   PhotoShelter, that shows 5960 but without the facial
15   copyright notice.  Is that correct, Mr. Oppenheimer?
16        A.    Yes.
17        Q.    Okay.  We were just at this page just a
18   moment or two ago, correct?
19        A.    A few minutes ago, yes.
20        Q.    Oh.  And do you see where it says "File
21   Name"?
22        A.    Oh, yes.
23        Q.    And the file name ends with opp5960.dng.  Do
24   you see that?
25        A.    Yes.
```

Videotaped Deposition of David Oppenheimer

1      Q.    Okay.  So is it fair to say this is 5960?

2      A.    Yes.

3            MR. STIPKALA:  Okay.  Will, go ahead and

4      scroll down some.

5            Okay.  I'm looking at these keywords again.

6            Will, I'd like you to -- now, we clicked

7      on the -- the first button which was the number

8      1-987295442.

9            Will, I'd like you to click on the "Marsh

10     Harbor" button.  See the third row there, "Marsh

11     Harbor"?

12  BY MR. STIPKALA:

13     Q.    And then we see "Search Results."  Do you

14  see that, Mr. Oppenheimer?

15     A.    Yes.

16     Q.    And 30 images are found, correct?

17     A.    That's what it says.

18           MR. STIPKALA:  Okay.  Will, if you could, go

19     back.  Hit the back arrow, and there's a button.

20     It's further down.  It's called "Real Estate."

21     Can you click on that?

22  BY MR. STIPKALA:

23     Q.    And how -- how many images do we return

24  here, Mr. Oppenheimer?

25     A.    1,732.

Videotaped Deposition of David Oppenheimer

137

1    Q.    So is it fair to say that there are 1,732

2    images with that tag line -- excuse me.  Is it

3    correct to say that there are 1,732 images with the

4    metadata tag "Real Estate"?

5    A.    I would believe that would be accurate.

6    Q.    Okay.  Okay.  All righty.  I think that we

7    can bring this to a conclusion.  I think we're done

8    with the internet.  I have a paper exhibit that I

9    could have you look at, but I don't think we're going

10   to be able to establish that every comma is the same

11   on the website as on the paper exhibit.

12   A.    I don't understand.  I don't understand what

13   you -- what you just said about a paper exhibit.

14   Q.    And, again, I have another exhibit I want

15   you to compare side by side and say, "Does this match

16   the website"?  And --

17   A.    Oh.

18   Q.    -- I don't want to waste your time, sir.

19   A.    Thanks, thanks.

20   Q.    Yes.

21   A.    Can I ask you a question --

22   Q.    Absolutely.

23   A.    -- off the record?  Well, it can be on the

24   record, but do you have background, like a digital

25   background?

Videotaped Deposition of David Oppenheimer

138

1       Q.    No.   This is just a blurring just like

2   Scott, so this is --

3               MR. FRANCIS:  I have the same thing, David.

4               THE WITNESS:  Oh, I don't know anything

5       about that stuff.

6               MR. STIPKALA:  Yesterday I didn't either,

7       but I saw Scott doing it.

8               MR. FRANCIS:  I don't like people to see my

9       messy office.

10              THE WITNESS:  I didn't know you could do

11      that.  Is that something I can set?  Is that a

12      setting I can set?

13              MR. FRANCIS:  Yeah.  And I don't remember.

14      Dana is always asking me how to do it.

15              THE WITNESS:  I should have done that

16      yesterday because of the window and the glare.

17              MR. STIPKALA:  Sure, sure.

18              THE WITNESS:  But -- all right.  Anyway.

19      Didn't mean to distract you.

20              MR. STIPKALA:  Okay.  Not at all.

21              Will, could you call up Exhibit 15.  Okay.

22      And we're going to scroll down.  Okay.  Stop

23      right there.

24  BY MR. STIPKALA:

25      Q.    Okay.  Mr. Oppenheimer, can you see what's

Videotaped Deposition of David Oppenheimer

139

1    on your screen?

2        A.    Yes.

3        Q.    And what does it appear to be?

4        A.    It appears to be the Facebook page for

5    Toler's Cove Marina.

6              MR. STIPKALA:    Okay.    Scroll down a little

7        bit more, Mr. La Salle.    Okay.

8    BY MR. STIPKALA:

9        Q.    Okay.    What do we see now?

10       A.    It looks like a Facebook post from me onto

11   Toler Cove's Facebook -- Toler Cover Marina's

12   Facebook page, marketing my -- marketing my

13   photography.

14       Q.    Okay.    Do you recall making this post?

15       A.    Not offhand.

16       Q.    Could it be that somebody else made this

17   post to your knowledge?

18       A.    No, I don't think so.

19             MR. STIPKALA:    Will, can you zoom in a

20       little bit?    Okay.    Thank you.

21   BY MR. STIPKALA:

22       Q.    And it says, "David Oppenheimer, arrow,

23   Toler's Cove Marina, LLC, November 15, 2018."  Do you

24   see that?

25       A.    Yes.

1      Q.    And it says, "Marsh Harbor Waterfront Homes
2  and Marina Luxury Real Estate, Charleston area of
3  South Carolina, Copyright 2013, David Oppenheimer.
4  Performance Impressions' Aerial Photography Archives,
5  Prints and Licensing," and then your website and
6  "Marsh Harbor."  Do you see that?
7      A.    Yes.
8           MR. STIPKALA:  Will, can you scroll down a
9      little bit so we can see that image?
10  BY MR. STIPKALA:
11      Q.    And does that appear to be the image known
12  as 5964?
13      A.    I believe so.
14      Q.    Okay.  Do you believe that this is a true
15  and correct copy of your posting on November 15,
16  2018, to Toler Cove Marina's Facebook page?
17      A.    That seems accurate.
18           MR. STIPKALA:  Okay. Thank you, Will.  Can
19      you call up Exhibit 16?
20  BY MR. STIPKALA:
21      Q.    And before we get into this, I believe you
22  said yesterday, Mr. Oppenheimer, that Performance
23  Impressions, LLC, has a Facebook account.  Is that
24  right?
25      A.    Yes.

Videotaped Deposition of David Oppenheimer

141

```
 1              MR. STIPKALA:  And -- okay.  Will, scroll
 2         down to show the top of the first page of
 3         Defendants' Exhibit 16.
 4    BY MR. STIPKALA:
 5         Q.   Okay.  What does this image appear to be?
 6    Or, excuse me.  Let me rephrase.
 7              What does this document appear to be?
 8         A.   Terms of service for Facebook.
 9         Q.   Okay.  Have you ever read the terms of
10    service for Facebook?
11         A.   I believe I have.  But I can't recall
12    specifically.
13              MR. STIPKALA:  Okay.  Will, if you could,
14         scroll down to the -- about the 6th page of this
15         PDF exhibit.  Okay.  Let's see.  Scroll up a bit.
16         Are we on the 6th page?  Yeah.  No.  You're on
17         the 7th page.  Please go up a page.
18    BY MR. STIPKALA:
19         Q.   Okay.  Do you see where it starts?  It says,
20    Number 3, "The permissions you give us."
21         A.   Yes.
22         Q.   Okay.  Then it says, "We need certain
23    permissions from you to provide our services," colon.
24    The next line it says, "Zero.  Permission to use
25    content you create and share," colon.  "Some content
```

Videotaped Deposition of David Oppenheimer

1    that you share or upload such as photos or videos may

2    be protected by intellectual property laws."

