**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**(CHARLESTON DIVISION)**

| | | |
|---|---|---|
| David Oppenheimer, | § | CASE NO: 2:19-cv-3590-RMG |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| Michael C. Scarafile, Patricia R. Scarafile, | § | |
| Sheila Glover Romanosky, and | § | |
| O'Shaughnessy Real Estate, Inc., d/b/a | § | |
| Carolina One Real Estate, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff David Oppenheimer ("Oppenheimer" or "Plaintif") files this memorandum in support of its Motion for Partial Summary Judgment on two issues; copyright infringement and eleven (11) of Defendants' affirmative defenses.

## I.    INTRODUCTION AND RELEVANT FACTUAL BACKGROUND

### A. The Plaintiff and the Copyrighted Works

This is a copyright infringement case brought by Oppenheimer, a professional photographer, against four individual defendants: Michael Scarafile and Patricia Scarafile (collectively, "the Scarafiles"), Sheila Romanosky ("Romanosky"), and their company, O'Shaughnessy Real Estate, Inc. d/b/a CarolinaOne Real Estate ("CarolinaOne" or "CORE") (together "Defendants").

Oppenheimer is a professional photographer, in the business of creating original and beautiful photographs, and licensing their use to businesses, non-profit organizations, and individuals for reasonable license fees. **See Declaration of David Oppenheimer, ¶ 2.** Mr. Oppenheimer also sells photographic prints and photography-based merchandise. **Id.** Nearly all of the photographs in his portfolio – which are displayed and offered for license on the website www.performanceimpressions.com – are Oppenheimer's original creations. **Id**. As germane to the instant suit, Oppenheimer is the author of, and at all times relevant to this claim, has been and is now the sole owner and proprietor of all rights, titles, and interests in and to the copyrights in the two (2) original photographs at issue in this case (the "Copyrighted Works" or "Works").**[1]**

There are two (2) original photographs relevant to this case, each registered – and thus separately protected – under the title "Travel, Festival, and Concert Photography by David Oppenheimer 2013," bearing certificate number VAu 1-142-190. See ECF No. 1-2; see also **Exhibit 1** - **Full 2013 Cert. of Registration and Deposit Photographs**. The first Work ("Work No. 1" or "Opp_5964") is a wide-angle aerial photograph, which depicts Tolers Cove Marina, as well as the Sullivan's Island Narrows, Sullivan's Island itself, and ultimately the coast of the Atlantic Ocean.  See **ECF No. 1-1, p. 2 of 3 – Work No. 1 as Published**. The second Work ("Work No. 2" or "Opp_5960") is an aerial photograph narrowly framing the Tolers Cove Marina in Mount Pleasant, South Carolina. See **ECF No. 1-1, p. 3 of 3 – Work No. 2 as Published**.

B. <u>**Defendants' Piracy of Oppenheimer's Work**</u>

Defendant CarolinaOne is a corporation organized under the laws of the State of South Carolina in the business of offering a full range of real estate services in the Metro Charleston area. The Scarafiles are the owners of CarolinaOne, while Romanosky is a licensed real estate agent

---

[1] As opposed to having purchased the copyrights from the author…

with CarolinaOne. **ECF No. 13, pp 1-3 – Defs' Motion to Dismiss**. Through their licensed brokers (like Romanosky), CarolinaOne advertises and promotes real estate properties on the Charleston Trident Association of Realtors' Multiple Listing Service for properties of which CarolinaOne has the exclusive listing – and receives commissions from the sale of said properties. **Id**.

In January of 2017, Oppenheimer first discovered that his two (2) Copyrighted Works were being published and publicly displayed without his authorization, license, or prior knowledge on several websites of realtors, agents, brokers, and/or other real estate sales entities for the purpose of advertising and marketing a boat slip located at 0 Tolers Cover marina 5G, in Mount Please, South Carolina ("Boat Slip Property"). See **ECF No. 41-15, pp. 7-8 – Oppenheimer's Answer to Defs' Irog No. 5**. Based on the information contained in these initially discovered listings, Oppenheimer was able to trace the advertisements back to CarolinaOne, as having the real estate sales listing on the property and to "Romanosky, as the license broker for the property. **Id**. Through further investigation, Oppenheimer discovered that the two (2) Works appeared on at least 34 websites without his authorization or license. **Id**. Oppenheimer then sent a formal notice letter to Defendants identifying all the known URLS on which the unauthorized images appeared, requesting that Defendants' cease and desist from all further dissemination of the Works, and seeking additional information regarding the uses of the Copyrighted Works. See **ECF No. 1-5 – Oppenheimer's Cease and Desist Letter**.

Defendants responded to Oppenheimer's formal notice letter on July 12, 2019, answering many of Oppenheimer's inquiries[2] and purporting to have ongoing infringing distributions and/or public displays of the Works removed from the Web. After exchanging several emails in pursuit of further investigation and (ultimately) resolution of the matter, in September of 2019,

---

[2] The substance of which were identified by Defendants as protected communications pursuant to Fed. R. Evid. 408, and therefore will not be disclosed herein.

Oppenheimer noticed that the Works were still being publicly displayed on several of the identified URLs, despite Defendants' assertions that they would be removed. Throughout the months of October through December of 2019, Oppenheimer continued to notify Defendants of such ongoing uses by identifying the specific URLs and requesting that the same be removed from the World Wide Web. Defendants failed to provide any explanation for these ongoing uses, and, in or around October of 2019, Defendants ceased responding to Oppenheimer's communications altogether. Left with no other means of resolution, Oppenheimer filed suit on December 30, 2019. See **ECF No. 1 – Complaint**.

