# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### (CHARLESTON DIVISION)

| | |
|---|---|
| David Oppenheimer, | § CASE NO: 2:19-cv-3590-RMG |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| Michael C. Scarafile, Patricia R. Scarafile, | § |
| Sheila Glover Romanosky, and | § |
| O'Shaughnessy Real Estate, Inc., d/b/a | § |
| Carolina One Real Estate, | § |
| | § |
| Defendants. | § |
| | § |
| | § |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 85]

COME NOW Dana A. LeJune and Samuel K. Allen, counsel of record for Plaintiff, David Oppenheimer ("Oppenheimer" or "Plaintiff") files this Response in Opposition to Defendants' motion for summary judgment [ECF No. 85].

## I.   INTRODUCTION

The case at bar is a straight-forward copyright infringement case brought by Oppenheimer against four individual defendants: Michael Scarafile and Patricia Scarafile (collectively, "the Scarafiles"), Sheila Romanosky ("Romanosky"), and their company, O'Shaughnessy Real Estate, Inc. d/b/a CarolinaOne Real Estate ("CORE") (together "Defendants").

Oppenheimer is a professional photographer, and is the author of, and at all times relevant to this claim, has been and is now the sole owner and proprietor of the right, title, and interest in and to the copyrights in the original photographs at issue in this case (the "Copyrighted Works").

See **ECF No. 87-2** and Declaration of Oppenheimer.It is undisputed that Defendant Romanosky located and copied the two (2) Copyrighted Works and then distributed and publicly displayed them on Defendant CORE's listing for the boat slip located at Toler's Cove Marina (the "Boat Slip Property") on November 2, 2016. See **ECF No. 85-2, ¶45**. Defendants also publicly displayed one of the Works in an advertisement in the Post & Courier newspaper. **Id. at ¶ 7 and 34 and ECF No. 51-4**.

Oppenheimer alleges that Defendants non-willfully (Count I) – or, in the alternative, recklessly/willfully (Count II) – infringed the Copyrighted Works by scanning, copying, reproducing, distributing, publishing, and/or otherwise using, unauthorized copies of said photograph[s] within the United States in violation of Title 17. See ECF No. 1. Oppenheimer further alleges claims of vicarious copyright infringement (Count III) and contributory copyright infringement (Count IV) against the Scarafiles, as well as violations of the Digital Millennium Copyright Act ("DMCA") (Count IV). See **ECF No. 1**.

Defendants have put forward several affirmative defenses, including Estoppel, Copyright Misuses, and Unclean Hands – which form the basis of their motion for summary judgment.

## II.    OPPENHEIMER'S COUNTER STATEMENT OF FACTS

### a.  The Plaintiff's Business and Proprietary Intellectual Property

Oppenheimer is a professional photographer, in the business of creating original and beautiful photographs, and licensing their use to businesses, non-profit organizations, and individuals for reasonable license fees. **See Declaration of David Oppenheimer, ¶ 2.** Mr. Oppenheimer also sells photographic prints and photography-based merchandise. **Id.** Nearly all the photographs in his portfolio – which are displayed and offered for license on the website www.performanceimpressions.com – are Oppenheimer's original creations. **Id**. Oppenheimer

does not have a practice of acquiring copyrights in photographs created by other authors; he creates original photographs. **Id at ¶ 3.** Nor does he use his original copyrighted photographs only for litigation, without a good faith licensing program. **Id**.

Like many professional photographers, Oppenheimer's business relies on promotion to solicit customers and receive revenue through lawful licensing. **Id at ¶3.** To this end, Oppenheimer includes a "share to social media" icon and/or button on its website in order to promote his copyright-protected works – and by extension, his business – *via* select social media outlets. **Id.** Social media sharing is a specific promotional tool that promotes Oppenheimer's website and forms a backlink to the original content on his website – thus providing direct marketing and advertising to directly drive customers to his website for the source content. **Id.** Specifically, here, the share icon allows lawful customers to share a photograph to certain social media but maintains Oppenheimer's CMI and includes a link back to Oppenheimer's original content on his website – thus, further promoting his copyright-protected content. **Id.**

This marketing tool does not authorize social media users (or anyone not specifically authorized by Oppenheimer) to download or copy the images without his express permission. **Id.** It is in no way or form an invitation to infringe. **Id.**

Instead, Oppenheimer works tirelessly to prevent the unauthorized use of his valued intellectual property. **Id at ¶ 4.** Over the last several years, and primarily because of the quality, his subjects' popularity, and the easy accessibility of the general public to his works, Oppenheimer has appreciated that a large number of his copyright-protected photographs were being pirated by commercial entities – and in some cases individuals – throughout the country. **Id.** Consistent with what studies of copyright infringement have shown, a high percentage of infringers of Oppenheimer's works are by realtors and real estate developers (**Exhibit 2**).

Oppenheimer tries to prevent or at least, make difficult the unauthorized copying and/or infringement of the images at issue, and includes his CMI on the face of the image as a "watermark," in the caption adjacent to the image, *and* within the metadata of the images when they are published. **Dec. of Oppenheimer at ¶5.** This CMI often includes a notice of copyright, the year the image was created and/or registered with the US Copyright Office, and the name of the author (i.e. © [year] David Oppenheimer). **Id.** Oppenheimer also includes a description of the image, a link to the website www.performanceimpressions.com on most publications where the images are available for licensing. **Id.** Oppenheimer provides notice of copyright and terms of service on the website, www.performanceimpressions.com. **Id.** Oppenheimer does allow his print partner, Fine Art America, to include its own watermark on the face of the image but ensures that Oppenheimer's CMI is visible in the caption adjacent to the image with a description of the image and link to the website www.performanceimpressions.com. **Id.** Oppenheimer further embeds licensing, contact, and copyright information into the metadata of the images before publishing. **Id.** Oppenheimer has also employed the use of some select image protection services, such as Image Rights, Pixsy, and Image Witness to monitor the use of his intellectual property. **Id.**

As a professional photographer in the business of selling licenses to his valued intellectual property faced with mass infringement, Oppenheimer has been forced to defend his copyright-protected works by pursuing blatant and obvious copyright infringers. **Id at ¶6**.

In the past 10 years, Oppenheimer has filed approximately 130 lawsuits, mostly against the more brazen infringers who either stick their heads in the sand, otherwise ignore the cease-and-desist letter, who simply refuse to stop infringing, or simply believe they are not culpable. **Id at ¶6.** However, this represents a minuscule fraction of the total number of companies and individuals appropriating Oppenheimer's works. **Id.** By way of example, Pixsy (just one of the

several image protection services utilized by Oppenheimer) located 2,846 instances of unlicensed public display of Oppenheimer's works in just the last 5 years. See **Dec. of Oppenheimer, at ¶6 and Exhibit 1 (Pixsy Results since 2016).**

Thus, Oppenheimer's approximately 130 lawsuits filed over the last 10 years represents less than 5% of the total number infringements discovered by just one "image protection service" in half of that same timespan.

Oppenheimer is certainly not the only professional photographer dealing with infringement on a massive scale. Defendants, however, would seemingly have them all just accept the reality of creating works for public display without compensation and seek a different profession. Not surprisingly, while image left has become more and more common, realtors such as Defendants comprise a substantial portion of photography infringement compared to other industries. According to their statistics, over 7% of all infringement cases handled by Pixsy in 2016 were connected to real estate. See **Exhibit 2 (Pixsy Article re Real Estate Photography Infringement).** Perhaps this is because 87% of buyers found online property photos very useful for the purchase, according to research conducted by the National Association of Realtors (NAR). See **Id.** Perhaps it is due to the understood notion that home with professional photographs sell 21 days faster and for more money than those with point-and-shoot images. **Id**. Whatever the reason, Defendants appear to be perfectly content being a part of this group of known infringers blaming the photographers for seeking compensation and justice for exponential decline in their business.