3         Do you see that?

4    A.    Yes.

5    Q.    Then it says -- I'm going to skip a couple

6    of paragraphs.  It says specifically, "When you share

7    posts or upload content that is covered by

8    intellectual property rights on or in connection with

9    our products, you grant us a non-exclusive

10   transferrable, sub-licensable , royalty-free and

11   worldwide license to host, use, distribute, modify,

12   run, copy, publicly perform or display, translate and

13   create derivative works of your content consistent

14   with your privacy and application settings."

15        Do you see that?

16   A.    Yes.

17   Q.    "This means, for example, that if you share

18   a photo on Facebook and give us permission to store,

19   copy and share it with others, again, consistent with

20   your settings, such as service providers that support

21   our service or other Facebook products you use.  This

22   license will end when your content is deleted from

23   our system."

24        Do you see that?

25   A.    Yes.

Videotaped Deposition of David Oppenheimer

143

1    Q.    Do you agree that when you post one of your

2    images to Facebook it is subject to those terms?

3           MR. FRANCIS:  Objection to the point it

4       calls for a legal opinion.

5           But you can answer the question, David.

6           THE WITNESS:  I believe it does.

7           MR. STIPKALA:  Okay.  Okay.  Will, if you

8       could, stop sharing that, and call up, let's

9       say -- give me just a moment, please.  Make sure

10      I got the right exhibit.  Of course, my

11      computer's decided to not respond.

12          All right.  Yes.  This will be Exhibit 139,

13      if you please.

14          Okay.  And scroll down to the -- okay.  Hold

15      there, please.

16   BY MR. STIPKALA:

17      Q.    Mr. Oppenheimer, can you see what's on your

18   screen?

19      A.    Yes.

20      Q.    And what are we looking at?

21      A.    It looks like Hamlit's Facebook page.

22      Q.    Okay.  I notice that there is an image there

23   with the word Hamlit written on it.  Do you see that?

24      A.    Yes.

25      Q.    It's sort of the -- well, let me back up.

Videotaped Deposition of David Oppenheimer

144

1           It's the banner photograph, isn't it?

2      A.    Yes.

3      Q.    Does this banner photograph for Hamlit's

4  Facebook page have facial copyright management

5  information on it?

6      A.    Yes.

7      Q.    Would you agree with me, though, that that

8  facial information -- excuse me.  Would you agree

9  with me that the copyright notice information on the

10  face of this banner photograph has been partially

11  cropped?

12     A.    I can't answer the question the way it was

13  asked.  Can you be more specific?

14     Q.    Can you read the copyright notice on this

15  photograph?

16     A.    Not really.

17     Q.    Does it name the author of this photograph?

18     A.    Yes.

19     Q.    And who is that author?

20     A.    Me.

21     Q.    Did you post this photograph as the banner

22  photograph for Hamlit's Facebook page?

23     A.    I believe I did.

24     Q.    Is it fair to say that you accidentally

25  cropped the copyright notice?

Videotaped Deposition of David Oppenheimer

1          MR. FRANCIS:  Objection as to form, vague.

2          But you can answer, David.

3          THE WITNESS:  Without knowing more

4      information, I don't think that is fair to say.

5  BY MR. STIPKALA:

6      Q.    How did it come to be that the copyright

7  notice is partially cropped here?

8          MR. FRANCIS:  Objection as to form,

9      speculation.

10         THE WITNESS:  I'm uncertain.

11  BY MR. STIPKALA:

12     Q.    If somebody else with your permission used

13  your photograph -- used your photograph in such a way

14  that the copyright notice was only partially visible

15  as seen in this banner photograph, would that be

16  acceptable?

17     A.    No.

18         MR. STIPKALA:  Okay.  Let's -- let's scroll

19     down, Will, if you please.  Okay.  We're

20     scrolling down.  A little bit further.  Okay.

21     Stop there.

22  BY MR. STIPKALA:

23     Q.    Who manages this Facebook page for Hamlit,

24  LLC?

25     A.    I do.

Videotaped Deposition of David Oppenheimer

146

1    Q.    Does anybody else?

2    A.    No.

3    Q.    We see some photos on the screen here that

4    appear to show an empty house; is that correct?

5    A.    No.

6    Q.    What do those photos show?

7    A.    They show an empty house, and they also show

8    a second house, and it's photographed from the

9    outside, so you can't tell if it's empty or not.

10    Q.    Okay.    What is the purpose of these photos

11    appearing on this Facebook page?

12    A.    To promote real estate rentals.

13    Q.    Okay.    Did you post those photos to this

14    Facebook page?

15    A.    I don't recall specifically, but I imagine I

16    did.

17    Q.    Do you know who took the photographs?

18    A.    Not all of them.

19    Q.    Did you take those photos?

20    A.    I recall taking the one with the snow.

21    Q.    But you do not recall taking the interior

22    photos; is that correct?

23    A.    I recall taking interior photos, and I

24    believe Alpha Real Estate also took some, but I -- so

25    I do recall taking some, but I can't specifically say

Videotaped Deposition of David Oppenheimer

147

1    that those ones are mine.

2        Q.    But you do recall taking the exterior shot

3    showing the snow; is that correct?

4        A.    Yes, that -- yes, it is correct.

5        Q.    Did you register your copyright in that

6    photo?

7        A.    I do not recall.

8        Q.    Do you recall a conversation with Alpha

9    Realty or whomever took the other pictures about

10   permission to post these photos on this Facebook

11   page?

12       A.    No, I do not.

13       Q.    Is it possible that such a conversation did

14   not happen?

15       A.    Yes, it is --

16           MR. FRANCIS:  Objection, speculation.

17           THE WITNESS:  -- possible.

18           MR. FRANCIS:  Sorry.  You can answer, David.

19           THE WITNESS:  That is possible.

20                          - - -

21       (Court reporter asks for the last objection to be

22       repeated for clarification.)

23                          - - -

24           MR. FRANCIS:  Objection to form,

25       speculation.

Videotaped Deposition of David Oppenheimer

1        MR. STIPKALA:  I'd like to scroll down,

2     Will, if you please.  Okay.  Here -- stop there,

3     please.

4  BY MR. STIPKALA:

5     Q.    So we're looking at what looks like a wooden

6  house surrounded by wild grass and then a picture of

7  wild flowers.  Do you see those?

8     A.    I do.

9     Q.    And they are dated July 10 at 12:19 a.m.  Do

10  you see that?

11    A.    Yes.

12    Q.    Do you recall who took those pictures?

13    A.    I don't recall seeing these photos.  So, no,

14  I do not recall who took these pictures.

15    Q.    Could somebody else have posted these to

16  your web page?

17        MR. FRANCIS:  Objection, speculation.

18        You can answer, David.

19        THE WITNESS:  It's a Facebook page, and

20     that's possible.  It looks like it's logged in as

21     me.  Like, this is attributed to the Hamlit user.

22        So can you scroll down to the next page?

23        MR. STIPKALA:  Yes.  Scroll down.  There

24     might be something useful there.  Okay.  Right

25     there.

Videotaped Deposition of David Oppenheimer

149

1    BY MR. STIPKALA:

2        Q.    Does that help you?

3        A.    Yeah.  This looks like a shared post, I

4    believe.  I don't think I posted.  I think I shared

5    somebody else's post.  That's what that looks like.

6        Q.    I see.

7        A.    John Ager -- it looks like John Ager posted

8    this, and this was something I thought was

9    interesting and shared to the Hamlit page, is -- is

10   my recollection.

11       Q.    Okay.  So may I offer you this.  John Ager,

12   his post appears to be dated July 9th at 11:04 p.m.