Through discovery, Defendants admitted that on November 2, 2016, they entered into a listing agreement with the seller of the Boat Slip Property. See **ECF No. 51-2, p. 11 - Defendants' Answer to Irog No. 5**. Defendants also testified that Romanosky – acting in her capacity as an agent for CarolinaOne – located Oppenheimer's two (2) Copyrighted Works on the Web and without license or authorization reproduced and then uploaded the Works to the Charleston Trident MLS for public display to advertise, market, promote, and sell the Toler's Cove boat slip. See ECF No. 51-2, p. 13 – **Defs' Answers to Irog No. 8**; ECF No. 51-3, p. 5 – **Defs' Answer to Irog No. 24**.

The evidence further uncovered that the copies of the Works that Defendants unlawfully reproduced contained Oppenheimer's copyright management information ("CMI") – as evidenced by an email dated November 10, 2016 from CarolinaOne to Romanosky attaching the second image at issue overtly showing "©2013 David Oppenheimer" on the face of the image. See **ECF No. 51-4 – November 10, 2016 Email attaching Copied Work**. Therefore, Defendants saw or *should have seen* Oppenheimer's CMI on the face of the Works prior to copying them, downloading them, and then distributing them on the Internet and were, therefore, on notice that the Copyrighted Works were copyright protected.

4

Additionally, through discovery, Defendants produced the "Multiple Listing Service Rules & Regulations" (the "MLS Rules") for the Charleston Trident Multiple Listing Service, Inc., for which Defendants are members. See **ECF No. 82-1 – MLS Rules**. The MLS Rules specify that "[w]ithin one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants." See *Id*., at page 3 of 31. The MLS Rules further provide that all listings "must have photos entered within 5 business days of the input date of the listing" and that no other participating member may advertise the listing "without the prior consent of the listing broker." See *Id*., at pages 4 and 10 of 31. Moreover, the MSL Rules specify that, with regard to copyrighted material, "[b]y the act of submission of any property listing content to the MLS, the Participant represents and warrants that he or she is authorized to license the property listing content as contemplated by and in compliance with this section and these rules and regulations…" and that such "[l]isting content includes, but is not limited to, photographs, images, graphics…." See *Id*, at page 20 of 31. Further, by uploading the Works to the Charleston Trident MLS, Defendants agreed "to defend and hold the MLS and every other participant harmless from and against any liability or claim arising from any inaccuracy of the submitted listing content or any inadequacy of ownership, license, or title to the submitted listing content." Id.

Defendants did not purchase a license, obtain authorization, or in any way compensate Oppenheimer for their infringing uses of the Copyrighted Works. **Oppenheimer Decl. ¶ 5.**

### C. <u>Motion for Partial Summary Judgment</u>

To streamline this case for trial, Oppenheimer now moves for summary judgment on the following issues:

      (1)     Defendants' liability for direct copyright infringement; *and*

      (2)     Eleven (11) of the affirmative defenses raised by Defendants.

Because there is no genuine issue of material fact regarding these issues, Oppenheimer asks the Court to grant summary judgment on each of them.

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact on the issue for which summary judgment is sought, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citation omitted).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient . . ." *Id*. at 252; see also *Camille Sedar v. Reston Town Center Property, LLC*, Case No. 19-1972 (4th Cir. 2021). Where the moving party does not bear the burden of proof on the issue at trial, it may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Factual controversies are to be resolved in favor of the nonmovant – the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 248.

### III.    ARGUMENT

#### A.    Defendants are Liable for Direct Copyright Infringement

The Copyright Act grants the copyright holder "exclusive rights to use and to authorize the use of his work in five qualified ways, including reproduction of the copyrighted work in copies." *Sony Corp. v. Universal City Studios, Inc*., 464 U.S. 417, 432-33, 78 L.Ed. 2d 574, 104 S.Ct. 774 (1984); *CoStar Grp., Inc. v. LoopNet, Inc*., 373 F.3d 544, 549 (4th Cir. 2004). The Act further provides that "anyone who violates any of the exclusive rights of the copyright owner … is an infringer of the copyright." *Id*., citing 17 U.S.C § 501. A plaintiff alleging copyright infringement must prove: (1) ownership of a valid copyright and (2) copying of the original elements of the copyright. *CoStar*, 373 F.3d at 549, citing *Feist Publin. Inv. v. Rural Tel. Serv. Co.*, 499 US 340 (1991). A direct infringer has thus been characterized as one who "trespasses into [the copyright owner's] exclusive domain" established in § 106. *Id.*

Oppenheimer is entitled to summary judgment on the cause of action pled as copyright infringement because he can prove both elements of it:

##### 1.    Oppenheimer Owns Valid Copyrights in the Copyrighted Work

Oppenheimer holds a certificate of copyright registration issued by the United States Copyright Office for the two (2) Copyrighted Works. See ECF No. 1-2; see also **Oppenheimer's Exhibit 1** (6-24-2019 Notice Letter to Defs with Full 2013 Cert. of Registration, pp 6 - 7).]. This certificate of registration is *prima facie* evidence of the validity of the copyrights and of the facts stated in the certificates. 17 U.S.C. § 410(c); *See also M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 434 (4th Cir. 1986).