### b. Plaintiff's Original Copyrighted Works at Issue

There are two (2) original photographs relevant to this case, each registered – and thus separately protected – under the title "Travel, Festival, and Concert Photography by David Oppenheimer 2013," bearing certificate number VAu 1-142-190. See **ECF No. 1-2**. The first Work

("Work No. 1" or "Opp_5964") is a wide-angle aerial photograph which depicts Tolers Cove Marina, as well as the Sullivan's Island Narrows, Sullivan's Island itself, and ultimately the coast of the Atlantic Ocean. See **ECF No. 1-1, p. 2 of 3**. The second Work ("Work No. 2" or "Opp_5960") is an aerial photograph more narrowly framing the Tolers Cove Marina in Mount Pleasant, South Carolina. See **ECF No. 1-1, p. 3 of 3**.

Oppenheimer did not acquire copyrights in these Works from another author; they are his original creations. **See Dec. of Oppenheimer, ¶9.** From the conception and planning to understanding the ideal angles, timing, and light in the capture and through all stages of editing and polishing the final expressions, Oppenheimer created the Works from scratch with significant effort, care, and time – and at great cost to him personally. **Id**. Specifically, for the creation of the Copyrighted Works, Oppenheimer charted and boarded a helicopter that had both rear doors removed for the purpose of capturing aerial photographs. **Id. at ¶10.** Oppenheimer sat in the rear of the helicopter reaching out of the open doors to capture photographs of the waterfront settlement by Sullivan's Island, South Carolina, depicting both close-up and wide-angle images of the entire coastal area. **Id.** To create valuable impressions, Oppenheimer was careful to capture the marina area, the Intracoastal Waterway and Sullivan's Island Narrows, along with the Atlantic Ocean to show its proximity to both. **Id**. Oppenheimer used a handheld Nikon D4 camera with a Nikon 24 to 70 mm f 2.8 lens. **Id.** Each of the Works were carefully and individually framed and captured. **Id.** This required extreme effort, including study, preparation, and professional techniques to create the best possible imagery of the subject. **Id.**

### c.   Plaintiff's Registration and Certificate of Copyright Registration

Beginning in 2011, Oppenheimer participated in a pilot program initiated by the U.S. Copyright Office to ensure that photographers receive clearly stipulated and classified individual

protection in each of their works – both published and unpublished. **See Dec. of Oppenheimer, ¶11.** The pilot program required Oppenheimer to submit his original photographs under a specific set of procedures allowing him to registered multiple unpublished photographs in a single registration application and receive individual protection in each work, rather than submitting a multitude of individual registrations. **Id**. and **Exhibit 4 (Instructions for Copyright Office Registration Pilot Program).**

On August 13, 2013, as part of this pilot program, Oppenheimer registered the two (2) Works with the U.S. Copyright Office by uploading the Works through the Electronic Copyright Office (eCO) Registration System and applying for a group registration of unpublished individual works entitled "Travel, Festival, and Concert Photography by David Oppenheimer 2013 **See Dec. of Oppenheimer, ¶12.** Oppenheimer received a certificate of registration from the Copyright Office confirming that the Works met the standards required for copyright protection. See **ECF No. 87-2.** The office notes on the certificate also stated "Registered as an unpublished collection, not as a published group. 37 CRF 202.3(b)(4)(i)(B)." **Id.**

Defendants are correct that in the Complaint, Oppenheimer mistakenly included an incomplete copy of the Certificate of Registration for VAu 1-142-190 (the "2013 Registration") as an exhibit. See **ECF No. 1-2**. However, such was the result of a simple clerical error made in good faith and carried no ill-meaning.

The copy of the Certificate that was filed with the Complaint was a scan of the printed version Mr. Oppenheimer received from the U.S. Copyright Office. **See Dec. of Oppenheimer, ¶14.** Mr. Oppenheimer placed a yellow sticky-note on the bottom of the document with the copyright application reference number handwritten thereon so that he could correlate the Certificate with the application. **Id.** Additionally, this printed version contained the first two (2)

pages of the Certificate on the front and back of a single piece of paper. **Id.** As such, when Mr. Oppenheimer initially scanned the document as a digital file, he failed to scan both sides – resulting in the incomplete Certificate seen in **ECF No. 1-2**. This version of the certificate has been used in prior lawsuits without issue.

Additionally, this error was corrected with Oppenheimer delivering the complete certificate in full to Defendants well before suit was even filed. **See Dec. of Oppenheimer, ¶15.** On June 24, 2019, over 6 months before the Complaint was filed, Oppenheimer – through the undersigned counsel – provided Defendants with the full 3-page Certificate of Registration as the first exhibit to the initial notice letter sent to Defendants. See **ECF No. 51-1.** Thus, Oppenheimer had already produced – and Defendants had already seen – the full Certificate of Registration. Oppenheimer's filing of the original scan with the yellow sticky-note was a simple clerical mistake. **See Dec. of Oppenheimer, ¶15.** Oppenheimer never intended to hide information, nor deceive Defendants or the Court. **Id.**

### d. Defendants' Piracy of the Works and Subsequent Obstreperous Conduct

In January of 2017, Oppenheimer first discovered that his two (2) original photographs (the "Copyrighted Works") were being published and publicly displayed without his authorization, license, or prior knowledge on several websites of realtors, agents, brokers, and/or other real estate sales entities for the purpose of advertising and marketing a boat slip located at 0 Tolers Cover marina 5G, in Mount Please, South Carolina ("Boat Slip Property"). See **ECF No. 41-15, pp. 7-8**.. Based on the information contained in these initially discovered listings, Oppenheimer was able to trace the advertisements back to CORE, as having the real estate sales listing on the property and to Defendant Romanosky, as the license broker for the property. **Id.** Through further

investigation, Oppenheimer discovered that the two (2) Works appeared on at least 34 additional websites without his authorization or license. **Id.**

On or about June 24, 2019, Oppenheimer sent a formal notice letter to Defendants identifying all the known URLS on which the unauthorized images appeared, requesting that Defendants' cease and desist from all further dissemination of the Works, and seeking additional information regarding the uses of the Copyrighted Works. See **ECF No. 1-5**.

Defendants responded to Oppenheimer's formal notice letter on July 12, 2019, answering many of Oppenheimer's inquiries[1] and purporting to have ongoing infringing distributions and/or public displays of the Works removed from the Web. **See Dec. of Oppenheimer, ¶23.** After exchanging several emails in pursuit of further investigation and (ultimately) resolution of the matter, in September of 2019, Oppenheimer noticed that the Works were still being publicly displayed on several of the identified URLs, despite Defendants' assertions that they would be removed. **Id**. Throughout the months of October through December of 2019, Oppenheimer continued to notify Defendants of such ongoing uses by identifying the specific URLs and requesting that the same be removed from the World Wide Web. **Id.** Defendants failed to provide any explanation for these ongoing uses, and, in or around October of 2019, Defendants ceased responding to Oppenheimer's communications altogether. **Id.** Left with no other means of resolution, Oppenheimer filed suit on December 30, 2019. See ECF No. 1.