13           MR. STIPKALA:  And then, Will, if you scroll

14       up -- stop.

15   BY MR. STIPKALA:

16       Q.    And then you see that Hamlit -- underneath

17   the word "Hamlit" is July 10 at 12:19 a.m.  Do you

18   see that?

19       A.    Yes.

20       Q.    So is it possible that John Ager posted it

21   July 9th, and then you shared it July 10th?

22       A.    That is possible.

23       Q.    Okay.  Okay.  Did you ask John Ager or

24   anyone else for permission to display these photos on

25   Hamlit's Facebook page?

Videotaped Deposition of David Oppenheimer

1      A.    My understanding of using the share button

2    is that you do not need to reach out to John, so I

3    did not --

4      Q.    Okay.

5      A.    -- that I recall.

6      Q.    Sure.   Begging your indulgence.

7           MR. STIPKALA:  Will, if you could, scroll

8      down one more.  It's about the 7th page.  Yeah.

9      A little bit further.

10   BY MR. STIPKALA:

11     Q.    Okay.   Do you see that image there that

12   we're looking at, Mr. Oppenheimer?

13          MR. STIPKALA:  Up a little bit.  I'm sorry.

14     I want to see the one with the snow.  I'm sorry.

15     The bottom of the previous page.

16   BY MR. STIPKALA:

17     Q.    Do you see that image, Mr. Oppenheimer?

18     A.    Yes.

19     Q.    Did you take that image?

20     A.    I recall taking that image.

21     Q.    May I compliment you, sir.  It looks like it

22   should be a post card.

23     A.    I appreciate that kindly.

24     Q.    Yes.   Okay.   And did you make this post?

25     A.    Yes.

Videotaped Deposition of David Oppenheimer

1    Q.    Okay.    Did you register the copyrighting of

2    that lovely snowy picture?

3    A.    Not that I recall.

4    Q.    Oh, do you see on your screen it says,

5    "August 1, 2021"?

6    A.    On the preceding page, yes.    Or the next

7    page, August 1st of 2021, yeah.

8    Q.    Yes.    In the top right-hand- -- excuse me --

9    top left-hand corner as in, like, this was -- well,

10    I'm going to propose to you, and you tell me if you

11    agree or disagree, that this may be a capture of the

12    Hamlit Facebook post -- let me start again.

13        Given that it says 8/1/2021 and this is --

14    you said appears to be the Hamlit Facebook page.

15    A.    I just want to say:    I can see the date on

16    the top of one page, and then we're really talking

17    about the other page where I can't see a date, so...

18    Q.    For sure.    And we can scroll up.

19    A.    Can I see the date on the next page?    Yeah.

20    There.    All right.    Thank you.

21    Q.    Okay.    So what I want to ask you: Is this a

22    true and correct copy of Hamlit's Facebook page as of

23    April -- I'm sorry.

24        Is this a true and correct copy of Hamlit --

25    I'm sorry.    We're going to wrap this up very soon

Videotaped Deposition of David Oppenheimer

1    because -- yeah, we're going to have to wrap it up.

2    Let me start over.

3            Is this a true and correct copy of Hamlit's

4    Facebook page as of August 1, 2021?

5        A.    I believe that's an accurate statement.

6            MR. STIPKALA:  Okay.  Okay.  We can stop

7        sharing your screen, if you please.  Okay.  All

8        righty.  Will, if I could ask you to call up

9        Exhibit 26.  Okay.  And let's scroll down a

10       little bit.  Yeah.  Yeah, yeah.

11           Okay.  So this is Defendants' Exhibit --

12       yes.  Okay.  Let's stop there, top of the first

13       page.

14   BY MR. STIPKALA:

15       Q.    Mr. Oppenheimer, do you recognize this

16   document?

17       A.    Not offhand.  Just -- can you scroll through

18   the whole thing?  I do recognize this document.

19       Q.    And what is it?

20       A.    It looks like Exhibit 2 in the complaint.

21       Q.    In the present case?

22       A.    Yes.

23       Q.    Okay.  And you filed this December 30, 2019;

24   is that right?

25       A.    According to the date filed on the top, it

Videotaped Deposition of David Oppenheimer

153

1    seems accurate.  I don't recall the date, but

2    December 30, 2019.

3        Q.    All right.  So you're seeing -- in the top

4    margin on this second page of the PDF, which is the

5    first page of the exhibit, it shows the date

6    12/30/19; is that right?

7        A.    Yes.

8        Q.    And then it gives the name of the court,

9    United States District Court, District of South

10   Carolina, Charleston Division.  Do you see that?

11       A.    Yes.

12       Q.    David Oppenheimer, Plaintiff, v. Michael C.

13   Scarafile and the other defendants, correct?

14       A.    Yes.

15       Q.    Then it says "Exhibit 2 - CR and Deposit."

16   What does "CR and Deposit" stand for?

17       A.    Copyright registration, and "deposit," the

18   copies that were deposited with the copyright office

19   for the registration -- in the registration.

20           MR. STIPKALA:  Will, if you could, scroll

21       down so we could see the first page of the

22       copyright registration certificate.

23   BY MR. STIPKALA:

24       Q.    Okay.  Do you see on your screen a document,

25   Mr. Oppenheimer?

Videotaped Deposition of David Oppenheimer

154

1      A.    Yes.

2      Q.    Would you agree with me that this appears to

3  be the first page of the Copyright Certificate of

4  Registration VAU 1-142-190.

5      A.    Yes.

6      Q.    And do you see that there's a yellow

7  sticky -- excuse me.  Let me back up.

8            Do you see that there's a yellow box in the

9  lower right-hand corner?

10     A.    Yes.

11     Q.    Do you know what that yellow box is?

12     A.    It's a sticky note.

13     Q.    Okay.  And what's written on the sticky

14 note?

15     A.    Service request number.

16     Q.    1-987295442, correct?

17     A.    Yes.

18     Q.    And you see at the top of the page it says

19 in blue text, page 2 of 5.

20     A.    Correct.

21           MR. STIPKALA:  Will, scroll down so we can

22     see the top of the next page.

23 BY MR. STIPKALA:

24     Q.    We see in the blue text there, page 3 of 5.

25 Do you see that?

Videotaped Deposition of David Oppenheimer

1      A.    Yes.

2      Q.    And then we see the registration number, and

3    then the service request number.  Do you see that?

4      A.    Yes.

5      Q.    And the same service request number

6    1-987295442 appears there, doesn't it?

7      A.    Yes.

8      Q.    Okay.  But didn't we establish yesterday

9    that this certificate of registration has three

10   pages, not just these two?

11     A.    Yes.

12     Q.    Do you recall why only two pages of your

13   three-page certificate of registration was filed in

14   this case, December 30, 2019?

15     A.    I believe so.

16     Q.    Why was that?

17     A.    Clerical error.

18     Q.    Do you know who made the clerical error?

19     A.    I believe it was more than one person.

20     Q.    Can you tell me any one of those persons?

21     A.    Yes.

22     Q.    Can you tell me all of those persons?

23     A.    Yes.

24     Q.    And who are they?

25     A.    Me and I believe Dana's paralegal, Paula.

156

1      Q.    Paula Taylor?

2            MR. FRANCIS:  I'll take some blame too.

3   BY MR. STIPKALA:

4      Q.    Okay.  All righty.  So if you had to do it

5   over again, you'd file all three pages, correct?