Oppenheimer presents the evidence below showing -- as a matter of law -- that he is the author of both of the Copyrighted Works at issue, that the Copyrighted Works are original to him, and that the Copyrighted Works have the requisite degree of creativity for copyright protection.

### i.   Oppenheimer's Certificate of Registration Establishes That He is the Owner of the Copyrighted Work

The certificates of registration in his name is *prima facie* evidence that Oppenheimer owns a valid copyright in the Copyrighted Works. In any judicial proceeding, *"the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."* 17 U.S.C. §410(c). The legislative history shows that the purpose of § 410(c) is to place the burden of challenging the validity of a copyright on the defendant:

> The plaintiff should not ordinarily be forced in the first instance to prove all of the multitude of facts that underline the validity of the copyright unless the defendant, by effectively challenging them, shifts the burden of doing so to the plaintiff.

H.R. Rep. No. 94-1476 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5773. This statutory presumption is enforced in the Fourth Circuit. *M. Kramer Mfg*, 783 F.2d, at 434 see also *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010 ("When [a certificate of registration] exists, the burden shifts to the defendant to prove that the claimed copyrights are invalid."); see generally 3-14 Nimmer on Copyright § 12.11[B]. Oppenheimer conclusively establishes his ownership of a valid copyright for the Copyrighted Work; thus, summary judgment on the first element is warranted.

### ii.   Oppenheimer is the Owner of *Valid* Copyrights

In addition, and in the alternative to reliance on the statutory presumption set- out above, Oppenheimer also presents summary judgment evidence that he is the owner of the Works at issue, and that the Works qualify for copyright protection. The declaration of David Oppenheimer, and the deposit materials authenticate the Works themselves, and establish Oppenheimer's ownership and originality of the Copyrighted Works.

Valid copyrights protect "original works of authorship." 17 U.S.C. § 102(a). To be "original," the work must have been independently created by the author, rather than copied from

another work, and possess "at least some minimal degree of creativity." *Feist Publications, Inc. v. Rural Telephone Service Co*., 499 U.S. 340, 361 (1991). The "requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id*.

In prior arguments, Defendants have erroneously alleged that the two (2) Works[3] should be considered a single work because of a note on the Certificate of Registration stating "*Registered as an unpublished collection, not as a published group. 37 CRF 202.3(b)(4)(i)(B).*" Defendants' anticipated assertion is both factually and legally incorrect.

When Congress enacted the Copyright Act, it gave the Register of Copyrights the discretion to allow groups of related works to be registered with one application and one filing fee. See 17 U.S.C. § 408(c)(1). As the legislative history explains, allowing "a number of related works to be registered together as a group represent[ed] a needed and important liberalization of the law." H.R. Rep. No. 94-1476, at 154 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5770; S.Rep. No. 94-473, at 136 (1975). Congress recognized that requiring applicants to submit separate applications for certain types of works (such as photographs) may be so burdensome and expensive that authors and copyright owners may forgo registration altogether, since copyright registration is not a perquisite to copyright protection. *Id*. Specifically, Congress cited "a group of photographs by one photographer" as an example of a "group of related works" that would be suitable for registration under section 408(c)(1). *Id*.

In 2001, the US Copyright Office issued a regulation allowing applicants to register a group of published photographs with one application and one filing fee. See 66 FR 37142, 37149-50 (July 17, 2001). This is called "group option for published photographs" ("GRPPH"). Prior to

---

[3] As well as all of the 6,000+ original works registered with the 2013 Registration.

2016, the US Copyright Office did not provide this same specific option for unpublished photographs. Instead, since 1978, the US Copyright Office allowed applicants to register an unlimited number of unpublished photographs with one application and one filing fee – referring to them as an unpublished collection. However, with an effective date of March 15, 2019, the US Copyright Office has now established a group registration option for unpublished photographs, referred to as "the group registration option for unpublished photographs ("GRUPH"). This rule replaced the registration accommodation for "unpublished collections." It also memorialized the Office's longstanding position regarding the scope of protection for a group of unpublished photographs – *officially codifying that registration covers the copyrightable authorship in each work that is submitted for registration, and that **each work is registered as a separate work***. See 37 C.F.R. § 202.4(r).

However, even before the establishment of GRUPH, both the Copyright Office and the courts have long recognized that a registration of an unpublished "collection" extends to each copyrightable element in the collection such that a valid registration of an unpublished collection of photographs "***registered each individual image***." See *Sohm v. Scholastic Inc.*, 959 F.3d 39 (2d Cir. 2020) (emphasis added), citing *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publishing Co.*, 747 F.3d 673 (9th Cir. 2014). Indeed, it is established in the Fourth Circuit that a single copyright registration may include ***multiple, individually cognizable copyrights*** for purposes of statutory damages under 17 U.S.C. § 504(c). See *Sony Music Entm't v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795 (E.D. Va. 2020) (emphasis added), citing *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003).

As such – even though there may be a note stating that the Works are registered as an "unpublished collection" – each individual photograph (including the two (2) works at issue) in

the 2013 Registration is registered as a separate work – and cannot be considered a single work or compilation.

There is no evidence in this record – and Defendants cannot adduce any – to show (much less prove) that Oppenheimer is not the owner of valid copyrights in the Copyrighted Works. Consequently, there is no dispute here that Oppenheimer is the owner of the Works. See 17 U.S.C. 201(a) (ownership initially vests in the author of a copyrighted work).  Finally, there is no doubt or dispute that the Copyrighted Works possess the requisite degree of originality to be copyrightable.  Oppenheimer is, therefore, entitled to summary judgment on the issues of ownership and validity.