Based on the information uncovered through his own investigation and through pre-suit discussions with Defendants,[2] Oppenheimer alleged in his Complaint that Defendants – or, potentially, someone at their direction, infringed the Works by "copying and distributing (or

---

[1] The substance of which were identified by Defendants as protected communications pursuant to Fed. R. Evid. 408, and therefore will not be disclosed herein.

[2] Including Defendants' assurance that the infringing images would be removed.

directing others to do so)" them to at least 34 different realtors, agent, brokers, and/or other entities. See **ECF No. 1, p. 3**. Oppenheimer specifically alleged that "[u]pon information and belief, one or more of the Defendants, or someone at their direction, located and accessed Oppenheimer's Works at http://www.performanceimpressions.com, then downloaded the Works, and then distributed them to at least 34 different realtors, agents, brokers, and/or other third parties to advertise and promote the boat slip located at 0 Tolers Cove Marina 5G in Mount Please, South Carolina." See ECF No. 1, p. 4.

Through the course of discovery, Defendants were forced to admit that Romanoski found the two (2) Works while searching the Web, downloaded – and/or reproduced – such Works, and, on or about November 2, 2016, uploaded them to the Charleston Trident MLS for public display to advertise, market, promote, and sell the Boat Slip Property. See **ECF No. 85-2, ¶45**. Defendants also publicly displayed one of the Works in an advertisement in the Post & Courier newspaper. **Id. at ¶ 7 and 34 and ECF No. 51-4**. Additionally, an email dated November 10, 2016, from CORE (coremarketing@carolinaone.com) to Ms. Romanosky (sromanosky@carolinaone.com) attaching the second image at issue clearly displaying Oppenheimer's CMI ("© 2013 David Oppenheimer") on the face of the work. See **ECF No. 51-4**. Defendants further admit that they never received any express license or authorization from Mr. Oppenheimer – nor did they provide any compensation to him for their infringing uses. See **ECF No. 51-3** (Irog No. 13).

Throughout litigation, Defendants have ignored their blatant piracy and attempted to hide their refusal to even speak with Oppenheimer after October of 2019 when he was seeking an amicable resolution short of the instant lawsuit. Instead, Defendants have shifted all the blame to Oppenheimer, painting themselves as the victims and unnecessarily amplifying all aspects of

litigation with disproportionate discovery and motion practice with the admitted intent of running up litigation fees as a means of weaponizing Fed. R. Civ. P. 68.

For these and the reasons provided below, Oppenheimer respectfully requests the Court deny Defendants' motion.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact on the issue for which summary judgment is sought, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citation omitted).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient . . ." *Id*. at 252; see also *Camille Sedar v. Reston Town Center Property, LLC*, Case No. 19-1972 (4th Cir. 2021). Where the moving party does not bear the burden of proof on the issue at trial, it may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Factual controversies are to be resolved in favor of the nonmovant – the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 248.

## IV.    ARGUMENT

### a.    **Oppenheimer's Marketing Practices Cannot Estop Him from Seeking Justice**

Defendants' first attempt at dismissal is based on the doctrine of estoppel. Specifically, Defendants' claim that between the years 2013-2016, when Oppenheimer published the Copyrighted Works without explicitly informing Romanosky and/or CORE that the instant suit may one day be filed, he intentionally seduced Defendants in a manner too difficult for anyone to resist: thus, forcing their misappropriation.  Defendants' argument on this issue is absurd.

To prove the defense of estoppel, Defendants must show that Oppenheimer 1) had actual knowledge or constructive knowledge that Defendants intended to use the Works without seeking license or compensation to him prior to their unauthorized reproduction, distribution, and public display; 2) that he misrepresented or concealed his knowledge of Defendants' future actions; 3) that he intended or expected Defendants to rely upon the concealment of his clairvoyance; 4) that Defendants used the Works without license or payment; and 5) that Defendants reliance upon Oppenheimer's concealing his premonitory knowledge was both reasonable and detrimental. See *Elmore v. Cone Mills Corp*., 187 F.3d 442, 446-47 (4th Cir. 1999); *Serv. Training, Inc. v. Data Gen. Corp*., 963 F.2d 680, 689 (4th Cir. 1992).

Defendants can only show one element of this defense: that Defendants undeniably reproduced, distributed, and publicly displayed the Copyrighted Works without license or payment.

Defendants falsely claim that Oppenheimer knew that a prominent copyright notice would not deter or prevent copyright infringement. The only evidence Defendants present in support of this is a blog post made by Oppenheimer in 2012 anecdotally stating that people had told him that they believed they were entitled to commercially use his photographs because they provided attribution. See 85-12 at 4. This statement in no way equates to Oppenheimer somehow expressing a belief that copyright notices are useless.

To the contrary, while neither registration nor publication with notice is required for copyright protection, providing a clear notice of copyright ownership does act as a deterrent to – and prevention of – copyright infringement. Such is established by the inclusion of 17 U.S.C. §401(d) in the Copyright Act, which states that "[i]f notice of copyright in the form and position specified by this section appears on the published copy or copies to which a defendant in a copyright infringement suit had access, then no weight shall be given to such a defendant's interposition of a defense based on innocent infringement in mitigation of actual or statutory damages, except as provided in the last sentence of section 504(c)(2)". In fact, many courts hold that evidence that the defendant received notice before the infringement occurred has been deemed "persuasive evidence of willfulness." *Microsoft Corp. v Software Wholesale Club, Inc*. 129 F.Supp. 2d 995, 1002 (S.D. Tex. 2000) (citing *Swallow Turn Music v. Wilson*, 832 F.Supp. 575, 579 (E.D. Tex. 1993); see also Jonathan Bailey, *Why Bother with a Copyright Notice?*, PLAGIARISM TODAY (June 27, 2012), https://www.plagiarismtoday.com/2012/06/27/why-bother-with-acopyright-notice/ [https://perma.cc/GLA9-6QFY] (explaining that even though notice is not required in most countries, "having a notice may provide some protection in those that do," because putting notice on a work "prevents confusion on the nature of the work and keeps others from thinking it is not copyrighted . . . [and] eliminates innocent infringer claims").

Oppenheimer understands that while it may not stop all infringement, a proper copyright notice does act as a deterrence to would-be copyright infringers, and does in fact often forestall or even prevent piracy. **See Dec. of Oppenheimer, ¶5.** To this end, Oppenheimer makes it a practice to include his CMI on the face of the image as a "watermark," in the caption adjacent to the image, and within the metadata of the images when they are published. **Id.** This CMI often includes a notice of copyright, the year the image was created and/or registered with the US Copyright Office, and the name of the author (i.e. © [year] David Oppenheimer). **Id.** Oppenheimer also includes a description of the image, a link to the website www.performanceimpressions.com on most publications where the images are available for licensing. **Id.** Oppenheimer provides notice of copyright and terms of service on the website, www.performanceimpressions.com. **Id.** While it is true that Oppenheimer allows his print partner, Fine Art America, to include its own watermark on the face of the image, he ensures that his CMI is visible in the caption adjacent to the image with a description of the image and link to the website www.performanceimpressions.com. **Id.** Oppenheimer further embeds licensing, contact, and copyright information into the metadata of the images before publishing. **Id.**

Defendants fail to show any examples of Oppenheimer publishing either of Works at issue without providing notice that they are owned by Mr. Oppenheimer and subject to copyright protection. Specifically, Oppenheimer published the Works on the following sites, respectively, and provided copyright notice identified correspondingly:

<u>**Work 1:**</u>

- Oppenheimer's website, performanceimpressions.com (published with Oppenheimer's copyright management information ("CMI") on the face of the image, in the caption adjacent to the image, and within the metadata)

- Flickr.com (published with Oppenheimer's CMI on the face of the image and in the caption adjacent to the image, and within the metadata)

- Live.photoshelter.com (published with Oppenheimer's CMI in the caption adjacent to the image and within the metadata).