6      A.    Yes.

7      Q.    Okay.

8      A.    I didn't file it, but my attorney would.

9      Q.    Sure.  Paula.

10     A.    Yes.

11           MR. STIPKALA:  Okay.  Will, if I could ask

12           you to call up Exhibit 50.  Okay.  And we're

13           going to scroll down to the top of the first

14           page.

15           MR. FRANCIS:  I am going to have -- I have

16           an objection to the exhibit -- exhibit as to

17           relevance, and I believe that it is a --

18           relevant -- irrelevant, harassing and -- well,

19           irrelevance and -- and harassment.  I'm not --

20           I'm not, at least at this time, saying that we're

21           not going to answer any questions as to the

22           transcript or anything on that, but I did want

23           the noted objection to the general exhibit.

24           MR. STIPKALA:  Thank you, sir, for the

25           record.

1              Will, if you could, show the top of the
2         first page there.
3    BY MR. STIPKALA:
4         Q.    Mr. Oppenheimer, do you recognize what this
5    shows so far?
6         A.    Yes.  Looks like the top of a complaint, the
7    case Oppenheimer v. Griffin.
8         Q.    And Oppenheimer v. Griffin, and this is
9    taking place in the Western District of North
10   Carolina, Asheville Division, and we see the case
11   number, 1- -- excuse me.  1:18-cv-00272-MR, right
12   over the word "Original."
13             MR. STIPKALA:  Will, if you could, scroll
14        down just a little bit more.
15   BY MR. STIPKALA:
16        Q.    And instead of a Complaint, do you see where
17   it says, "Transcript of Motion Hearing"?
18        A.    Yes.
19        Q.    And then it says -- a little bit further
20   down, it says, "Proceedings in the Matter of Cause
21   17:101 Copyright Infringement, held before the
22   Honorable Martin Reidinger on the 4th day of
23   December, 2019."  Do you see that?
24        A.    Yes.
25        Q.    And then it continues that it was -- now on

1     line 21, it says, "Commencing at 2 p.m."  Do you see

2     that?

3          A.     Yes.

4          Q.     Do you recall this hearing at 2 p.m. on

5     December 4, 2019?

6          A.     Yes.

7          Q.     Okay.  Do you remember testifying in that

8     hearing?

9          A.     Yes.

10         Q.     Do you recall what you testified about?

11         A.     Vaguely.

12         Q.     What do you remember?

13         A.     What do I remember?  I remember the judge

14    asking me about Photo Quo.

15         Q.     Uh-huh.

16         A.     That's the only thing that comes to mind.

17    I'd have to think about it for a little bit or I

18    could read what you have in front of me here and...

19         Q.     Sure, sure.

20               MR. STIPKALA:  Will, can you scroll down to

21          the 21st page of the PDF, and it's going to be

22          towards the bottom we're going to be looking.

23    BY MR. STIPKALA:

24         Q.     And -- okay.  So this is going to be -- it

25    says -- at the bottom in blue text, it says, "Page 20

Videotaped Deposition of David Oppenheimer

159

1   of 49."

2           Do you see that?

3   A.    Yes.

4   Q.    And it says -- it has a Bates number

5   Carolina One 013195.  And it says --

6   A.    Hold on.  What was that last set of numbers

7   you just -- oh, yeah.  All the way at the bottom.

8   Yeah.  Got it.

9   Q.    Yeah.  The Bates number at the bottom.

10          Okay.  Then the line 23, it says, "Courtroom

11  Deputy: Would you put your left hand on the Bible,

12  please, and raise your hand."

13          And do you recall doing that?

14  A.    Yes.  Vaguely.

15  Q.    And then on the top of the next page, go

16  slowly because there's a sentence that bridges both

17  pages.  Do you remember testifying under oath?

18  A.    Yes.

19  Q.    Okay.  So I don't need to re-read all this

20  to you.  Okay.

21          MR. STIPKALA:  Will, if you could, scroll

22      to -- I believe it's the 26th page.

23  BY MR. STIPKALA:

24  Q.    I'm sorry.  I'm looking for it to make this

25  as efficient as possible.

1    Do you remember who was asking you

2    questions?

3    A.    Judge Reidinger.

4    Q.    Was anybody else asking you questions?

5    A.    My attorney.

6    Q.    And who was that?

7    A.    Dana LeJune.

8    Q.    Okay.  At the bottom of this page, do you

9    see where it says Q?

10    A.    Yes.

11    Q.    This is a request from Mr. Dana LeJune.  He

12    says: "So I wanted to satisfy the judge.  This

13    morning you and I discovered that there were not 12,

14    as argued in the motion, different websites where we

15    know it was used.  Do you know how many there

16    actually were?"

17    Do you see that?

18    A.    Yes.

19    Q.    And then line five on the next page, you

20    answer: "I didn't realize the discrepancy until after

21    I had left the house, and so I wasn't able to go

22    through my records and see if there was one that we

23    left out, and we did have 12, or we miscounted."

24    Do you see that?

25    A.    Yes.

1        Q.    Was that your testimony?

2              MR. FRANCIS:  Objection.  The document

3        speaks for itself.

4              You can answer, David.

5              THE WITNESS:  I imagine it was.

6    BY MR. STIPKALA:

7        Q.    And then the question was:  "Well, it's A

8    through K, and I count 11."

9              And then you answered: "I've counted 11 on

10   the document, but for some reason I thought it was

11   12, so I'm not sure where that discrepancy came in,

12   but I'm certain from looking at the declaration and

13   reviewing the websites that those are 11 distinct,

14   different websites, and we had a concern that some of

15   these might be unrelated listings, but they showed

16   the inside of the same house, so it was unlikely that

17   it was a different property and a different person."

18             Did you see that?  Was that your testimony?

19             MR. FRANCIS:  Objection.  The document

20       speaks for itself.

21             You can answer, David.

22             THE WITNESS:  According to this, it's my

23       testimony.  I just don't recall it.  I just want

24       to read it again.

25             All right.  That -- I read it again, and

Videotaped Deposition of David Oppenheimer

162

1        that recollected my memory to where I believe

2        that was my testimony.

3             MR. STIPKALA: Okay. I apologize.

4             THE WITNESS: I'm just going to stand up for

5        a second.

6 BY MR. STIPKALA:

7      Q. Okay. If we could go to the -- further

8 along, it says -- I'm sorry. I need to put you on

9 the right page. It's page 26 of 49. And it says --

10 the Court makes a statement on 21. "The Court:

11 Dr. Reidinger" --

12        Yes?

13      A. Oh, I burped, sir.

14      Q. It says -- on line 21, on page 26 of 49, it

15 says, "The Court: I want to follow up on a couple of

16 things, Mr. Oppenheimer. First, on this issue of the

17 website -- on the websites that are listed in your

18 affidavit. Of the 11 that are listed, A through K,

19 three of them are on the same website, HomeAway, with

20 almost identical information. Is that three times

21 that the photo was posted on the same listing, or are

22 those different listings?"

23        "The Witness: Can I grab my declaration?"

24        Is that you?

25      A. I guess so. I believe so.

Videotaped Deposition of David Oppenheimer

163

Q.    Then the Court says on line 5 of that page,
"The Court: Mr. LeJune, if you would, please hand a
copy to Mr. Oppenheimer."

Mr. LeJune on line 7: "May it please the
Court."

Line 8, "The Court: I'm looking at paragraph
six of your declaration where it has subparts H, I
and J."

"The Witness: I've made a mistake here, and
those are image URLs, not actual listing URLs, and I
apologize to the Court for that mistake."