## 2.  Defendants Copied the Work

Oppenheimer must also establish that Defendants engaged in unauthorized copying of the Copyrighted Work. *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002). A plaintiff in a copyright infringement suit can prove copying either directly or indirectly. *See Lyons P'ship, L.P. v. Morris Costums, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001).

Here, there is no evidence contrary to the fact that Defendants directly copied Oppenheimer's Copyrighted Works, and then distributed and publicly displayed the same without license or other authorization. See ECF No. 51-2, p. 13; ECF No. 51-3, p. 5. Defendants have already admitted that Romanosky – acting in her capacity as an agent for CarolinaOne – located Oppenheimer's two (2) Copyrighted Works on the Web and without license or authorization reproduced and then uploaded the Works to the Charleston Trident MLS for public display to advertise, market, promote, and sell the Toler's Cove boat slip. Id.

The evidence further proves that the copies of the Works that Defendants unlawfully reproduced contained Oppenheimer's copyright management information ("CMI") – as evidenced by an email dated November 10, 2016 from CarolinaOne to Romanosky attaching the second

image at issue overtly showing "©2013 David Oppenheimer" on the face of the image. See ECF No. 51-4. Therefore, Defendants saw or *should have seen* Oppenheimer's CMI on the face of the Work prior to copying it, downloading it, and then distributing it on the Internet and were, therefore, on notice that the Copyrighted Work was copyright protected.

Additionally, through discovery, Defendants produced the "Multiple Listing Service Rules & Regulations" (the "MLS Rules") for the Charleston Trident Multiple Listing Service, Inc., for which Defendants are members. See ECF No. 82-1 – The MLS Rules. The MLS Rules specify that "[w]ithin one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants." See *Id*., at page 3 of 31. The MLS Rules further provide that all listings "must have photos entered within 5 business days of the input date of the listing" and that no other participating member may advertise the listing "without the prior consent of the listing broker." See *Id*., at pages 4 and 10 of 31. Moreover, the MSL Rules specify that, with regard to copyrighted material, "[b]y the act of submission of any property listing content to the MLS, the Participant represents and warrants that he or she is authorized to license the property listing content as contemplated by and in compliance with this section and these rules and regulations…" and that such "[l]isting content includes, but is not limited to, photographs, images, graphics…." See *Id*, at page 20 of 31. Further, by uploading the Works to the Charleston Trident MLS, Defendants agreed "to defend and hold the MLS and every other participant harmless from and against any liability or claim arising from any inaccuracy of the submitted listing content or any inadequacy of ownership, license, or title to the submitted listing content." Id.

When Defendants disseminated the Boat Slip Property listing containing the Works at issue to the MLS, they were knowingly offering other participating members the right and ability to list (i.e. publicly display) the Works, while also (per the MLS Rules) representing and warranting that

Defendants were authorized to license the listing content (when, in fact, they were not). See ECF No. 82-1. Defendants uploaded the Works to the MLS for the express purpose disseminating the listing content to as many participating members for the purpose of advertising and marking the Boat Slip Property. Indeed, Defendants were successful in this endeavor, as the 34 websites were advertising Defendants' Property. See **Exhibit 2 – Infringing Works on 34 Websites**.

Finally, then, there is no factual or subjective issue of "substantial similarity" here; the Works in question are photographs, and a visual comparison of the photographs shows that the original work exploited by Defendants are exact copies of the entirety of each respective Work. **ECF No. 1-1 and Exhibit 2 – Infringing Works on 34 Websites.** The Fourth Circuit has held that "[i]f there [is] clear proof of actual copying by the defendants **that is the end of the case.**" *M. Kramer Mfg.*, 783 F.2d at 445.

All such activities were done without the authority of Oppenheimer and therefore constitute infringements of his exclusive rights to both reproduce, distribute and publicly display the Works.

Thus, it is undisputed – and therefor, there are no genuine issues of material fact – that Defendants copied protected elements of Oppenheimer's two (2) Works, and summary judgment should be entered against Defendants.

### B.  Defendants' Affirmative Defenses Fail

In their Answer to Oppenheimer's Complaint, Defendants alleged the following boilerplate affirmative defenses: 1) fair use; 2) statute of limitations; 3) unclean hands; 4) waiver; 5) estoppel; 6) no standing; 7) abandonment; 8) acquiescence; 9) copyright misuse; 10) license; and 11) failure to mitigate damages. See **ECF No.20 – Defendants' Answer**.

Defendants failed to produce any facts or other evidence to support any of these defenses. Defendants did not plead with any specificity, and no evidence has been offered by way of

affidavit, deposition testimony, or other admissible evidence to prove any of these eleven (11) affirmative defenses.

Defendants have completely failed to produce any facts or other evidence to support any such pleadings. In his written discovery requests, Oppenheimer asked Defendants to produce all documents relating to, concerning, evidencing, and/or supporting "each and every affirmative defense alleged in your Answer." **See Exhibit 3 – Response to Oppenheimer's Request for Production No. 50**. In response to such request, Defendants stated only *"Defendants respond that they will produce responsive documents in their possession, custody, or control as kept in the ordinary course of Defendants' business within one (1) week of this response."* **Id.** Defendants then produced a screenshot of the Facebook terms of service and several screenshots of the Works at issue published by Oppenheimer online. However, Defendants completely failed to state which documents in this listing were related to, concerned, evidenced, and/or supported any of their affirmative defenses, and they failed to indicate the manner in which the documents were related to, concerned, evidenced, and/or supported any of them.