**Work 2**:

- Oppenheimer's website, performanceimpressions.com (published with Oppenheimer's copyright management information ("CMI") on the face of the image, in the caption adjacent to the image, and within the metadata)

- Flickr.com (published with Oppenheimer's CMI on the face of the image and in the caption adjacent to the image, and within the metadata)

- Live.photoshelter.com (published with Oppenheimer's CMI in the caption adjacent to the image and within the metadata).[3]

- Facebook.com (published with Oppenheimer's CMI on the face of the image and in the caption adjacent to the image)

- Fine Art America (published with Oppenheimer's CMI in the caption adjacent to the image).

- Pixel.com (published with Oppenheimer's CMI in the caption adjacent to the image).

See **See Dec. of Oppenheimer, ¶17 and Exhibit 3 (Oppenheimer Response to Irog No. 2**.

Defendants chastise Oppenheimer for failing to employ technological obstacles, such as paywalls, pop windows, and non-removable embedded markings across the entirety of his images – which may deter some infringers but would also detrimentally harm Oppenheimer's marketing efforts. Defendants further claim that Oppenheimer's failure to educate the general public on the specifics of the Copyright Act estops him from protecting his Works.

Defendants fail to cite any law supporting the notion that such failures equate to estoppel or the so-called "bait-and-litigate" practice. To the contrary, the red-letter law provides the exact opposite. Copyright protection exists from the moment the work is created. See *Eldred v. Ashcroft*,

---

[3] Oppenheimer has set up his account with live.photoshelter.com to dynamically generate watermarks by extrapolating the CMI contained within the metadata of the photographs uploaded therein. Unfortunately, for reasons unknown and newly discovered to Oppenheimer, this process does not always work as intended and occasionally results in some of the photographs getting published without a watermark on the face of the image.

537 U.S.C. 186, 195 (2003). Neither registration nor a copyright notice are required for an author to receive copyright protection in his original work. Berne Convention Implementation Act of 1988, 102 Stat. 2853, 2857-59. Further, as a basic matter, copyright infringement is a strict liability offense, in which a violation does not require a culpable state of mind. See *CoStar Grp., Inc. v. LoopNet, Inc*., 373 F.3d 544, 549 (4th Cir. 2004).

Far from concealing his efforts to protect the Works,[4] Oppenheimer employs multiple tactics to prevent the unauthorized use of his valued intellectual property. The Copyright Act defines such actions as effective forms of notice under 17 U.S.C. § 401. Oppenheimer's protective measures greatly exceed the requirements of the law. Indeed, such efforts prevent Defendants from claiming that their piracy was innocent. See 17 U.S.C. §401(d). As such, they certainly prevent Defendants from succeeding on their nonsensical proposition that they were duped into infringing both of the Works at issue.

Defendants also inflate the significance of Oppenheimer's use of a "share button" on his website – which is a commonly-used marketing tool for professional photographs aimed at expanding his customer reach and brand recognition. Oppenheimer includes a "share to social media" icon on his website, which allows existing and potential customers the ability to share a photograph to certain social media. **See Dec. of Oppenheimer, ¶3.** When a photograph is shared it usually includes Oppenheimer's copyright notice or links to a webpage where there is notice of copyright, as well as a link back to Oppenheimer's original content on performanceimpressions.com. **Id.** This practice promotes Oppenheimer's business by encouraging potential customers to visit his website and license his works for a fee. **Id.** However, the share button icon does not authorize social media users (nor anyone not specifically authorized by

---

[4] And in direct opposition to Defendants' derogatory claim of "baiting"

Oppenheimer) to download or copy the images without his expressed permission. **Id.** In no way is this an invitation to infringe. **Id.**

Additionally, Defendants show no evidence that – through this practice – Oppenheimer is intending to induce others to copy his Works without license. Nor can Defendants show any evidence that such practices have actually resulted in infringement.

Most importantly however, Defendants have presented no evidence to show that they actually relied upon misleading information from such alleged methods, or that they even obtained either of the Copyrighted Works through a "social media share icon." In fact, Defendants admit that they do not know specifically where or how they located the Works at issue. See **ECF No. 85-2 at ¶ 45**. The best they can say is that Romanosky "performed a Google® search at the time and found the two images." **Id.** Yet, amazingly – and despite her extremely vague recollection – Romansky claims that she relied upon some an unspecific deception in an unidentified publication.

The Fourth Circuit was equally unpersuaded by these arguments in the case B*rammer v. Violent Hues Productions, LLC*, No. 18-1763, at *6 (4th Cir. Apr. 26, 2019). In *Brammer*, commercial photographer, Russell Brammer ("Brammer"), advertised his copyright-protected image on his own website as well as on the image-sharing website Flickr. See *Brammer*, at *2. Although Mr. Brammer was not as thorough in his protection practices as Oppenheimer,[5] he did include the phrase "© All rights reserved" beneath the photograph *Id*. The defendant, Fernando Mico ("Mico") – the owner of Violent Hues Productions, LLC ("Violent Hues"), testified that he believed that he located Brammer's photograph "through a Google Image search, which led [him] to the website Flickr." *Id*. at *4. Mico also testified that he did not see any "indication on the Photo

---

[5] For example, it does not appear that Mr. Brammer included a copyright notice on the face of the image or in its metadata. *Id*. Additionally, Mr. Brammer failed to include his name or the year in the copyright notice that was provided in the caption beneath the photograph. *Id*

itself or the Flickr website that the Photo was copyrighted," and so he believed that it was publicly available. *Id*. The Fourth Circuit rejected Mico's claim that he acted in "good faith" believing that that the image was publicly available. *Id.* First, the Fourth Circuit reasoned that because copyright infringement is a strict liability offense, and that "good faith" is thus presumed, the defendant's claim of innocence does not constitute a defense to liability. *Id.*, citing *Monge v. Maya Magazines, Inc*., 688 F.3d 1164, 1176 (9th Cir. 2012) ("[T]he innocent intent of the defendant constitutes no defense to liability." (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.08[B][1] (Matthew Bender rev. ed. 2011)). The Fourth Circuit then stated that "regardless of the weight one might place on the alleged infringer's state of mind," Violent Hues did not offer any evidence that it acted in good faith. *Brammer*, at *13-14. Specifically, the Fourth Circuit found that Mico did not explain why his belief that the image was freely available was reasonable "given that all contemporary photographs are presumptively under copyright, 17 U.S.C. § 302(a), and given his own acknowledgement that he downloaded the Photo from Flickr, which stated '© All rights reserved' in the Photo caption." *Id*. at *14.

Here, Defendants have likewise failed to explain how Ms. Romanosky's belief that images found through a Google "were publicly available" is reasonable given the presumption of copyright protection to photographs and given the fact that both Works at issue prominently stated "© 2013 David Oppenheimer" on the face of the image. Defendants' argument stretches the bounds of credulity, and it simply does not hold water in the Fourth Circuit.

Moreover, Defendants' move for estoppel is not limited to Oppenheimer's practices concerning the specific Works at issue – nor to Defendants' acts of infringement.[6] Instead, Defendants' theory is proposed on the macro level; suggesting that Oppenheimer is generally

---

[6] Admitting that they are not even aware of specifically where or how the Works were obtained. See ECF No. 85-2 at ¶ 45.

barred from protecting any and all of his 20,000+ original works simply because he was aware of the possibility that infringers might take his images without compensation in 2012, yet decided to continue to advertise and market his business by publishing his photographs with clear notices of copyright ownership.