The Court says, line 13:  "So there are nine
that you are identifying; is that correct?"

"The Witness: I'm counting eight complete
and different websites that display the work.  I
apologize again.  There is booking.com, vrbo.com,
rentbyowner.com, expedia.com, travelocity.com,
ebookers.ie, j2ski.com, and homeaway.com, and I did
not catch that those were image URLs."  Period.

Do you see that?

A.    Yes.

Q.    Was that your testimony?

A.    I believe so.

MR. FRANCIS:   Objection.   The document
speaks for itself.

Videotaped Deposition of David Oppenheimer

164

1          You can answer.

2          THE WITNESS:  I believe so.

3    BY MR. STIPKALA:

4    Q.    Okay.  So sort of summarizing what happened

5    here, help me understand.  You and your attorney,

6    Mr. LeJune, had alleged that there were 12 websites,

7    but then you finally counted but eight different

8    websites; is that correct?

9    A.    No.

10   Q.    What happened then?

11   A.    There were actually more than 12, and they

12   just were never admitted into the complaint, and then

13   some image URLs were counted as page URLs, but I

14   believe, from my recollection, it was actually much

15   greater than 12.

16   Q.    Of the 12 --

17   A.    Just know you -- they just weren't included

18   in the complaint or the declaration.

19   Q.    Okay.  But of the twelve that were listed in

20   the complaint, that number gets reduced to eight; is

21   that correct?

22   A.    Yes.

23   Q.    And you apologize to the Court for the

24   mistake you've made here; is that correct?

25   A.    Yes.

Videotaped Deposition of David Oppenheimer

1      Q.    And this was on December 4, 2019; is that

2   right?

3      A.    I don't recall the date.

4            MR. STIPKALA:  If we could, go back to the

5      second page of this exhibit, please, Will.

6   BY MR. STIPKALA:

7      Q.    And line 17, does that refresh your

8   recollection as to when this testimony occurred?

9      A.    Not particularly, but I don't dispute the

10  date listed.

11     Q.    And what is that date?

12     A.    The 4th of December 2019.

13           MR. STIPKALA:  And, Will, can you go back

14     to -- we were just looking at Exhibit 26.  And go

15     ahead and share Exhibit 26.

16  BY MR. STIPKALA:

17     Q.    And on the first page of Exhibit 26 right

18  there, you see that it is -- the date filed is

19  December 30, 2019.  Do you see that?

20     A.    Yes.

21     Q.    So is it fair to say that you filed your

22  complaint in the present case just about four weeks

23  after that testimony in the Griffin case?

24     A.    Yes.

25           MR. STIPKALA:  Okay.  Will, if you could,

Videotaped Deposition of David Oppenheimer

| | |
|---|---|
| 1 | open up Exhibit 68.  And I want to look at RFA |
| 2 | 89, if you please.  Wait, wait, wait.  I'm sorry. |
| 3 | Stop.  Let's -- let's look at the first page |
| 4 | first so we can see what it is.  Okay.  Right |
| 5 | there. |
| 6 | BY MR. STIPKALA: |
| 7 | Q.    Do you recognize this document, |
| 8 | Mr. Oppenheimer? |
| 9 | A.    This is your clients' Fourth Requests For |
| 10 | Admissions. |
| 11 | Q.    Okay.  Have you seen this document before? |
| 12 | A.    I haven't seen what's down below, but I |
| 13 | imagine so. |
| 14 | MR. STIPKALA:  Okay.  Let's scroll down to |
| 15 | RFA number 89.  Okay.  And zoom in, please. |
| 16 | BY MR. STIPKALA: |
| 17 | Q.    And do you see where it says 89, and this is |
| 18 | a request for admission, number 89, and then it says, |
| 19 | "The as-filed complaint, Exhibit 4, ECF number 1-4 |
| 20 | entitled Exhibit 4, The Infringing URLs, recites the |
| 21 | URL" -- I'm going to skip over the URL -- "at least |
| 22 | eight times." |
| 23 | Do you see that? |
| 24 | A.    Yes. |
| 25 | Q.    And then your -- the response to that |

1  request is, "Admit."

2           Do you see that?

3  A.     Uh-huh.

4  Q.     And then let's scroll up to 88.  And it

5  says, "Request for Admission 88.  As-filed Complaint

6  Exhibit 4, ECF Number 1-4, entitled Exhibit 4, The

7  Infringing URLs, recites the URL" -- I'm going to

8  skip over that URL -- "at least 13 times."

9           Do you see that?

10  A.     Yes.

11  Q.     And what was your answer?

12  A.     "Admit."

13  Q.     So December 4, 2019, you were apologizing

14  for overstating 12 URLs which turned out to be eight;

15  is that correct?

16  A.     Not necessarily.

17  Q.     What were you apologizing for?

18  A.     Mistaking page URLs for image URLs or

19  mistaking image URLs for page URLs.

20  Q.     And what is the difference?

21  A.     An image URL is the -- a direct link to

22  where the photograph is being hosted, and the page is

23  a web page, kind of -- you know, is a -- is the

24  address of a web page.

25  Q.     Is the distinction between the page URL and

1    the image URL explainable by our discussion about

2    framing and embedding that we had yesterday?

3        A.    I don't think I fully understand your

4    question.

5        Q.    We spoke of framing, right?

6        A.    Yes.

7        Q.    And I think we had a discussion over whether

8    you frame something, whether that's an infringement

9    or not; is that right?  Let me rephrase it.

10        We had a discussion about whether framing is

11   technically copyright infringement.  Do you recall

12   that discussion?

13        A.    Yes.  I know we switched terminology around

14   and went from framing to embedding to backlinking

15   and -- so, yes.

16        Q.    Sure.  Why did we go from 12 URLs to eight

17   URLs on December 4, 2019?

18        A.    Because in that instance, we were discussing

19   how many unique individual web pages displayed the

20   photograph, and a couple of the image URLs mistakenly

21   were counted as web pages in the complaint.  There

22   were actually other web pages that were not included

23   in the complaint.  There were more than 12.  And

24   the -- it was a mistake.

25        Q.    I see.  Were any of the image UR- --

Videotaped Deposition of David Oppenheimer

169

1      A.    I want to sort of go back and say, to the

2  best of my recollection there were more than 12.

3  Sorry.

4      Q.    Sure, sure.

5            Were any of the URLs that got excluded exact

6  duplicates of URLs that were kept?

7            MR. FRANCIS:   Objection.

8            And just to clarify, are we talking about

9        the Griffin matter?

10            MR. STIPKALA:   The Griffin matter, December

11        4th.

12  BY MR. STIPKALA:

13      Q.    In the Griffin matter on December 4, 2019,

14  were any of the URLs that got excluded exact

15  duplicates of any of the URLs that were kept?

16      A.    Again, this is, like, a -- it's -- it's a

17  question -- the way it's phrased, I don't think I

18  could answer it properly.   Can you rephrase -- state

19  the question.

20      Q.    Did you reduce the number of URLs in the

21  Griffin matter on December 4, 2019, because they were

22  a duplication of another URL?   Let me rephrase it.

23      A.    No.

24      Q.    Okay.   Let me -- let me rephrase it.   I'm so

25  sorry.   My job, to ask a good question.   All right?

Videotaped Deposition of David Oppenheimer

170

1    A.    It's technical stuff.

2    Q.    Yes.  In the 12 URLs originally pled in the

3   Griffin matter, were any of those URLs duplicative of

4   another of those URLs?