To pass the summary judgment stage, Defendants are required to offer (at least *some*) evidence proving the elements of their affirmative defenses, or in some other manner show that some genuine issue of material fact exists as to those pled defenses. They have not; indeed, they are unable to do so. As to each of these defenses for which Defendants failed to bring forth credible evidence, summary judgment should be granted in favor of Oppenheimer, and these affirmative defenses should be stricken.

### i.    Fair Use

The Copyright Act provides that "the fair use of a copyrighted work … for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. As fair use is an

14

affirmative defense to copyright infringement, the burden is on Defendants to prove fair use as a matter of law. *Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590, 114 S.Ct. 1164, 127 L.Ed. 2d 500 (1994).*

In order to show fair use, Defendants must establish that the use was fair in light of four factors:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Whether a given use of copyrighted material is "fair" requires a case-by-case analysis in which the statutory factors are ***not "treated in isolation"*** but are "weighed together, in light of the purpose of copyright." *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed. 2d 500 (1994).

1. The Purpose and Character of the Use

Under the first factor of a fair use courts consider "the purpose and character of the use." 17 U.S.C. § 107. This inquiry "may be guided by the [fair use] examples given in the preamble to § 107," specifically, "criticism, comment, news reporting, teaching … scholarship, or research." *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 578, 114 S.Ct. 1164, 127 L.Ed 2d 500 (1994).

Indeed, Defendants do no claim that they used Oppenheimer's Works for criticism, comment, news reporting, teaching, scholarship, or research. The reason for this is simple: Defendants crudely – yet patently – copied and pasted Oppenheimer's Copyrighted Works ***in their***

15

*totality, without making any alterations whatsoever.* **ECF No. 1-1 and Exhibit 2 – Infringing Works on 34 Websites.** Defendants made no political, critical, or educational statement about the Works, nor about the subject matter of which they depict.  **Id**.  Instead, Defendants unauthorized use of Oppenheimer's Works were done for the express commercial purpose of advertising, marketing, promoting, and selling the Boat Slip Property. See See ECF No. 51-2, p. 13; ECF No. 51-3, p. 5.

This factor, therefore, weighs heavily against a fair use defense.

2.   The Nature of the Copyrighted Works

"For more than a century, photographs have been held to be copyrightable 'writings' under Article I, § 8 of the Constitution." *Rogers v. Koons*, 960 F.3d 301, 306 (2d Cir. 1992) (citation omitted). This is so even when they are largely "factual," rather than artistic in nature. See *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 111 U.S. 53, 60-61, 4 S.Ct. 279 28 L.Ed. 349, 1884 Dec. Comm'r Pat. 186 (1884) (recognizing copyright protection over photographs in holding that a photograph of Oscar Wilde was an original work of art because the author was required to make such creative decisions as placement of Oscar Wilde in front of the camera, selection of the angle, light and shade, etc.). Today, photographs are protected under copyright law as "visual art works." U.S. Copyright Office, Circular 42. The copyright in a photograph protects the photographer's artistic choices, such as the selection of the subject matter, any positioning of subjects, the selection of camera lens, the perspective, including placement and orientation of the camera, the lighting, focus, and the timing of the exposure. **Id**. Here, Oppenheimer's Copyrighted Works are creative photographs – captured at a precise moment with a great degree of care and difficulty **Declaration of David Oppenheimer ¶ 3**. Oppenheimer made innumerable creative choices in capturing the precise angle, positioning, lighting, shading, and coloration in each of the Works. **Id**. There is no

16

question that the Copyrighted Works are of high artistic merit deserving of copyright protection. Thus, this factor also weighs against a finding of fair use.

### 3. Portion of Works Used

The third fair use factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." *Philpot*, 279 F.Supp.3d at 718-19. "Generally, as the amount of the copyrighted material that is used increases, the likelihood of fair use decreases." *Id*. Here, it is apparent on the face of the infringing images attached to the Complaint as Exhibit 1, that Defendant used the Copyrighted Works *in their entirety*. **See No. 1-1 and Exhibit 2 – Infringing Works on 34 Websites.**

There is no question that the Defendant appropriated 100% of each of the Copyrighted Works in his infringing uses. Thus, this factor also weighs against a finding of fair use.

### 4. Effect of the Use Upon the Market or Value of the Work

According to the Fourth Circuit, the "ultimate test" of fair use is whether the progress of human thought "would be better served by allowing the use than by preventing it." *Brammerer v. Violent Hues Productions, LLC*, No. 18-1763, at *6 (4th Cir. Apr. 26, 2019), citing *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013). In *Branner v. Violent Hues*, a nearly identical situation arose wherein the plaintiff, a commercial photographer, brought a copyright infringement suit after learning that defendant had made an unlicensed use of one of his photographs on its website. *Id*. The Fourth Circuit rejected the defendant's fair use argument, holding:

> Violent Hues did not comment on the Photo, promote the Photo, "remix" the Photo, or otherwise engage with the Photo in a way that might stimulate new insights. See H. Brian Holland, *Social Semiotics in the Fair Use Analysis*, 24 Harv. J.L. & Tech. 335, 390-91 (2011). What Violent Hues did was publish a tourism guide for a commercial event and include the Photo to make the end product more visually interesting. Such a use would not constitute fair use when done in print, and it does not constitute fair use on the Internet.
>
> *Id*. at *20.