Under Defendants' proposed standard, any copyright holder that understands the threat of infringement and chooses to market their works without paywalls or detailed educational disclaimers on the potential consequences of unlicensed, use has forfeited the protections bestowed by the Copyright Act. Analogizing this flawed logic outside the copyright world, a retail store owner who fails to physically chain their merchandise to the shelfs (or fails to keep the same under lock and key), without posting signs on the front door warning that thieves will be prosecuted, is inviting (or "baiting") patrons to steal.[7]

Far from intending Defendants' acts of infringement, Oppenheimer is actively trying to stop the rampant piracy of his valued Works. Defendants' claim of estoppel has no merit and Oppenheimer respectfully requests that the Court reject the same.

### b. Oppenheimer's Claims against Defendants for their Direct and Undisputed Piracy of his Valid and Registered Copyrights are Not Misuse

#### i. Oppenheimer's Marketing and Protection Methods are Authorized by Law and Necessary for Business

Defendants' support for their affirmative defense of copyright misuses mirrors that of their estoppel defense. Defendants have coined the phrase "bait and litigate" to cast Oppenheimer's reasonable (and more importantly, lawful) methods of advertising and protection in a disingenuous light for the sole purpose of prejudicing the Court. Just as they do in their argument for estoppel, Defendants' claim that Oppenheimer's methods of marketing his works to as many potential

---

[7] Such an understanding would eliminate the existence of self-pay kiosks at supermarkets and airports – which are becoming increasingly prevalent in the marketplace.

customers (i.e., lawful licensees) as possible with prominent notices of copyright ownership[8] somehow encourages theft (or what Defendants' refer to as the "bait" portion of their theory) and then asserting his rights against indisputable violators (or what Defendants' call "litigate") amounts to general copyright misuse.

First, Defendants' recitation of the facts is deceptive and, in many instances, outright untruthful.

It is true that Oppenheimer holds over 100 copyright registrations and that, once the works are registered, it is his general practice to publish such works on his business website, as well as to a few carefully selected online publications.[9] **Exhibit 3 (Oppenheimer Response to Irog No. 2**. The published works include a copyright notice on the face of the image, within the caption, and/or within the metadata of the image. **See Dec. of Oppenheimer, ¶3.** Oppenheimer often further embeds keywords in the metadata of the images which both describe the subject matter of the work as well as include his own name and copyright management information. **Id.** Oppenheimer does this so that individuals and businesses searching online for photographs to license can find his works, identify Oppenheimer as the copyright owner, and lawfully purchase a license as intended. **Id.** This is a common marketing technique for professional photographers, as it acts as a virtual sky beam attracting customers in the market to purchase licenses. **Id.** Oppenheimer also includes a "share to social media" icon on his website – allowing existing and potential customers the ability to share a photograph to certain social media – further promoting his business and encouraging the market to visit his website to purchase licenses. **Id.**

---

[8] But without technical measures, such as paywalls, pop-up windows, and/or obtrusive watermarks over the entire image – which will literally prevent (or significantly restrict) the viewing of the very works he is trying to promote and license.

[9] Such as Flickr, Photoshelter, and Facebook.

Oppenheimer is a professional photographer. The goal of his business is to sell as many licenses to as many businesses and/or individuals as possible. **See Dec. of Oppenheimer, ¶18** Success in this venture dictates that as many potential customers view his original and valued works as possible**. Id.** This is not only necessary for business, but such practices are Oppenheimer's rights as the copyright owner. The Copyright Act grants Oppenheimer the exclusive right to reproduce his copyright-protected works, as well as to "distribute copies [] of the copyrighted work[s] to the public by sale or other transfer of ownership" and to "display the copyrighted work[s] publicly. See 17 U.S.C. § 106(3) and 106(5).

However, the unfortunate side-effect of such marketing is that unscrupulous infringers can also find his images with ill intentions.

To combat against the threat of piracy (while also reaching out to new customers and building his brand recognition), Oppenheimer includes clear and unambiguous copyright notices on the face of the image, within the caption, and/or within the metadata of the image. **See Dec. of Oppenheimer, ¶5.** Although the law does not require him to do so, Oppenheimer includes these notices with his photographs to distinguish his works from others and to ensure that people who view his works appreciate that he owns all rights and title to them. **Id.**

Employing the technological obstacles suggested by Defendants completely undermines the goal his business. If customers are prevented and/or limited from viewing his photographs due to paywalls, pop-ups, and/or obtrusive watermarks covering entire images, they will simply move on to another photographer's images.

Defendants misleadingly allege that Oppenheimer does not use watermarks and that it is because Oppenheimer says it would be "a lot of work." See **ECF No. 85-1, p. 17-18**. First, the primary reason that Oppenheimer does not include a giant watermark over the entirety of his works

is because such a practice "really detracts from the photographs." See **ECF No. 85-5, 54:11-15**. Defendants deceivingly omit this crucial validation in their brief. Moreover, Oppenheimer absolutely employs the use of watermarks in his works. **See Dec. of Oppenheimer, ¶5 and Exhibit 3 (Oppenheimer Response to Irog No. 2**. However, instead of covering the entire image with giant lettering, Oppenheimer includes watermarks at the bottom corner of the works in a manner that is "not intrusive to a view, but [is] apparent and legible to a business owner or an editor, and so that way when somebody needs a photograph to use, he has the final product ready for them with the notice of copyright on the face that they can use that's not detracting to the photograph." See **ECF No. 85-5, 54:16-24**.

When his works are used without license, Oppenheimer takes steps to first stop the infringements and seek just compensation. As demonstrated in the case at hand, Oppenheimer does everything within his power to avoid litigation.

As stated, well before filing the instant lawsuit, Oppenheimer sent a formal notice letter to Defendants identifying all known infringements of the two (2) Copyrighted Works, requesting that such infringements end, and requesting information regarding the full scope of unauthorized use. See **ECF No. 1-5**. Despite Oppenheimer's tireless efforts to have the infringing images removed from public display and amicably resolve the matter, Defendants failed to make good on their promise to eliminate all instances of infringement without explanation and then ceased responding to Oppenheimer's communications entirely. With Defendants refusing to discuss resolution, Oppenheimer was left with no choice but to file suit or allow the limitations to run on his claims and truly acquiesce to these blatant acts of infringements.

Moreover, the lawsuits Oppenheimer does file represent a tiny fraction of the total instances of blatant infringement. Just one of the image protection services used by Oppenheimer

found that there existed 2,846 instances of unauthorized use of Oppenheimer's works since 2016. See **Exhibit 1 (Pixsy Results since 2016).** When considered against such number, the 130 lawsuits Oppenheimer has filed in the last 10 years shows that such efforts are but a mere speedbump against the widespread piracy being suffered.

As an artist and business owner, Oppenheimer has to strike a balance between marketing his works to as many customers as possible, while ensuring that the consuming public understands that such works are his valued property and are not for the taking.

To do this, Oppenheimer must exercise his right to publicly display his images. However, at times, Oppenheimer must also exercise his right to prevent others from pirating his intellectual property. While Defendants may derogatorily refer to this as a "bait and litigate" scheme, Oppenheimer's practices are encouraged by the law, and required for him to build a successful business.

### ii. Defending Intellectual Property Rights Through Litigation is Not Misuse

Although this issue has been briefed numerous times before the Court, Oppenheimer again posits that Defendants' claims of copyright misuse must fail.