5    A.    Yes.

6    Q.    They were duplicative?

7    A.    To the best of my recall, looking at my

8   testimony here -- oh, no.  I'm not sure what I'm

9   looking at now.

10    Q.    No, no.

11    A.    But, yeah, I believe there were duplicative

12   URLs, but that's not why they were removed.

13    Q.    You mean the URLs were identical, like two

14   URLs?  I thought that some were image URLs and others

15   were page URLs?

16    A.    I'm really sorry.  I -- like, the first half

17   of your sentence and the second half, I thought we

18   were talking about two different things.

19    Q.    Do you remove -- excuse me.  Let me start

20   over.  In the Griffin matter --

21    A.    Yes.

22    Q.    -- did you remove any URLs because they were

23   pleaded more than once?

24    A.    No is -- my understanding is no.

25    Q.    Okay.  But then some four weeks later, in

Videotaped Deposition of David Oppenheimer

171

1    the present case, you repeated the URL set forth in

2    Request For Admission 88 13 times; isn't that right?

3        A.    Yes.

4        Q.    Why was that one URL repeated 13 times in

5    our case?

6        A.    Because I believe that that URL was used to

7    display the photograph on 13 separate, different

8    websites.  So there were 13 different displays that

9    stemmed from this.

10       Q.    Well, is that 13 URLs or is that one URL?

11       A.    My understanding and my work flow procedures

12   are that if I find an infringement, I will document

13   the URL.  Below it, I will place the image URL that

14   is being used to display the photo on that page, so

15   if I go to a different website, like Century 21

16   that's also sharing the photos that your client stole

17   from me, and I go to that page and look at the image

18   URL and it's also the same image URL, I'll document

19   that page and put the same image URL in there.

20             And from -- my understanding of case law is

21   that each separate display on a different web page is

22   its own infringing use, and my attorney in Atlanta, I

23   believe, told me a month or two ago that if a

24   photograph is infringed and hosted one time, like

25   this, but then used on 13 different pages, that

Videotaped Deposition of David Oppenheimer

172

1    there's more liability than just the one use.

2           And so I'm not saying that that photograph

3    was infringed 13 times.  I'm saying that that

4    photograph was displayed on 13 different pages, and

5    that's why it's being listed.

6       Q.    I thought we had a discussion in which you

7    said that backlinking or framing is not technically

8    infringement.  Is that -- am I misrecalling our

9    discussion?

10          MR. FRANCIS:  Objection to anything calling

11       for his legal opinion on infringement.

12          But you can answer the question, David.

13          THE WITNESS:  Can you ask the question

14       again?

15   BY MR. STIPKALA:

16      Q.    Is -- when one website frames and displays

17   an image located somewhere else without making a copy

18   of it, is that infringement, to your knowledge?

19          MR. FRANCIS:  Same objection.

20          THE WITNESS:  That's a very compound

21       question, and you'll have to break it down and be

22       more specific.

23   BY MR. STIPKALA:

24      Q.    So we have website A, and we have an image

25   that's over on, let's say, a photographer's website

173

1    or -- excuse me.  Let me start over.

2            You're a photographer.  You have photos on

3    your server.  Somebody else has a website.  Do you

4    understand me so far?

5        A.    Yes.

6        Q.    Photo on your server, website over here.

7    Now, that website then uses your photo that's on your

8    server, never leaves your server, but it appears on

9    that website.  Do you follow me?

10       A.    Yes.

11       Q.    And we call that backlinking or framing or

12   embedding.

13       A.    Yes, embedding.

14       Q.    Okay.

15       A.    For lack of a better word, to my knowledge.

16       Q.    Now, to your understanding, is that or is

17   that not infringement?

18            MR. FRANCIS:  Same objection, calling for a

19        legal opinion.

20            You can answer.

21            THE WITNESS:  Again, the courts have evolved

22        on that subject, but I believe up until two years

23        ago, that would not be considered an

24        infringement.

25   BY MR. STIPKALA:

1    Q.    What happened two years ago?

2    A.    Well, within the last two years I believe

3    there were a couple of court cases where judges had

4    ruled that embedding was a violation of copyright,

5    unauthorized embedding.

6    Q.    Were you aware of those cases when you filed

7    our complaint?

8    A.    I can't recall.

9    Q.    Help me understand why one URL appears 13

10   times in your complaint.

11        MR. FRANCIS:  Objection.  I think that was

12   asked and answered.

13        But you can answer, David.

14        THE WITNESS:  I believe your clients

15   uploaded my photographs to an MLS service which

16   distributed them, made them available to a wide

17   range of real estate companies and that that

18   image URL was one of the images -- one of the

19   hosted images used to market your clients'

20   clients' property.

21   BY MR. STIPKALA:

22   Q.    So you've listed in the complaint both the

23   URL that displays the image and also the URL of where

24   the image is located; isn't that right?

25   A.    Correct.

Videotaped Deposition of David Oppenheimer

1    Q.    And then for another example or instance --

2    A.    Excuse me.  I'm sorry.  I -- can you repeat

3  the last question because I answered without fully

4  processing the question.

5    Q.    So in your complaint, Exhibit 4, you have

6  listed a website that displays the image and then

7  also the URL to where the image is located displayed

8  on that website; is that right?

9    A.    I don't have the complaint in front of me,

10  and I'm not exactly sure how it's structured and

11  displayed.  I can't recall.

12    Q.    Okay.  But it's your understanding that

13  these URLs that are repeated multiple times are the

14  image URLs; is that correct?

15    A.    That is my understanding, yes.

16    MR. STIPKALA:  Okay.  All righty.  Let's

17  take a very brief break.  Let's see.  It's 3:52.

18  Let's reconvene at four o'clock, unless somebody

19  needs a longer break.

20    THE WITNESS:  That's fine with me.  Thank

21  you.

22    THE VIDEOGRAPHER:  All right.  Off the

23  record at 3:52 p.m.

24              - - -

25    (There was a recess from 3:52 to 4:03.)

Videotaped Deposition of David Oppenheimer

176

```
 1                          - - -
 2              THE VIDEOGRAPHER:  On the record at
 3       4:03 p.m.
 4  BY MR. STIPKALA:
 5       Q.    Mr. Oppenheimer, did you speak with your
 6  attorneys during the break?
 7       A.    No.
 8       Q.    You have filed numerous copyright
 9  infringement suits; isn't that right?
10       A.    Yes.
11              MR. FRANCIS:  Objection, form, vague.
12  BY MR. STIPKALA:
13       Q.    How many --
14              MR. FRANCIS:  You can answer, David.
15              THE WITNESS:  Yes.
16  BY MR. STIPKALA:
17       Q.    How many lawsuits would you say for
18  copyright infringement have you filed in the last
19  decade?
20       A.    Over 100.
21              MR. FRANCIS:  Objection, relevance.
22              Sorry.  Yeah.  You can answer, David.  I'm
23       not going to stop you from answering.
24              But object to relevance, harassment.
25              You can answer.
```

Videotaped Deposition of David Oppenheimer

177

1    THE WITNESS:  Over 100.

2    BY MR. STIPKALA:

3    Q.    You said yesterday that none of those -- you

4    said yesterday that you've never been in front of a

5    jury; is that right?

6    A.    That I can recall.

7    Q.    Okay.  So is it fair to say that none of

8    your copyright infringement cases that you filed in

9    the last decade have gone to trial; is that right?

10    A.    As far as I can recall.

11    Q.    So all of the copyright infringement cases

12    that you filed in the last decade have settled before

13    trial; isn't that right?