17

In considering the fourth factor, the Fourth Circuit stated that courts must consider "not only the extent of market harm caused by the particular actions of the alleged infringer, *but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original*." *Id*. at *18 (citing *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 590 (1994)(emphasis added), see also *Bouchat v. Balt. Ravens Ltd. P'ship*, 619 F.3d 301, 307 (4th Cir. 2010 ("*Bouchat IV*") ("[O]ne need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." (quoting *Harper & Row*, 471 U.S. at 568)). The Fourth Circuit went on to find that "a 'common sense' presumption of cognizable market harm exists when a commercial use is not transformative but instead 'amounts to mere duplication of the entirety of an original.'" *Id*., quoting *Campbell*, 510 U.S. at 591.

Because Defendants' use was commercial in nature, there is a presumption of unfairness on this fact. *Sony Corp*., 104 S.Ct. 774, 793; *Princton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1381, 1385-86 (6th Cir. 1996). Additionally, when Oppenheimer's valued works are pirated and posted on the Internet without Oppenheimer's authorization or knowledge, Oppenheimer no longer has the ability to monitor or control the use of his intellectual property. As such, the possibility for additional instances of copyright theft grow exponentially as his original works get distributed around the Web undetected.

Moreover, the potential market for Oppenheimer's Copyrighted Works were diminished by virtue of the fact that Defendants simply copied the Works and distributed them to all members of the Charleston Trident MLS, rather than pay Oppenheimer for licenses to use the Works as required by the law. This factor supports a denial of fair use as well.

ii.    **Statute of Limitations**

The Copyright Act's statute of limitations, 17 U.S.C. § 507(b), provides that *"No civil action shall be maintained under the provision of this title unless it is commenced within three years after the claim accrued."* The question of whether the "discovery rule" or the "injury rule" applies to determine when a civil cause of action accrues under the Copyright Act is a legal one. Under the discovery rule, a "cause of action accrues 'when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.'" Under the injury rule, a cause of action accrues at the time of the injury.

While the Copyright Act is silent as to when a copyright claim accrues for purposes of the three-year statute of limitations, the Fourth Circuit has explicitly held that *"[t]he limitations period for bringing copyright infringement claims is three years after the claim accrues. And a claim acrrues when 'one has knowledge of a violation or is chargeable with such knowledge.'" Lyons P'Ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 796 (4th Cir. 2001) (quoting *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 202 (4th Cir. 1997).

Courts in this district strictly follow Fourth Circuit precedent. See *Royalty Stat, LLC v. Intangible Spring Corp.*, Civil Action No. PX 15-3940, 2018 U.S. Dist. LEXIS 4791, 2018 WL 348151, at *3 (D. Md. Jan. 10, 2018); *Topline Sols., Inc. v. Sandler Sys., Inc.,* Civil Action No. ELH-09-3102, 2017 U.S. Dist. LEXIS 70384, 2017 WL 1862445, at *21 (D. Md. May 8, 2017); see also *Mitchell v. Capitol Records, LLC,* 287 F. Supp. 3d 673, 677 (W.D. Ky. 2017)

To bar a copyright violation action on statute of limitations grounds here, Defendants must demonstrate that Oppenheimer knew of the putative violations, or was chargeable with such knowledge, more than three years before filing suit on December 30, 2019. See *Lyons*, 243 F.3d 796. In other words, the statute of limitations does not bar a claim for copyright infringement

provided that Oppenheimer first knew of the potential violation, or was chargeable with such knowledge, on or after December 30, 2016. See *Id*.

Here, Defendants have produced no evidence that would show that Oppenheimer knew or should have known of Defendants' infringements until January of 2017 – within three years before filing suit. As such, Oppenheimer's claims are timely, and Defendants' affirmative defense should be stricken.

### iii.     Unclean Hands and Copyright Misuse

The doctrine of copyright misuse prohibits a copyright holder from using a copyright "to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which is contrary to public policy to grant." *Alcatel USA, Inc. v. DGI Techs, Inc.*, 166 F.3d 772, 792 (5th Cir. 1999)(quoting *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (4th Cir. 1990)(quoting *Morton Salt Co. v. G.S. Suppiger*, 314 U.S. 488, 492, 62 S. Ct. 402, 86 L. Ed. 363, 1942 Dec. Comm'r Pat. 733 (1942))). At its core, copyright law seeks "to promote the dissemination of creative expression and provide incentives for copyright owners to produce … original works." *CBS Broad, Inc. v. EchoStar Communications Corp*., 265 F.3d 1193, 1211 (11th Cir. 2001). However, these goals are undermined when a copyright holder attempts to go beyond the rights granted by the law to stifle the creativity of other authors. See *A&M Records, Inc. v. Napster, Inc*., 239 F.3d 1004, 1026 (9th Cir. 2001).