The doctrine of copyright misuse prohibits a copyright holder from using a copyright to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which is contrary to public policy to grant. *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (4th Cir. 1990) (quoting *Morton Salt Co. v. G.S. Suppiger*, 314 U.S. 488, 492, 62 S. Ct. 402, 86 L. Ed. 363, 1942 Dec. Comm'r Pat. 733 (1942))). In *Laserbomb*, the Fourth Circuit did establish that misuse of copyright is a valid affirmative defense and that such defense may extend beyond the context of violating antitrust laws. *Lasercomb*, 911 F.2d at 979. However, Defendants fail to cite any

statute, case, or legal interpretation whatsoever supporting the proposition that filing multiple lawsuits or even being a so-called "copyright troll" rise to the level of copyright misuse.

While misuse may not end with violating antitrust laws, nearly every interpretation of this defense finds that misuse has occurred when a copyright holder has engaged in some form of anti-competitive behavior by attempting to extend the rights beyond those granted by the Copyright Act. See *Lasercomb*, at 979, *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191, 206 (3d Cir. 2003); *Religious Tech. Ctr. V. Lerma*, No. 95-1107-A, 1996 WL 633131, at *12 (E.D. Va. Oct. 4, 1996) (listing examples of copyright misuse as attempting to restrain a defendant from using material over which the plaintiff has not rights, distributing the copyright discriminatorily, and refusing to supply a list of copyrighted songs where requested, but not identifying filing multiple lawsuits or so-called "trolling"); *CBS Broad, Inc. v. EchoStar Communications Corp*., 265 F.3d 1193, 1211 (11th Cir. 2001); *A&M Records, Inc. v. Napster, Inc*., 239 F.3d 1004, 1026 (9th Cir. 2001) (stating that the goals of the copyright laws are undermined **when a copyright holder attempts to go beyond the rights granted by the law to stifle the creativity of other authors**); S*oc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 65 (1st Cir. 2012), *cert. denied*, 133 S. Ct. 1315 185 L. Ed. 2d 195 (U.S. 2013); *In re Indep. Serv. Orgs. Antitrust LItig.*, 85 F.Supp.2d 1130, 1175-76 (D. Kan. 2000); *Malibu Media, LLC v. Doe*, 2014 U.S. Dist. LEXIS 77929, 2014 WL 2581168, at *2 (N.D. Ill. 2014) ("[T]he predicate for a misuse defense is an attempt to use the copyright monopoly to control something the monopoly does not protect."); *Assessment Tech. of WI, LLC v. WIREdata, Inc*., 350 F.3d 640, 647 (7th Cir. 2003).

Defendants' argument for misuse does not fit into any such interpretation. Indeed, just as they did in their argument for estoppel, Defendants do not suggest that Oppenheimer has

specifically misused his copyrights for the two (2) Works at issue. Instead, Defendants make the argument that Oppenheimer has misused all of his copyrights in all of his photographs, attempting to sweep up the two (2) specific Works along with the other 20,000+ images in Oppenheimer's portfolio. Defendants' suggested relief is completely unprecedented, and not available to them under current caselaw.

In fact, Courts that have addressed the exact argument presented by Defendants have roundly rejected the same. Courts across the country have consistently held that filing multiple suits does not raise an inference that a plaintiff has engaged in copyright misuse. In *Energy Intell. Group, Inc. v. CHS McPherson Refinery, Inc.*, 300 F.Supp. 3d 1356 (D. Kan. 2018), just as the Defendants suggest here, the *Refinery* defendant argued that the plaintiff "engaged in abuse of process through its actions of ***filing multiple copyright infringement lawsuits against its clients,*** paying its employees bonuses for finding and reporting potential copyright infringement claims, engaging in efforts to 'entrap' its largest clients into admitting that they are engaging in copyright infringement, and by pushing the Refinery into purchasing a costly Global Enterprise License to avoid this lawsuit." *Id*. at 1373. The district court found none of these facts or arguments persuasive; holding that that the *Refinery* defendant "failed to come forward with any evidence that EIG misused its copyrights." *Id*. at 1374.

Similarly, in *Malibu Media, LLC v. Does*, 2014 U.S. Dist. LEXIS 77929, 2014 WL 2581168, at *2 (N.D. Ill. 2014), when the defendant offered the existence of multiple similar copyright infringement lawsuits in support of a copyright misuse defense, the court stated "[i]t is certainly true that [the plaintiff] has filed a very large number of infringement suits in this district and in others. ***But that is what the holders of intellectual property rights do when they are faced with mass infringement***." *Id*.

Further, in *Design Basics, LLC v. MTF Assocs., Inc.*, No. 1:17-cv-00031 (M.D. Pa. Mar. 28, 2019), the district court declined to allow a copyright misuse affirmative defense when the *MTF* defendants alleged that the plaintiff established a "scheme that incentivized Plaintiff's employees to find violations of its copyrights and then pursue[] litigation" … "attempting to use its copyrights as a sword rather than a shield," and "with the intent of exacting settlement payments from the alleged infringers." *Id*. at *11. In finding that the *MTF* defendants' allegations failed to support a reasonable inference of copyright misuse, the court analyzed:

> The doctrine of copyright misuse is "principally aimed at avoiding anticompetitive conduct that contravenes the goal of copyright law – 'to stimulate artistic creativity for the general public good.'" *Malibu Media, LLC v. Doe*, No. 4:15-cv-2281, 2018 WL 5841866, at *10 (M.D. Pa. Nov. 8, 2018 (citing *Video Pipeline*, 342 F.3d at 204). Misuse exists where a copyright holder has engaged in some form of anti-competitive behavior. See Practice mgmt.., 121 F.2d at 521 (finding copyright misuse where license to use copyrighted goods prohibited licensee from using competing goods); see also *Lasercomb, Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (finding that a copyright holder misused its copyright by including in licensing agreements a provision that neither the licensee company nor its officers or its employees could develop competing goods for the ninety-nine year term of the agreement.) *Id*. at *10.
>
> . . . .
>
> ***While Defendants' allegations suggest that Plaintiff engaged in an aggressive litigation strategy in defense of its copyrights, Defendants do not allege facts that suggest that this strategy constituted anti-competitive behavior. Plaintiff's copyright claim is not "likely to interfere with creative expression to such a degree that [it] affect[s] in any significant way the policy interest in increasing the public store of creative activity."*** *Video Pipeline*, 342 F.3d at 206. Further, the copyright misuses defense fails where a plaintiff merely seeks to enforce its copyright, and nothing more. See *Artista Records, Inc. v. Flea World, Inc*., 356 F.Supp.2d 411, 428-29 (D.N.J. 2005) ("the fact of enforcing a valid copyright, without more, simply cannot constitute copyright misuse."). Defendants have only alleged that Plaintiff is seeking to enforce its own copyrights and nothing more.

*Id.* at *11 (emphasis added).

Similarly, because Defendants have no evidence to support the required element that Oppenheimer's claim is "likely to interfere with creative expression" to a degree that would suppress the public store of creative activity, they cannot raise a misuse defense.

Defendants' claim that most of Oppenheimer's suits have settled and that he has yet to go to trial is equally unavailing. In making this argument, Defendants fail to comprehend the most obvious explanation: Oppenheimer's cases do not go to trial and often settle because there is often no question as to the validity of his claims and the liability of defendants. Just as with Defendants in this matter, Oppenheimer pursues litigation in situations where an infringer has unquestionably pirated his work and after he has exhausted attempts at pre-suit resolution.