14    A.    I believe so.

15    Q.    And when I say they've settled, I mean that

16    the accused infringers pay you money to agree to drop

17    the suit; is that right?

18    A.    Actually, go back to my last question and --

19    can you -- can we go back to the question before?  I

20    was -- because I think the -- I answered incorrectly.

21    Q.    Okay.  I think my question was that all --

22    of all of the copyright infringement suits that you

23    have filed in the last decade, all of them have

24    settled before trial.  Isn't that right?

25    A.    I don't know the terminology, but some have

Videotaped Deposition of David Oppenheimer

 1    had default judgments, so I don't -- I think that
 2    makes the answer not a yes or no.
 3        Q.    Okay.  So some -- some settle, correct?
 4        A.    Yes.
 5        Q.    And others are resolved through default
 6    judgment; is that right?
 7        A.    I believe so.
 8        Q.    Is there any other outcome that you're aware
 9    of?
10        A.    (No response).
11        Q.    Let me rephrase.  A case --
12        A.    Thank you.
13        Q.    A case is either settled or it's gone to
14    default judgment in the past decade; is that right?
15        A.    I believe there was one I dropped if I'm not
16    mistaken.  I recall one that I dropped.
17        Q.    Why did you drop that one?
18        A.    You said -- I'm sorry.  Did you say, "Why?"
19        Q.    Why?
20        A.    Because of evolving case law and -- yeah,
21    evolving case law.
22        Q.    How did case law evolve?
23        A.    A judge issued a ruling.
24        Q.    And that caused you to drop the cause
25    without settling.

Videotaped Deposition of David Oppenheimer

179

1       A.    Yes, it did.

2       Q.    Okay.  When did that case happen?

3       A.    Might have been 2016.  I don't recall.

4       Q.    When a case is decided by default judgment,

5  what does that mean?

6            MR. FRANCIS:  Objection, calling for legal

7       opinion.

8            You can answer, David.

9            THE WITNESS:  I believe it means that one of

10      the parties did not show up, and then -- so the

11      Court takes it upon themselves to issue a ruling

12      or a jury is impaneled to make a ruling.

13  BY MR. STIPKALA:

14      Q.    Okay.  When default judgment is entered,

15  what have you experienced in those cases?

16           MR. FRANCIS:  Objection, form, vague.

17  BY MR. STIPKALA:

18      Q.    What happens for you after a default

19  judgment?

20      A.    Can you be specific on what you're asking

21  me?

22      Q.    So a case -- a default judgment is entered

23  in a case that you've brought for copyright

24  infringement.  Okay?

25      A.    Yes.

Videotaped Deposition of David Oppenheimer

```
 1         Q.    Default judgment is entered.  Right?  And
 2    then at some point the Court says that the defendant
 3    in default has to pay Mr. Oppenheimer some money; is
 4    that right?
 5         A.    I believe so, yes.
 6         Q.    And when you settle a case, that means that
 7    the defendant offers you money and pays you money and
 8    you drop the case; is that right?
 9         A.    Not necessarily.
10         Q.    Okay.  Please explain.
11         A.    It could be other -- other settlement terms
12    besides money.
13         Q.    Like what?
14              MR. FRANCIS:  I'm going to object to any
15         specifics on the basis of confidentiality, but
16         I'll allow the witness to testify in general
17         terms to the extent of his knowledge.
18              THE WITNESS:  Could you repeat the question,
19         please?
20    BY MR. STIPKALA:
21         Q.    If a case doesn't settle for a money payment
22    to you, upon what other terms might it settle,
23    generally speaking?
24              MR. FRANCIS:  And I'll repeat this -- okay.
25         No objection to a "generally speaking."
```

Videotaped Deposition of David Oppenheimer

1      THE WITNESS:  I recall settling a matter

2   with an infringer or two that were not in court,

3   I believe, where either I've offered to make a --

4   for them to make a donation or to improve their

5   copyright training procedures internally, so

6   there's other things besides a payment that would

7   be consideration in a settlement.

8  BY MR. STIPKALA:

9      Q.    Would it be fair to say that most cases that

10  settle, though, are settled for a cash payment?

11     A.    I would think that's --

12           MR. FRANCIS:  Objection.  Sorry.

13           You can answer, David.

14           Objection to form.

15           THE WITNESS:  I believe that's an accurate

16   statement.

17  BY MR. STIPKALA:

18     Q.    You've sued a number of people who are

19  trying to sell real estate; is that fair to say?

20           MR. FRANCIS:  Objection to form.

21           You can answer.

22           THE WITNESS:  I believe that's accurate.

23  BY MR. STIPKALA:

24     Q.    Would you say that you find yourself

25  unfortunately frequently in suit against people

Videotaped Deposition of David Oppenheimer

182

| | |
|---|---|
| 1 | selling real estate who have allegedly infringed your |
| 2 | photographs?  Rephrase. |
| 3 | Would you say that you're frequently in a |
| 4 | copyright suit against people selling real estate who |
| 5 | have allegedly infringered copyrights of your |
| 6 | photographs? |
| 7 | A.    I would object to the word "frequently," but |
| 8 | it's happened on several occasions or more, so... |
| 9 | Q.    All right.  You have sued a school; is that |
| 10 | right? |
| 11 | A.    I believe so. |
| 12 | Q.    You have sued the Friends of the Greenville |
| 13 | Zoo; is that right? |
| 14 | A.    Yes. |
| 15 | Q.    And you've sued Episcopal Communicators; is |
| 16 | that right? |
| 17 | A.    Yes. |
| 18 | Q.    Do you know what kind of organization |
| 19 | Episcopal Communicators is? |
| 20 | A.    Somewhat -- |
| 21 | MR. FRANCIS:  Objection to form, vague. |
| 22 | BY MR. STIPKALA: |
| 23 | Q.    Who is Episcopal Communicators? |
| 24 | A.    It's an organization, and I don't know much |
| 25 | about them.  I do know that they were having a |

Videotaped Deposition of David Oppenheimer

183

1  conference, and the conference subjects were

2  photography and website best practices, and they

3  stole my photo to advertise their $700 conference for

4  website best practices and for photography. That's

5  all I know much about them.

6      Q.    How do you decide whether to sue a potential

7  infringer when you detect potential infringement?

8      A.    It's always a last resort and something I

9  decide with my attorneys.

10      Q.    When you do decide -- when you do decide to

11  file suit, you ask the Court to award you money

12  damages in the complaint; isn't that right?

13      A.    I believe --

14          MR. FRANCIS:  Objection as to form.

15          You can answer, David.

16          THE WITNESS:  I don't know if that's the

17      case initially, and I don't -- I don't -- I can't

18      speak for all cases at once.

19  BY MR. STIPKALA:

20      Q.    Do you recall filing a complaint where you

21  don't ask for money damages?

22      A.    Again, the "filing the complaint" -- the

23  question's compound in a way because the time span.

24  Can you break it up?

25      Q.    In the copyright infringement cases that

Videotaped Deposition of David Oppenheimer

1    you've filed in the last decade, do you recall an

2    instance where you've filed a complaint that does not

3    ask for money damages?

4        A.    I believe so.

5        Q.    What did you ask for in those complaints?

6        A.    I don't have them in front of me, and I

7    can't recall the language, but what I'm trying to say

8    is I think in the complaints themselves, some of

9    them, they do not ask for money.  They ask the Court

10    to get to the bottom of it, and there's not, like, a

11    dollar amount asking for in the complaint, so I --

12    but, again, I can't speak to the complaints without

13    seeing them.