To prevail on this defense, Defendants would have to prove either: (1) that Oppenheimer violated antitrust laws; or (2) that Oppenheimer illegally extended its monopoly beyond the scope of the copyright or violated the public policies underlying copyright laws. See S*oc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 65 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 1315 185 L. Ed. 2d 195 (U.S. 2013); see also *In re Indep. Serv. Orgs. Antitrust LItig.*, 85 F.Supp.2d 1130, 1175-76 (D. Kan. 2000). "[T]he predicate for a misuse defense is an attempt to

use the copyright monopoly to control something the monopoly does not protect." *Malibu Media, LLC v. Doe*, 2014 U.S. Dist. LEXIS 77929, 2014 WL 2581168, at *2 (N.D. Ill. 2014).

Here, Defendants make no such claims. There is no evidence that Oppenheimer has breached any antitrust laws. Further, Defendants have no evidence that Oppenheimer in any way tried to secure a monopoly in the aerial photography industry, tried to prevent/stifle the creation of new and original photographs, or is in any other way trying to secure exclusive rights for all aerial photographs in the world – thereby putting all other photographers out of business.

To the extent that Defendants' affirmative defenses of unclean hands and/or misuse are based upon Oppenheimer's past litigation (i.e. Defendants' false claim that Oppenheimer is a so-called "troll"), such argument has no merit.

Courts across the country have consistently held that filing multiple suits does not raise an inference that a plaintiff has engaged in copyright misuse. In *Energy Intell. Group, Inc. v. CHS McPherson Refinery, Inc.*, 300 F.Supp. 3d 1356 (D. Kan. 2018), just as the Defendants suggest here, the *Refinery* defendant argued that the plaintiff "engaged in abuse of process through its actions of ***filing multiple copyright infringement lawsuits against its clients,*** paying its employees bonuses for finding and reporting potential copyright infringement claims, engaging in efforts to 'entrap' its largest clients into admitting that they are engaging in copyright infringement, and by pushing the Refinery into purchasing a costly Global Enterprise License to avoid this lawsuit." *Id.* at 1373. The district court found none of these facts or arguments persuasive; holding that that the *Refinery* defendant "failed to come forward with any evidence that EIG misused its copyrights." *Id.* at 1374.

Similarly, in *Malibu Media, LLC v. Does*, 2014 U.S. Dist. LEXIS 77929, 2014 WL 2581168, at *2 (N.D. Ill. 2014), when the defendant offered the existence of multiple similar copyright infringement lawsuits in support of a copyright misuse defense, the court stated "[i]t is

certainly true that [the plaintiff] has filed a very large number of infringement suits in this district and in others. ***But that is what the holders of intellectual property rights do when they are faced with mass infringement***." *Id*.

Further, in *Design Basics, LLC v. MTF Assocs., Inc.*, No. 1:17-cv-00031 (M.D. Pa. Mar. 28, 2019), the district court refused to allow the inclusion of a copyright misuse affirmative defense when the *MTF* defendants alleged that the plaintiff established a "scheme that incentivized Plaintiff's employees to find violations of its copyrights and then pursue[] litigation" … "attempting to use its copyrights as a sword rather than a shield," and "with the intent of exacting settlement payments from the alleged infringers." *Id*. at *11. In finding that the *MTF* defendants' allegations failed to support a reasonable inference of copyright misuse, the court analyzed:

> The doctrine of copyright misuse is "principally aimed at avoiding anticompetitive conduct that contravenes the goal of copyright law – 'to stimulate artistic creativity for the general public good.'" *Malibu Media, LLC v. Doe*, No. 4:15-cv-2281, 2018 WL 5841866, at *10 (M.D. Pa. Nov. 8, 2018 (citing *Video Pipeline*, 342 F.3d at 204). Misuse exists where a copyright holder has engaged in some form of anti-competitive behavior. See Practice mgmt.., 121 F.2d at 521 (finding copyright misuse where license to use copyrighted goods prohibited licensee from using competing goods); see also *Lasercomb, Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (finding that a copyright holder misused its copyright by including in licensing agreements a provision that neither the licensee company nor its officers or its employees could develop competing goods for the ninety-nine year term of the agreement.) *Id*. at *10.
>
> . . . .
>
> ***While Defendants' allegations suggest that Plaintiff engaged in an aggressive litigation strategy in defense of its copyrights, Defendants do not allege facts that suggest that this strategy constituted anti-competitive behavior. Plaintiff's copyright claim is not "likely to interfere with creative expression to such a degree that [it] affect[s] in any significant way the policy interest in increasing the public store of creative activity."*** *Video Pipeline*, 342 F.3d at 206. Further, the copyright misuses defense fails where a plaintiff merely seeks to enforce its copyright, and nothing more. See *Artista Records, Inc. v. Flea World, Inc*., 356 F.Supp.2d 411, 428-29 (D.N.J. 2005) ("the fact of enforcing a valid copyright, without more, simply cannot constitute copyright misuse."). Defendants have only alleged that Plaintiff is seeking to enforce its own copyrights and nothing more.

Id. at *11 (emphasis added).

22

Similarly, because Defendants have no evidence to support the required element that Oppenheimer's claim is "likely to interfere with creative expression" to a degree that would suppress the public store of creative activity, they have no evidence to support a misuse defense.