This argument too has been rejected by courts across the country. In the 2020 case *Strike 3 Holdings v. Doe*, 964 F.3d 1203 (D.C. Cir. 2020, the D.C. Circuit held that "[w]here, as here, a plaintiff alleges that it is the victim of copyright infringement on a massive scale, ***the mere fact that it has filed a significant number of lawsuits is not a valid basis on which to impute an improper purpose. Nor is the fact that many such lawsuits settle or are dismissed at an early stage necessarily suggestive of improper intent***.")*, Id*., citing *Frank v. Gaos* , —— U.S. ——, 139 S. Ct. 1041, 1046, 203 L.Ed.2d 404 (2019) (emphasis added). It cannot be disputed that Oppenheimer is a victim of massive copyright infringement. See **Exhibit 1 (Pixsy Results since 2016).** Defendants themselves admit this in their argument. See ECF No. 85-1, p. 2 ("Plaintiff has long been the victim of alleged copyright infringement.") The fact that he has brought approximately 130 out of multiple thousands of infringers shows that Oppenheimer is simply trying to take some stand against an overwhelming plague of piracy.

Indeed, this logic has even specifically applied to Oppenheimer himself. In October of 2021, in *Oppenheimer v. GEI Consultants, Inc*., the Northern District of Illinois rejected

Defendants' attempt to hold Oppenheimer to a different set of rules because he is a so-called "seasoned litigator." *Oppenheimer v. GEI Consultants, Inc*., CN 1:21-cv-01967, *7 (N.D. Ill. Oct. 27, 2021). Instead, the court found that such argument is "misplaced" and that "[n]othing in Copyright Laws or the Federal Rules of Civil Procedure allow the Court to hold Oppenheimer to a different standard simply because he is a frequent litigator." *Id*.

Oppenheimer is simply seeking to enforce his own copyrights in the subject Work because of the now admitted infringement of the Work in its entirety by these Defendants. Defendants have shown no evidence that neither Oppenheimer's marketing efforts nor his history of standing up to unabashed infringers constitutes misuse or provides any grounds for a Court to dismiss his suit.

### c. Each Copyrighted Work is Protected as an Individual Work under the Law

Defendants first false claim that Oppenheimer purposefully concealed the nature of his registration for the two (2) Copyrighted Works at issue and then incorrectly argue that these two (2) distinct Works should be considered just a single work for the purpose of statutory damages. Defendants' argument is misplaced and cannot hold.

First, Defendants erroneously claim that Oppenheimer purposefully mislead Defendants and the Court by included in the Complaint a Certificate of Registration for the Works at issue that was missing its second page. While it is true that Oppenheimer mistakenly included an incomplete copy of the Certificate of Registration for VAu 1-142-190, such was a simple clerical error made in good faith – and carried no ill-meaning.

The copy of the Certificate that was filed with the Complaint was a scan of the printed version Mr. Oppenheimer received from the U.S. Copyright Office. Mr. Oppenheimer placed a yellow sticky-note on the bottom of the document with the copyright application reference number handwritten thereon so that he could correlate the Certificate with the application. Additionally,

this printed version contained a the first two (2) pages of the Certificate on the front and back of a single piece of paper. As such, when Mr. Oppenheimer initially scanned the document as a digital file, he failed to scan both sides – resulting in the incomplete Certificate seen in ECF No. 1-2. When he realized his mistake, Oppenheimer immediately investigated the matter and, when he learned the reason behind the error, he was honest, apologetic, and sincere toward both opposing counsel and the Court.

However, before filing the Complaint, Oppenheimer included the full 3-page Certificate of Registration as the first exhibit to the initial notice letter sent to Defendants on June 24, 2019. See **ECF No. 51-1**. Thus, Oppenheimer had already produced – and Defendants had already seen – the full Certificate of Registration. Oppenheimer's filing of the original scan with the yellow sticky-note was a simple clerical mistake and absolutely not intended to hide information, nor deceive Defendants or the Court.

Moreover, Oppenheimer had no reason to mislead either Defendants or this Court, because the information contained on page 2 has zero effect on the validity of the copyrights for the two (2) Works at issue. Defendants are both factually and legally mistaken that the note on page 2 stating "*Registered as an unpublished collection, not as a published group. 37 CRF 202.3(b)(4)(i)(B)*" renders all 6,000+ images included in the 2013 Registration as "a single work."

When Congress enacted the Copyright Act, it gave the Register of Copyrights the discretion to allow groups of related works to be registered with one application and one filing fee. See 17 U.S.C. § 408(c)(1). As the legislative history explains, allowing "a number of related works to be registered together as a group represent[ed] a needed and important liberalization of the law." H.R. Rep. No. 94-1476, at 154 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5770; S.Rep. No. 94-473, at 136 (1975). Congress recognized that requiring applicants to submit separate

applications for certain types of works (such as photographs) may be so burdensome and expensive that authors and copyright owners may forgo registration altogether, since copyright registration is not a perquisite to copyright protection. *Id*. Specifically, Congress cited "a group of photographs by one photographer" as an example of a "group of related works" that would be suitable for registration under section 408(c)(1). *Id*.

In 2001, the US Copyright Office issued a regulation allowing applicants to register a group of published photographs with one application and one filing fee. See 66 FR 37142, 37149-50 (July 17, 2001). This is called "group option for published photographs" ("GRPPH"). Prior to 2016, the US Copyright Office did not provide this same specific option for unpublished photographs. Instead, since 1978, the US Copyright Office allowed applicants to register an unlimited number of unpublished photographs with one application and one filing fee – referring to them as an unpublished collection. However, with an effective date of March 15, 2019, the US Copyright Office has now established a group registration option for unpublished photographs, referred to as "the group registration option for unpublished photographs ("GRUPH"). This rule replaced the registration accommodation for "unpublished collections." It also memorialized the Office's longstanding position regarding the scope of protection for a group of unpublished photographs – *officially codifying that registration covers the copyrightable authorship in each work that is submitted for registration, and that **each work is registered as a separate work***. See 37 C.F.R. § 202.4(r).

However, even before the establishment of GRUPH, both the Copyright Office and the courts have long recognized that a registration of an unpublished "collection" extends to each copyrightable element in the collection such that a valid registration of an unpublished collection of photographs "***registered each individual image***." See *Sohm v. Scholastic Inc.*, 959 F.3d 39 (2d

Cir. 2020) (emphasis added), citing *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publishing Co.*, 747 F.3d 673 (9th Cir. 2014). Indeed, it is established in the Fourth Circuit that a single copyright registration may include ***multiple, individually cognizable copyrights*** for purposes of statutory damages under 17 U.S.C. §504(c). See *Sony Music Entm't v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795 (E.D. Va. 2020) (emphasis added), citing *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003).

Moreover, Oppenheimer registered the two (2) Works with the mutual knowledge and understanding between him and the Copyright Office that he would be receiving full protection for each individual work submitted. Beginning in 2011, Oppenheimer participated in a pilot program initiated by the U.S. Copyright Office to ensure that photographers receive clearly stipulated and classified individual protection in each of their works – both published and unpublished. **See Dec. of Oppenheimer, ¶11.** The pilot program required Oppenheimer to submit his original photographs under a specific set of procedures allowing him to registered multiple unpublished photographs in a single registration application and receive individual protection in each work, rather than submitting a multitude of individual registrations. **Id.** and **Exhibit 4 (Instructions for Copyright Office Registration Pilot Program).**

On August 13, 2013, Oppenheimer registered the two (2) Works with the U.S. Copyright Office as part of this program by uploading the Works through the Electronic Copyright Office (eCO) Registration System and applying for a group registration of unpublished individual works entitled "Travel, Festival, and Concert Photography by David Oppenheimer 2013." **See Dec. of Oppenheimer, ¶11.** Oppenheimer received a certificate of registration from the Copyright Office confirming that the Works met the standards required for copyright protection. See **ECF No. 87-2**. The Copyrighted Works at issue are not part of a compilation or organized collection. Instead,

each of the two (2) Copyrighted Works are individually cognizable works of authorship which are recognized as two (2) separate Works. Pursuant to the understood law of copyright protection, each work is considered a separate work of authorship for the purposes of statutory damages.