14        Q.    Sure.  Do you -- are you aware of filing a

15    complaint where you do not ask for money damages at

16    least in the abstract, even if you don't name a

17    dollar amount?

18        A.    Again, I think -- I just fall back on my

19    last answer on that, and that's -- I don't think that

20    there's always -- I can't see the complaints.  I

21    can't speak for 100 different lawsuit complaints that

22    are not in front of me.  I don't recall the wording

23    of all of them.  I don't know if some say we're

24    looking for monetary resolution or if it says we're

25    looking to get to the bottom of this.  So I just

Videotaped Deposition of David Oppenheimer

185

1    can't say for certain as I'm sitting here right now.

2        Q.    Do you recall a complaint -- excuse me.  Do

3    you recall filing a complaint where you've only asked

4    for an injunction to stop the infringement?

5        A.    Not that I recall.

6        Q.    Do you recall seeking attorneys' fees in

7    your complaints?

8        A.    Yes.  I believe -- I believe some say that.

9    I can't speak for all of them.

10       Q.    And, of course, you -- well, are you aware

11   that the defendants that you sue incur attorneys'

12   fees defending the suits that you bring?

13       A.    Yes, I am aware of that.  Well, actually, I

14   take back that answer.  I'm aware that some are.

15       Q.    So you're aware that at least some of the

16   defendants that you sue incur attorneys' fees --

17       A.    Yeah.

18       Q.    -- defending the suits you bring.

19       A.    And I'm also aware that some do not incur

20   attorneys' fees.

21       Q.    Who does not incur attorneys' fees?

22       A.    Two come to mind.  Well, again, these are

23   not in-court matters, but they're disputes, and in

24   one of them -- or actually -- yeah.  One is in court.

25   There's an attorney in California.  His name is

Videotaped Deposition of David Oppenheimer

186

1   Prutton, and he's defending himself, so he is not --

2   unless he's paying himself, he's not paying any

3   attorneys' fees.

4       Q.    Is it fair to say that this Attorney Prutton

5   is -- when he's working on your case, he's not

6   earning money on other cases?  Is that fair to say?

7       A.    I would say that's fair to say.  The same

8   way it's fair to say that I didn't earn any money

9   when he stole my photo and used it to advertise his

10  law firm business.

11      Q.    Do you know the magnitude of attorneys' fees

12  that defendants incur when they defend the suits that

13  you bring?

14      A.    No.

15      Q.    You have no inkling of how much it costs to

16  defend a copyright infringement suit?

17      A.    I think it --

18          MR. FRANCIS:  It's been asked and answered.

19          THE WITNESS:  I've seen attorneys file for

20      attorneys' fees of $3,000.  I've heard of cases

21      costing over $300,000.  So I think it can be a

22      wide range, so what any particular case or how

23      much any particular person spent, I have no idea.

24  BY MR. STIPKALA:

25      Q.    Has a defendant that you have sued ever

1  claimed their attorneys' fees against you?

2      A.    I don't fully --

3          MR. FRANCIS:  You know, objection.

4          THE WITNESS:  -- understand the question.

5          MR. FRANCIS:  I'm going to just warn the

6      witness again.  I'll let -- I'm allowing the

7      witness to talk about generalities when we're

8      talking, but I object and will instruct the

9      witness not to answer about any specific cases,

10     especially any -- anything that might be under a

11     confidentiality and non-disclosure agreement.

12         You can answer the question.

13 BY MR. STIPKALA:

14     Q.    Allow me to rephrase.  Without naming names

15 or naming parties, are you aware of any instance in

16 which a defendant demanded of you their attorneys'

17 fees for defending against the suit that you brought?

18     A.    Demanded you?  Demanded what -- what was the

19 word after "demanded"?

20     Q.    Demanded that you --

21     A.    Oh.

22     Q.    -- pay them --

23     A.    Got you.

24     Q.    -- for their attorneys' fees.

25     A.    Not that I can recall.

Videotaped Deposition of David Oppenheimer

1    Q.   Mr. Oppenheimer, are there any answers to my

2  questions that you wish to change before we close

3  this deposition?

4    A.   I wanted to say about yesterday's testimony

5  that I'm not sure how Fine Art America works on the

6  back end, but some recollection makes me think that

7  those watermarks on Fine Art America are removable,

8  but there's a chance that they're not removable and

9  that they have two copies, one with the watermark and

10 one that they use for making prints when somebody

11 buys a copy.

12   Q.   I understand.  So when we discuss Fine Art

13 America's watermark, you're saying that it could

14 either be a removable watermark, on one hand, or it

15 could be an example where they advertise one image

16 with an embedded watermark and then deliver another

17 image or another copy of the image that does not have

18 an embedded watermark once you pay for the image.  Is

19 that what you --

20   A.   Correct.  Yeah.

21   Q.   Is there any --

22   A.   They print it out -- yeah.  Go ahead.  They

23 print out -- they don't provide digital copies.  They

24 provide printed copies through the mail.

25   Q.   I see.  Do you know whether you provide an

Videotaped Deposition of David Oppenheimer

189

1   image to Fine Art America with no watermark?

2       A.    Yes.

3       Q.    And then they do the rest?

4       A.    Correct.

5       Q.    Whether it's a removable watermark or a --

6   two copies, one with the watermark and one without?

7       A.    Yes.  And that's an option that I applied,

8   so there's an option to have no watermark as well.

9       Q.    Uh-huh.  No watermark in what context, as

10  advertised?

11      A.    Yes.

12      Q.    But still when the print comes, it's not

13  going to have a watermark.

14      A.    Correct.

15      Q.    All right.  Is there any information I asked

16  about today that you remember now but you didn't

17  recall when I asked the question about it?

18      A.    Not that I could -- nothing that comes to

19  mind.

20      Q.    Okay.  Are there any documents other than

21  the exhibits that we have discussed that you have

22  used to refresh your memory during today's

23  deposition?

24      A.    No.

25            MR. STIPKALA:  Okay.  We're going to --

Videotaped Deposition of David Oppenheimer

190

1    Defendants are going to suspend this deposition

2    pending resolution of a motion to compel and

3    production of any compelled documents.  Once we

4    get those documents, we may move the Court to

5    re-open this dep- -- this deposition.  I think

6    that's -- in the immortal words of Forrest Gump:

7    That's all I have to say about that.

8        MR. FRANCIS:  Plaintiff will reserve

9    questions for either a re-opened deposition or

10   for trial.

11       MR. STIPKALA:  I guess we can go off the

12   record then.

13       THE VIDEOGRAPHER:  All right.  This

14   concludes today's deposition of Mr. David

15   Oppenheimer.  We're off the record at 4:25 p.m.

16                    - - -

17   (Videotaped deposition adjourned at 4:25 p.m.)

18                    - - -

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3          I, Deidre Osborne, Court Reporter and Notary

4   Public for the State of South Carolina at Large, do

5   hereby certify:

6          That the foregoing deposition was taken by

7   videoconference on the date and at the time and

8   location stated on page 1 of this transcript.

9          That the deponent was duly sworn to testify to the

10  truth, the whole truth, and nothing but the truth.

11         That I am not related to nor the employee of any of the

12  parties hereto, nor related to or employed by any attorney or

13  counsel employed by the parties hereto, nor interested in the

14  outcome of this action.

15

16

17

18          _____

19          Deidre Osborne, RPR

20          Registered Professional Reporter

21          Notary Public

22          State of South Carolina at Large

23          My Commission Expires:

24          June 13, 2029

25