Perhaps the strongest case against Defendants' unsupported "troll" argument comes from the D.C. Circuit holding in *Strike 3 Holdings v. Doe*, 964 F.3d 1203 (D.C. Cir. 2020). In *Strike 3*, the district court characterized the plaintiff as a "copyright troll" that has "flood[ed]" district courts around the country with thousands of lawsuits "smacking of extortion," and dismissed the case declaring that it would not indulge the plaintiff's so-called "feigned desire for legal process" by "oversee[ing] a high-tech shakedown." See *Strike 3 Holdings, LLC v. Doe*, 351 F.Supp.3d 160, 161-62 (D.D.C. 2018). The D.C. Circuit reversed this decision finding that the district court abused its discretion. *Strike 3*, 964 F.3d at 1214. In doing so, the D.C. Circuit found that a court cannot "reasonably infer that a plaintiff lacks a legitimate motive in pursuing discovery based solely on the plaintiff's litigation volume and case history." *Id*. at 1213.  The D.C. Circuit went on to state that "[w]here, as here, a plaintiff alleges that it is the victim of copyright infringement on a massive scale, ***the mere fact that it has filed a significant number of lawsuits is not a valid basis on which to impute an improper purpose. Nor is the fact that many such lawsuits settle or are dismissed at an early stage necessarily suggestive of improper intent***."), *Id*., citing *Frank v. Gaos* , ––– U.S. –––, 139 S. Ct. 1041, 1046, 203 L.Ed.2d 404 (2019).

Moreover, in addition to losing future immediate business, the value of Oppenheimer's Works are at risk of being diluted by massive and continuous infringement and, eventually, total devaluation. Oppenheimer's attempt to regain some control over his proprietary intellectual property is therefore, in no way misuse under copyright law – nor evidence of unclean hands.

Because Defendants failed to come forward with any documents and/or other evidence in support of this claim through the course of discovery to support a claim of unclean hands or copyright misuse, this affirmative defense must be dismissed.

### iv.    License

As an affirmative defense, Defendants bear the burden of establishing a license. *See Bourne v. Walt Disney Co.,* 68 F.3d 621, 631 (2d Cir. 1995); *Grant Heilman Photography, Inc. v. McGraw-Hill Cos.*, 28 F. Supp.3d 399, 407 (E.D. Pa. 2014). To prove that Defendants had a license to reproduce, distribute, and/or publicly display the Works at issue, Defendants must prove that Oppenheimer manifested its acquiescence to the conduct at issue. *See e.g. Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998).

Defendants cannot establish any license defense.

At no time did Oppenheimer ever grant Defendant authority to reproduce, distribute, publicly display, and/or use the Works in any manner. Oppenheimer and Defendants never entered into a license agreement – or any agreement for that matter – either expressed or implied. In fact, prior to Oppenheimer bringing claims against Defendants, the two parties never once came into contact with one another. Because there was never privity between Oppenheimer and Defendants, it was impossible for Oppenheimer to authorize Defendants to use the Works in any manner.

Since Oppenheimer never provided express or implied authorization for the the alleged infringements, Defendants' license defense has no evidentiary support.

Because Defendants have not – and cannot – put forward any evidence supporting their claim of license, Defendants' license defense must be stricken.

### v.    Estoppel, Waiver, Abandonment, and Acquiescence

Defendants raised the affirmative defenses of estoppel, waiver, abandonment, and acquiescence. ECF No. 20. Generally, a waiver/estoppel defense in copyright actions applies when

"the party to be estopped had knowledge of defendant's infringing conduct, and either intended his own conduct to be relied upon or acted so that the party asserting the estoppel had a right to believe it was so intended. Additionally, the defendant must be ignorant of the true facts and must rely on plaintiff's conduct to his detriment." *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F. Supp. 531, 535 (S.D.N.Y. 1977). Essentially, to succeed in a defense of waiver/estoppel, the accused infringers must show that they substantially relied on the misleading conduct of the copyright owner in connection with taking some action.

To pass the summary judgment stage, Defendants must offer some evidence proving each element of their affirmative defenses or at least show that some genuine issue of material fact exists. Defendants failed to offer any evidence to support a finding of Oppenheimer's acquiescence or waiver in connection with building infringing houses using the copyrighted plans. Defendants have failed to put forward any evidence of these affirmative defenses and, therefore, they must be stricken.

## CONCLUSION

Oppenheimer has conclusively established that – as a matter of law – that Defendants directly infringed Oppenheimer's valid copyrights in the Copyrighted Works.

Additionally, Defendants failed to carry their burden of proof to establish that, with respect to any of the eleven (11) affirmative defenses listed above, there are facts supporting them. Oppenheimer is therefore entitled to summary judgment on these affirmative defenses.

WHEREFORE, PREMISES CONSIDERED, Oppenheimer prays that this Court GRANT its Motion for Summary judgment as set forth above, and for such and other relief as they may be entitled.

Dated this 8th day of April 2022.

Respectfully submitted,

**ALLEN LEGAL**

By:    /s **Samuel K. Allen**
SC Bar 68552
Federal ID No. 7744
1417 Ashley Road
Charleston, South Carolina   29407
Ofc:  843-481-4000
sam@allenlegal.net

LEJUNE LAW FIRM
Dana A. LeJune
Texas Bar: 12188250
NC Bar: 49025
Scott M. Francis
Texas Bar: 24088795
1225 North Loop W
Suite 825
Houston, Texas  77008
713.942.9898 Phone
713.942.9899 Facsimile
dlejune@triallawyers.net
*Pro Hac Vice Counsel*

NORTH CAROLINA OFFICE:
7 Orchard Street
Suite 200
Asheville, NC 28801
828-774-5800 Office

Attorneys for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 8th of April 2022, I forwarded the foregoing instrument to all opposing parties.

*s/Samuel K. Allen*
Samuel K. Allen