For these reasons, Defendants' motion on this issue fails. Moreover, because the incomplete registration which was originally filed in the Complaint was the result of an unintended error, immediately corrected, and mooted both by the fact that Oppenheimer had already produced the full certificate and the recognition of the Works as separately cognizable works of authorship, such does not amount to unclean hands.

### d.  Defendants' Claims of Unclean Hands are without Merit

Next, Defendants falsely allege that Oppenheimer has overstated the number of websites upon which the infringements were publicly displayed. While Oppenheimer did include some duplicates in the list of infringing URLs attached to the Complaint as Exhibit 4, such is not an indication of any nefarious intent but a result of multiple different websites pulling the Works from a common source image URL. **See Dec. of Oppenheimer, ¶25.** Oppenheimer did not inflate the number of real estate websites publicly displaying one or both Copyrighted Works at issue. **Id.** Oppenheimer correctly pled that the Works appeared on websites for at least 34 different realtors, agents, brokers, and/or other entities.

While Oppenheimer will admit that some of the image URLs listed in Exhibit 4 are repeated, most of the so-called "duplicate" URLs are properly included because they were used separately for different infringing websites.

It is important to note the distinction between the image URLs and the main real estate website. An image URL is a web address that specifies the location of an image online. **See Dec. of Oppenheimer, ¶25.** The real estate entities can then link the image URL to make the image

appear on the main real estate website. **Id.** In this case, multiple real estate websites accessed the Copyrighted Works from a single image URL. See **Id. and ECF No. 1-4.**

For example, the infringing images that were published on the main websites of Applegate Real Estate, CCBG Real Estate Group, Domicile Charleston, Ed Hunnicutt Real Estate, Georgia Bell Homes, The Agent Owned Realty Co., The Homes Finder Realty Group, Century 21, and Marshall      Walker      each      linked      to      the      image      URL http://cdn.resize.sparkplatform.com/chs/1024x768/true/20161107182638003582000000-o.jpg *independently* to publicly display one of the Works without authorization or license on nine (9) separate websites. **See Dec. of Oppenheimer, ¶26.** Thus, although the image URL may have been repeated, its inclusion on Exhibit 4 indicates separate uses.

In total, out of approximately 125 URLs listed in Exhibit 4, only 10 are truly repeated under the same infringing real estate website. The remaining URLs all reflect a separate, independent distribution, and/or public display of the Works without Oppenheimer's license or authorization and are, therefore, properly included in Exhibit 4.

Such is not proper grounds for an "unclean hands" defense, nor does it affect the number of DMCA violations for the undeniable number of URLs which displayed the Copyrighted Works without Oppenheimer's CMI and/or false designation.

### e.  Facts Show Defendants Acted with Knowledge

In their final point, Defendants argue that Oppenheimer's DMCA claims fail because Defendants did not act with the requisite knowledge of their actions.

17 U.S.C. § 1202(b) states that "[n]o person shall, without the authority of the copyright owner or the law—1) intentionally remove or alter any copyright management information … or … 3) distribute … copies of works … knowing that copyright management information has been

removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title." Section 1202(c) defines CMI as "any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, ***including in digital form***, … (2) "the name of, and other identifying information about, the author of a work," (3) "the name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright." 17 U.S.C. § 1202(c)(2) and (3) (emphasis added).  The courts that have analyzed this issue have uniformly found that CMI within a works' embedded metadata (or a "digital watermark") fits the definition of CMI conveyed in connection" with the work. See *IQ Group, Limed v. Wiesner Publishing, LLC*, 409 F.Supp.2d 587, 596 (D.N.J. 2006) (concluding that "Congress viewed a digital watermark as an example of copyright management information."), citing H.R. Rep. No. 105-551 (1998); see also *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, Case No. 18-20350 (5th Cir.2020).

The undisputed evidence shows that when Oppenheimer published the two (2) images at issue, he included his CMI on the face of the images, in the caption adjacent to the images, and within the metadata of the images. Oppenheimer's facial CMI includes a "©" or the word "Copyright" in the lower right corner of the images; CMI in the caption includes a description of the images, proper notice of copyright with Oppenheimer's name and year the image was created and/or registered, as well as the website URL www.performanceimpressions.com; CMI in the metadata includes proper notices of copyright, and notices declaring "All Rights Reserved" in addition to instructions, Oppenheimer's address, phone number, email, and the website URL www.performanceimpressions.com. See **ECF No. 1-6, pp 1-5** and **ECF No. 1-7, pp 1-5**.

Moreover, documents produced by Defendants show an email dated November 10, 2016, from the email address coremarketing@carolinaone.com to sromanosky@carolinaone.com attaching the second image at issue clearly displaying Oppenheimer's CMI ("© 2013 David Oppenheimer") on the face of the work. **ECF No. 51-4.** Defendants also admit that Ms. Romanosky uploaded the images at issue to the Charleston Trident Multiple Listing Service. **ECF No. 85-2, ¶45.** Although Defendants have not produced any of the infringing images in native format (claiming that they no longer maintain any of the original, native format images), because the images as received by Defendants contained Oppenheimer's CMI on their face, they would have also contained Oppenheimer's CMI within the metadata. Clearly though, as displayed on the URL's, Oppenheimer's CMI had been removed from the metadata of the infringing images.

On its own website, carolinaonerealestate.com, Defendants provide a copyright notice stating "©2021 Carolina One Real Estate" and include a notice provision pursuant to the Digital Millennium Copyright Act ("DMCA"). Defendants recognize the importance of copyright law and protecting their own intellectual property. Defendants knew – or had reasonable grounds to know – authors use CMI to protect intellectual property when publishing content online. As such, Defendants knew – or had reasonable grounds to know – that if Oppenheimer was not credited as the author of the images at issue, they would be susceptible to false credit and further unauthorized uses.

## V.    CONCLUSION

For all the reasons stated above, Oppenheimer respectfully requests that the Court DENY Defendants' Motion for Summary Judgment, and for such and other relief as he may be entitled.

Dated: April 25, 2022                    Respectfully submitted,

**ALLEN LEGAL**

By:   /s **Samuel K. Allen**
SC Bar 68552
Federal ID No. 7744
1417 Ashley Road
Charleston, South Carolina  29407
Ofc: 843-481-4000
sam@allenlegal.net

LEJUNE LAW FIRM

By:   _____
Dana A. LeJune
Texas Bar: 12188250
NC Bar: 49025
Scott M. Francis
Texas Bar: 24088795
1225 North Loop W
Suite 825
Houston, Texas  77008
713.942.9898 Phone
713.942.9899 Facsimile
dlejune@triallawyers.net
*Pro Hac Vice Pending*

NORTH CAROLINA OFFICE:
7 Orchard Street
Suite 200
Asheville, NC 28801
828-774-5800 Office

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this the 22nd day of April, I forwarded the foregoing instrument to all opposing parties.

*s/Samuel K. Allen*
Samuel K. Allen